JAMES H. MCCOMAS
Attorney at Law
Of Counsel to
Friedman, Rubin & White
1227 West 9th Avenue, Suite 201
Anchorage, Alaska 99501
(907) 258-0704
Telefax: (907) 278-6449



March 15, 2000

Attorney Averil Lerman
Office of Public Advocacy
900 W. 5th Ave., Suite 525
Anchorage, AK 99501

TEL: 269-3500
FAX: 269-3535

Re: P-CR Application of Patrick Harvey
   3AN-95-2745 CI / 3AN-S93-3568 CR
   /MO&J No. 3489

Dear Ms. Lerman,

    Pursuant to your request, I have reviewed the materials pertaining to Mr. Harvey's application for post-conviction relief.  Specifically, I have read the following documents in their entireties, and I rely on them as the factual basis for my opinions:

        * Indictment

        * Transcript of Grand Jury Proceedings (7/2/93)

        * Transcript of Trial (starting w/Openings; 3/9/94)
        * Transcript of Trial (3/10/94)
        * Transcript of Trial (3/14/94)
        * Transcript of Trial (3/15/94, vols. V & VI)
        * Transcript of Trial (3/17/94)
        * Transcript of Sentencing (4/7/94?)

        * Jury Instructions

* Affidavit of Attorney C.R. Kennely (3/31/95)
* Affidavit of Laurie M. Harvey, mother (8/8/94)
* Affidavit of James Esquivel, son (//94)
* Affidavit of Connie Harvey, wife (8/31/94)
* Affidavit of Jerry A. Shivers & Atts. (8/30/94)

* Transcript of P-CR Hearing (4/26/96)
* Transcript of P-CR Hearing (5/8/96)

* M.O. & J. on direct appeal (11/13/96)

* Affidavit of Moses Schanfield, Ph.D. (12/21/99)

* Opinion letter of D.H. Kaye re DNA (2/14/2000)

* Deposition: Kim McGee, PDA investigator (9/8/95)

* Affidavit of Michael Karnavas, trial counsel (4/3/95)
* Deposition: Michael Karnavas, trial counsel (12/8/98)
* Deposition: Michael Karnavas, trial counsel (12/9/98)

* Discovery re Gary Shaw

* Various trial exhibits & other documents


## OVERVIEW

When he is healthy, Michael Karnavas is an excellent criminal defense attorney. His deposition testimony shows that he has been able, in retrospect, to identify the factors which impaired his representation of Mr. Harvey. Physical, emotional, and mental exhaustion from an unending trial schedule obviously consumed all his reserves. [DEP-MK, 23-46, 84-88, 188-89, 215-16] The result was inadequate case analysis, deficient investigation and preparation, and unacceptably bad judgment in conducting the trial. His uncharacteristic mistakes in this case did not concern subtleties or minor points. As trial counsel himself testified, these were "major oversight[s]," and "simple errors" -- the kind he teaches against in CLEs. [Id., 58 & 84] Because of his exhaustion, trial counsel committed "some glaring errors that are just rookie errors." [Id., 88]

Unfortunately for applicant, these mistakes had an outcome determinative effect on the trial.

## PROCEDURES & STANDARDS

### Statutory and Rule 35.1 Provisions

Applicant is entitled to post-conviction relief if he proves that his convictions were obtained "in violation of the constitution of the United States or the constitution or laws of Alaska."   Alaska Criminal Rule 35.1(a)(1); AS § 12.72.010(1).[1]

The burden of proving ineffective assistance is on applicant.   State v. Jones, 759 P.2d 558, 569 (Alaska App. 1980).   Applicant bears the burden of proving all factual assertions by clear and convincing evidence.   Rule 35.1(g); AS § 12.72.040.   On the other hand, the essential elements of ineffectiveness -- incompetence and prejudice -- need only be proved by a preponderance of the evidence.   Arnold v. State, 685 P.2d 1261, 1264 (Alaska App. 1984).[2]

### Ineffectiveness Standard: U.S. Constitution

The Sixth Amendment to the U.S. Constitution guarantees that the accused in a criminal case shall receive the effective assistance of counsel. Powell v. Alabama, 308 U.S. 444 (1940).  This guarantee applies to state court prosecutions through the 14th Amendment.  Gideon v. Wainwright, 372 U.S. 335 (1963).  An attorney is ineffective, for 6th Amendment purposes, when he performs "below an objective standard of reasonableness;" if that deficiency creates a "reasonable probability" that, but for his errors, the outcome of the trial would have been different, a new trial is required.   Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).[3]

---

[1] The "laws of Alaska" include Criminal Rules promulgated by the Supreme Court, as well as the Alaska Constitution and statutes.  Price v. State, 647 P.2d 611 (Alaska App. 1982).

[2] Since the elements of ineffective assistance of counsel are mixed questions of fact and law, the statutory burden of proving "factual assertions" by clear and convincing evidence does not apply.  See, e.g., State v. Simpson, 946 P.2d 890 (Alaska App. 1997); State v. Laraby, 842 P.2d 1275, 1280 (Alaska App. 1992).

[3] Accord Thompson v. Calderon, 120 F.3d 1045 (9th Cir.) (en banc), cert. denied, 118 S.Ct. 14 (1997); Johnson v. Baldwin, 114 F.3d 835 (9th Cir. 1997); Baylor v. Estelle, 94 F.3d 1321 (9th Cir. 1996); Sager v. Maass, 907 F.Supp. 1412 (D. Or.), aff'd, 84 F.3d 1212 (9th Cir. 1996); Griffin v. McVicar, 84 F.3d

## Ineffectiveness Standard: Alaska Constitution

Art. I, § 11, Alaska Constitution, also guarantees the effective assistance of counsel to one accused of crime. The state right to counsel is denied whenever the trial attorney (1) fails to perform "at least as well as a lawyer of ordinary training and skill in criminal law," and (2) there is at least a reasonable doubt that such ineffectiveness contributed to the conviction. <u>Risher v. State</u>, 523 P.2d 421, 424-25 (Alaska 1974). <u>Accord</u> <u>State v. Simpson</u>, 946 P.2d 890 (Alaska App. 1997). Thus, the prejudice prong of state constitutional ineffectiveness analysis is considerably easier to meet than in federal cases.

## Tactical Justifications

In both state and federal courts, the competence of trial counsel is presumed, and a further presumption is made that an attorney's actions were "motivated by sound tactical considerations." <u>Jones</u>, 759 P.2d, 569; <u>Strickland</u>, 466 U.S., 689. Generally speaking, the presence of a legitimate tactical justification precludes success on the first prong of ineffectiveness analysis. <u>Jones</u>, 759 P.2d, 569.

There are, however, two important exceptions to the "tactical" justification rule. **First**, "a mistake made out of **ignorance** rather than from strategy cannot later be validated as being tactically defensible." <u>Jones</u>, 759 P.2d, 569 (emphasis added); <u>Arnold</u>, 685 P.2d 1265-67; <u>U.S. v. Span</u>, 75 F.3d 1383, 1390 (9th Cir. 1996).

**Second**, if the purported "tactic" is **objectively unreasonable** -- that is, one which "no reasonably competent attorney would have adopted under the circumstances" -- ineffectiveness will be found. <u>Jones</u>, 759 P.2d, 569-70. Simply labeling a decision "tactical" or "strategic" does not create a justification. <u>State v. Hicks</u>, 536 N.W.2d 487, 491 (Wis.App. 1995), <u>aff'd on other grounds</u>, 549 N.W.2d 435 (Wis. 1996). Instead, "[t]rial counsel's decisions must be based upon facts and law upon which an ordinarily prudent lawyer would have relied." <u>State v. Felton</u>, 329 N.W.2d 161, 169 (Wis. 1983). The concept of "tactical decision" itself "implies deliberateness, caution, and circumspection,"

---

880 (7th Cir. 1996); <u>U.S. v. Span</u>, 75 F.3d 1383 (9th Cir. 1996); <u>Byrd v. U.S.</u>, 614 A.2d 25 (D.C.Ct.App. 1992); <u>Nichols v. Butler</u>, 953 F.2d 1550 (11th Cir. 1992) (en banc); <u>Harris v. Reed</u>, 894 F.2d 871 (7th Cir. 1990); <u>U.S. v. Swanson</u>, 943 F.2d 1070 (9th Cir. 1991).

and "must evince reasonableness under the circumstances." <u>Felton</u>, 329 N.W.2d, 169.

## SUMMARY Of OPINIONS

### Instances of Ineffective Representation

Based upon my review of this material, it is my opinion that trial counsel's representation failed to meet the standard of "a lawyer with ordinary training and skill in the criminal law" in the following ways:

1. Failure to Understand & Exclude, Or Effectively to Confront, DNA Evidence.

2. Failure to Request, Obtain & Argue the Cautionary Instruction on Admissions by the Accused.

3. Failure Adequately to Investigate & to Incorporate Investigation in the Preparation and Presentation of the Defense.

4. Failure to Litigate Non-Specific Counts Prior to & At Trial.

5. Failure to Protect Accused From Improper Inferences of Guilt.

### Tactical Justifications

In his deposition, trial counsel admitted that almost none of his challenged acts/omissions arose from, or were supported by, tactical decision-making. Instead, he cited exhaustion, neglect, and ignorance as causes. <u>See</u> "NO TACTIC" sections of points 2-4, <u>infra</u>. The few tactical justifications trial counsel did assert are, in my opinion, objectively unreasonable, and cannot excuse his conduct. <u>Jones</u>, 759 P.2d, 569-70. <u>See</u> "NO TACTIC" sections 1 & 5, <u>infra</u>.

### Prejudice

This was a case which could have been won by either side. K.E.'s credibility was the central pillar of the state's case, and it was subject to considerable doubt, beginning with her prior recantation. The verdict indicates

that the jury believed some, but not all, of her allegations -- applicant was acquitted of two counts of SAM-1.

The state sought to bolster K.E.'s credibility and to corroborate her claims by two separate, subsidiary pillars -- (1) the DNA evidence and (2) applicant's "love letter" to K.E. Even rudimentary case analysis would identify, and recognize the importance of undermining, these two supports for the complainant's accusations. An effective defense approach would necessarily focus on knocking out both of these supports. No effective strategy was planned or executed here.

In my opinion, counsel's unjustified ineffectiveness resulted in prejudice that meets both the federal and state standards. For the reasons stated below, each of the five areas of ineffectiveness independently raise at least a reasonable doubt that trial counsel's conduct contributed to applicant's convictions on Counts III-X. <u>Risher, supra</u>. Under the federal standard, areas 1, 3 & 4 are independently sufficient to create a "reasonable probability" that, but for those errors, the outcome of the trial would have been different. <u>Strickland, supra</u>.

## SPECIFIC INSTANCES Of
## <u>UNJUSTIFIABLE & PREJUDICIAL INEFFECTIVENESS</u>

### 1. Failure to Understand & Exclude, Or Effectively to Confront, <u>DNA</u> Evidence.

### <u>FACTS</u>:

The prosecution proffered the DNA evidence in its opening statement as corroborative of K.E.'s claim that applicant engaged in sexual intercourse with her. [TR-Tr. 67-69] In his opening, trial counsel nearly forgot to address the DNA evidence at all, and then simply said it was "hogwash." [<u>Id</u>., 75]

The DNA "facts" presented to the jury arose from the comparison of known blood samples from applicant and K.E. with a sample of fetal tissue that had been preserved for a different purpose from K.E.'s abortion on November 19, 1991. [TR-Tr. 343-45]

<u>Harvey</u> - 6

The state's DNA analysis was done at the LifeCodes lab, and its expert witness was Michael Baird, Ph.D., the vice president of lab operations. He testified that analysis of Chromosome #6 (HLADQ alpha) revealed that applicant had alleles 1.1 & 1.3, and K.E. had 4. & 4. [TR-Tr. 431] The fetal tissue sample showed alleles 1.1 and 4. [Id.] Dr. Baird testified applicant could not be excluded as the father, and that the 1.1 allele was present in about 13% of the Caucasian population. [Id., 435]

Dr. Baird also described PCR testing which was done on a region of Chromosome #1 known as D1S80. [TR-Tr. 436] Applicant was typed 18, 24; K.E. was 24, 25; the fetal sample was 18, 24, 25. [Id., 438] Only two alleles should have been present -- one from the mother, one from the father -- so Dr. Baird assumed some of the mother's tissue was mixed in with the fetal sample. [Id.] Based on the D1S80 testing, Dr. Baird said applicant could not be excluded as the biological father. [Id., 438]

Based on a statistical analysis of both tests, Dr. Baird computed applicant's probability of having fathered K.E.'s fetus to be 87.34%. [TR-Tr. 439] This figure is called the "probability of paternity," and will be referred to hereinafter as "PoP." The 87% PoP was derived by using Bayes' Theorem to combine the paternity index discussed below with "the non-genetic odds in favor of paternity." [Id., 441] According to Dr. Baird, the non-genetic odds were set by "using a neutral position of 50%..." [Id.]

Dr. Baird computed the "paternity index" -- hereinafter "PI" -- to be 6.9. He explained that the PI tells the "genetic odds in favor of paternity," and that applicant's odds were almost 7 times greater than for a "random person." [Id., 439-40] He testified that "the genetic odds in favor of paternity are 6.9 times more likely that [applicant] is the biological father than a random Caucasian person of the population." [Id., 441-42]

By trial counsel's own assessment, his cross-examination of Dr. Baird was "pathetically weak." [DEP-MK, 54] He elicited that there had been some problems with DNA testing in the early days, including at LifeCodes. [TR-Tr. 446] Counsel emphasized that the statistical evidence assumed applicant was Caucasian, [id., 458], although applicant certainly appears to be Caucasian and there was no contrary evidence. Counsel questioned Dr. Baird about Alaska's inapplicable statutory presumption of paternity in civil cases. [Id., 455-58]

**INEFFECTIVE:** Although, prior to trial, he received written reports from LifeCodes, trial counsel never learned about or understood the state's DNA

evidence. He did no research, and failed to make any effort to exclude or limit the state's DNA evidence and related testimony. He was oblivious to the existence and significance of physical evidence that the fetal tissue sample had been contaminated. He never learned about or understood the potentially unconstitutional assumption underlying the 87% PoP figure. He never learned about or understood what conclusion could validly be drawn from the PI, and where the state's expert and argument exceeded that limit of validity.

Trial counsel's very brief, informal chat with Barry Scheck was not an adequate substitute for preparing the DNA aspect of the case. [DEP-MK, 50-51, 230-31] Notwithstanding that contact, it is clear from the transcript that defense counsel did not even understand the meaning of the words and concepts contained in the original lab reports and in Dr. Baird's testimony.

Although this highly technical genetic and statistical evidence constituted half of the "corroboration" for K.E.'s accusations, trial counsel did not substantively consult with a qualified expert on DNA until he was already in trial. [DEP-MK, 51-54] He characterized this belated effort as "sort of an afterthought. [Id., 53] This was far too little, way too late. Trial counsel himself graphically described his cross-examiantion of Dr. Baird as "pathetically weak," and admitted feeling "a little panicky" about the DNA evidence. [Id., 54]

Competent counsel would have appreciated the significance of an 87% PoP to a lay jury. Even without other evidence, that figure approximates some jurors' understanding of proof beyond a reasonable doubt. As merely corroborative evidence, both the PoP and the PI "genetic odds" are powerful numbers.

With this in mind, competent counsel would identify, research and investigate -- well before trial -- (1) grounds for excluding or limiting the evidence, (2) ways to undermine the testing process and statistical conclusions on cross-examination, and (3) a qualified DNA expert, with whom to consult/use as an expert witness.

Regarding exclusion/limitation of the evidence, trial counsel was told by his own expert, Dr. Moses Schanfield, that PoP figures had been held inadmissible in criminal cases in various states. [Schanfield Aff., 12/21/99] This communication occurred three months before trial, and was apparently ignored by trial counsel. Competent counsel would have followed up this tip with legal research. Had he done so, trial counsel would have found analysis and authority to support a motion to exclude the state's DNA testimony. See,

e.g., <u>State v. Bible</u>, 858 P.2d 1152, 1184-89 (Ariz. 1993) (In Banc) (DNA random match probability calculation and testimony inadmissible); <u>State v. Skipper</u>, 637 A.2d 1101, 1103-08 (Conn. 1994) (PoP based on Bayes' Theorem inadmissible; conviction reversed); <u>State v. Spann</u>, 617 A.2d 247 (N.J. 1993) (same; new trial ordered); <u>State v. Hartman</u>, 426 N.W.2d 320, 326 (Wis. 1988) (same; reversed).[4]

Moreover, just by reading these cases, by consulting with his own expert in a meaningful way, and/or by reading up on the PI & PoP, competent counsel would have learned enough about those statistics to prepare and conduct an effective, substantive cross-examination of Dr. Baird.

For example, competent counsel would demonstrate that the 87% PoP depends upon a wholly unsupported presumption that there is substantial evidence that applicant is guilty of having intercourse with K.E. He would show that the non-genetic odds in favor of paternity were not "neutral," as Dr. Baird claimed, but instead assumed a substantial likelihood -- 50% -- of applicant's guilt. <u>Spann</u>, 617 A.2d, 252-53; D.H. Kaye letter 2/14/2000. Dr. Baird would have had to admit the gross inconsistency between this mathematical assumption and the required, 100% presumption of applicant's innocence. <u>Skipper</u>, 637 A.2d 1107-08. Similarly, a competent, prepared attorney would show that the PoP is inherently circular, and therefore unhelpful and unfair. Since the PoP formula <u>assumes</u> a substantial (50%) likelihood that applicant had sex with K.E., it cannot properly be used to prove the very fact that it assumes. <u>Hartman</u>, 426 N.W.2d, 326.

Competent counsel would also have learned enough to undermine Dr. Baird's rather expansive testimony about the meaning of the PI. Baird's insistence that the PI means applicant is 6.9 times more likely to be the father than a randomly selected man is flat wrong. What the PI actually means is that **all** of the 78,000 Alaskan men, or of the millions of American men, having applicant's genotypes are 6.9 times more likely to father a child with the specified genotypes than a randomly selected man would be. [D.H. Kaye opinion letter, 3, 6] Conversely, the PI is the relative probability of the genetic evidence occurring, <u>given</u> that the tested man <u>is</u> the biological father; it is not the "odds" that the tested man is the father, given the biological evidence. [<u>Id.</u>, 10]

---

[4] <u>See also</u> <u>Plemel v. Walter</u>, 735 P.2d 1209, 1215-19 (Ore. 1987) (en banc) (PI admissible, but strict limits on testimony and contemporaneous disclosure requirements imposed).

Dr. Baird's testimony about the PI should have been successfully challenged, because it was based on the transposed conditional, also known as the "inverse fallacy." Plemel, 735 P.2d, 1217-18; D.H. Kaye letter, 3. Overstatement of the PI converts it into an invalid PoP, based on the unstated, 50% assumption that the accused engaged in intercourse with the complainant. Plemel, 735 P.2d, 1215.

Finally, competent counsel would have learned that the presence of an extra allele on Chromosome #1 means the fetal tissue sample was contaminated. Dr. Baird's assumption that the contamination was due to mixing fetal and maternal tissue in collecting the sample is certainly possible, but there are other possibilities as well. No one can prove where along the chain of custody the contamination actually did or did not occur. [D.H. Kaye letter, 5] This circumstance provided counsel with a promising basis for objecting to admission of the PCR test results, and, if admitted, for cross-examining Dr. Baird.

Here, counsel violated the first rule of effective representation --

> A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

Alaska Rule of Professional Conduct, Rule 1.1(a).

> In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question, the preparation and study the lawyer is able to give the matter and whether it is feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field in question. In many instances, the required proficiency is that of a general practitioner. Expertise in a particular field of law may be required in some circumstances.

Comment to Alaska Rule of Professional Conduct, Rule 1.1(a).

> Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation. The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more elaborate treatment than matters of lesser consequence.

Comment to Alaska Rule of Professional Conduct, Rule 1.1(a).

**NO TACTIC:** Trial counsel took contradictory positions on whether his failure to prepare to meet the DNA evidence was the result of a tactical decision. On one hand, he asserted that the potential inadmissibility of the statistical evidence "never occurred" to him. [DEP-MK, 98-99] He admitted he should have discovered and raised grounds to exclude this evidence, noting that such litigation would, at least, have produced a specific explanation of just what technical testimony the state was offering. [Id., 100-01] He testified his failure to do so "was wrong," and "a stupid decision on my part." [Id., 101]

Similarly, trial counsel admitted having been unaware of the 50% assumption of guilt contained in the PoP calculation until applicant's current counsel told him about it at his deposition. [DEP-MK, 103] Concomitantly, he was previously unaware of the state court authority precluding use of the PoP in criminal cases. [Id.] He had no tactical reason for failing to cross-examine Dr. Baird about the problem with applying Bayes' Theorem to prove the guilt of a presumptively innocent accused. [Id., 263] When asked for an explanation for this failure, trial counsel replied, "How about ignorance? ... You can underscore that." [Id.]

Of course, "a mistake made out of **ignorance** rather than from strategy cannot later be validated as being tactically defensible." Jones, 759 P.2d, 569 (emphasis added); Arnold, 685 P.2d 1265-67; U.S. v. Span, 75 F.3d 1383, 1390 (9th Cir. 1996).

On the other hand, at other points in his deposition, trial counsel claimed he made a strategic decision not to exclude the DNA evidence. [DEP-MK, 233-34; 260-61] The purported tactic was to let the DNA evidence in, beat up Dr.

Baird on cross, and then argue that the state's whole case must be weak since they relied on weak DNA evidence. [Id.]

This excuse founders on three independently sufficient points. First, it is contradicted by trial counsel's own testimony at the same deposition, admitting he erred. [DEP-MK, 98-103]  Second, trial counsel did virtually nothing to pursue this belatedly claimed strategy.  He made no effort to learn about or understand what the state's expert would actually say, nor to find out how the statistical conclusions were reached.  Therefore, he could not, and did not, prepare and conduct, a devastating cross-examination of Dr. Baird.  [Id., 102-03, 263]  Instead, he produced a "pathetically weak" examination, which left counsel feeling a "little panicky."  [Id., 52-54]

Third, this quasi-sponsorship "tactic" is not objectively reasonable in a winnable case.  It is even more unreasonable where, as here, it is invoked as to one of only two categories of corroboration for the solitary accuser's testimony. Fourth, it is objectively unreasonable to stand idle while the prosecution introduces contestable "scientific" evidence that one's client is 87% likely to be guilty of Count VI, even in the absence of any other evidence against him.

Simply labeling a decision "tactical" or "strategic" does not erect a justification.  State v. Hicks, 536 N.W.2d 487, 491 (Wis.App. 1995), aff'd on other grounds, 549 N.W.2d 435 (Wis. 1996).  Instead, "[t]rial counsel's decisions must be based upon facts and law upon which an ordinarily prudent lawyer would have relied."  State v. Felton, 329 N.W.2d 161, 169 (Wis. 1983). If the purported "tactic" is **objectively unreasonable**, ineffectiveness will be found.  Jones, 759 P.2d, 569-70.

In Hicks, the accused, an African-American man, was prosecuted for burglary, robbery, and sexual assault in the home of the white complainant. Hicks' defense was mistaken identification/alibi.  The principal corroboration for the identification was the recovery of Negroid head and pubic hairs from the complainant's apartment, and of a Caucasian head hair from Hicks' pants two days after the offense.  The state's hair expert testified the Negroid hairs were consistent with, and could have originated from, Hicks.  Similarly, the Caucasian head hair was consistent with, and could have originated from the complainant.  Post-conviction DNA testing **excluded** Hicks as the source of all Negroid hairs susceptible to DNA analysis.

On appeal, trial counsel was found ineffective for not submitting the questioned head/pubic hair samples to an independent lab for DNA analysis prior

to trial.  Hicks, 536 N.W.2d, 490-92.  Rejecting a claim that the failure to have the hairs examined was a reasonable strategic decision, the Court said that any appropriate action trial counsel had taken would "not [have been] inconsistent with" his announced trial strategy.  The Court concluded, "We can see no reason that he needed to elect one or the other."  Hicks, 536 N.W.2d, 491.  The same observation can, and should, be tellingly made in the present case.

**PREJUDICE:**  Trial counsel's failure to exclude, limit or meaningfully confront Dr. Baird's testimony was obviously prejudicial.  The result was that the validity of one of only two areas of corroborative evidence was functionally conceded to the prosecution.  By the time of closing argument, the state had unimpaired -- though misleading -- evidence that applicant was 7 times more likely than a random man to have been the father, and that there was an 87% probability that he, and he alone, was guilty, at least, of Count VI.

Trial counsel's later presentation of telephonic testimony from Dr. Schanfield -- "sort of an afterthought," and pulled together after the disaster on cross [DEP-MK, 52-54] -- did not begin to undo the damage.  Dr. Schanfield's testimony explicitly identified the state's PI number as "accurate," and the extrapolation from it as "prejudicial."  [TR-Tr. 493-94]  Because he was unprepared and did not understand the facts or issues, trial counsel failed to elicit how Dr. Baird's testimony about the PI was based on the transposed conditional/inverse fallacy. Because he was unprepared and did not understand the facts or issues, trial counsel failed to elicit an explanation of the 50% presumption of guilt built into Dr. Baird's PoP calculation.

### 2.  Failure to Request, Obtain & Argue the Cautionary Instruction on Admissions by the Accused.

**FACTS:** Other than the DNA evidence, the only corroboration for K.E.'s accusations consisted of the "love letter" written by Mr. Harvey to K.E. while he was working in Kodiak.  [St.'s Trial Exs. 1 & 2; TR-Tr. 89, 282-83]  Trial counsel perceived the potential harm the letter could do to his effort to achieve acquittal.  [DEP-MK, 85]  Additionally, K.E. testified to a number of oral admissions she claimed applicant made to her.  [TR-Tr. 87, 93, 95-96, 98, 237, 266, 272-74, 285]

Trial counsel failed to discover readily available facts which would have helped dilute the impact of the letter.  He also failed to request, obtain, and argue, the pattern instruction on an accused's admissions.  That instruction was

first given to the jurors by the Court, <u>sua</u> <u>sponte</u>, **after** they announced that they had reached a verdict. [TR-Tr. 806-10]

**INEFFECTIVE:**   Competent counsel would have pursued factual and legal strategies in dealing with this important piece of evidence.  By contrast, trial counsel made only a limited effort at a factual response.  He did introduce the letter Mr. Harvey had sent to K.E., his wife and his son shortly before sending St.'s Ex. 1 & 2 to K.E. alone. [Def. Tr. Ex. T; TR-Tr. 184-88]  In this way, counsel endeavored to establish some context for the latter epistle -- applicant's first letter was stern and harsh, so he followed it with an effort to reassure K.E. she was still loved.

There were additional, and potentially even more helpful, facts available. Applicant's step-mother, Laurie M. Harvey, would have testified that the use of affectionate terminology was a normal part of their intra-family communication. [Laurie Harvey Aff., 8/8/94]  Calling each other "baby," "honey" or "darlin'" was just apart of their upbringing and family custom.  [<u>Id.</u>]  Unfortunately, neither defense counsel nor the defense investigator ever interviewed Ms. Harvey, and so the familial context and custom facts were never discovered.

On the legal front, any competent attorney would have requested, obtained, and argued the part of the pattern instruction dealing with admissions. That instruction would have informed the jurors that an "admission" is "itself not sufficient to warrant an inference of guilt," that they are the "exclusive judges" of whether an accused's statement is an admission, that they "must reject" any admission they find to be untrue, and that an oral admission "ought to be viewed with caution."   Pattern Crim. Jury Instn. No. 1.24 (Admission/Confession); <u>Wilson v. State</u>, 670 P.2d 1149, 1153 (Alaska App. 1983).

Although Criminal Rule 30 no longer requires trial judges to give any part of the admissions instruction <u>sua</u> <u>sponte</u>, prior Alaska case-law establishes the importance of giving such a charge, particularly when the admission is a significant component of the state's case.  <u>See, e.g.</u>, <u>Stork v. State</u>, 559 P.2d 99, 102-03 (Alaska 1977) (admission was "substantial factor" in state's case); <u>Bakken v. State</u>, 489 P.2d 120, 123, 125 (Alaska 1971) (admission played "crucial role" by corroborating questionable complainant).  <u>Accord</u> <u>Osborne v.</u> <u>Russell</u>, 669 P.2d 550, 558 n.11 (Alaska 1983) (even more elaborate civil instruction on admissions is "a correct statement of law").[5]

---

[5] When the accused testifies at trial, denying, admitting, and explaining the alleged admissions, the importance of giving the instruction is diminished.

Obviously, the trial judge would have included the admissions charge in the final jury instructions had trial counsel asked him to do so.  Indeed, the Court belatedly gave the instruction, <u>sua</u> <u>sponte</u>, **after** the jury had already reached its verdict.  [TR-Tr. 806-10]

**NO TACTIC:**  Trial counsel admits he had no tactical reason for failing to request, obtain, and argue the admissions instruction.  [TR-Tr. 81-82]  He agrees that his failure to do so was an unjustifiable "oversight."  [<u>Id</u>., 82]  He "should have known, and [] knew better," [Id., 84], and described his failure in this regard as "almost sad."  [<u>Id</u>.]

**PREJUDICE:**   Aside from the DNA evidence, the letter/alleged admissions were the only corroboration for K.E.'s accusations.  Trial counsel recognized that his failure to obtain and argue the admissions instruction was prejudicial to applicant's case.  [DEP-MK, 85-86]  That failure could have made the difference between conviction, on the one hand, and acquittal of a hung jury on the other.  [<u>Id</u>., 86]

At his deposition, trial counsel described the admissions instruction as a "critical instruction" in dealing with the letter, calling it a "pretty powerful jury instruction, especially when you got to deal with an admission by the client." [DEP-MK, 85, 222]  He should have used it during his closing argument to undermine the impact of the letter.  [<u>Id</u>., 85, 224]  Trial counsel had obtained and <u>successfully</u> used the instruction in "many, many" of his prior cases.  [<u>Id</u>., 224-26, 256-58]

Obviously, the trial court's <u>sua</u> <u>sponte</u> provision of the charge to the jury **after** they had reached their verdict, and in the absence of any further argument to the jury by counsel, could not undo the harm.

### 3.  Failure Adequately to Investigate & to Incorporate Investigation in the Preparation and Presentation of the Defense.

**FACTS:**  K.E. and the prosecution portrayed her as an innocent, naive victim of persistent sexual molestation by her second step-father, applicant.  She claimed the first act of intercourse occurred in California, when she was in 7th

---

<u>Alexander v. State</u>, 611 P.2d 469, 477-83 (Alaska 1980).  In the present case, applicant did <u>not</u> testify at trial.

grade -- about 12 years old. [TR-Tr. 83-84] In her story, K.E. was having sex in Alaska only with applicant, so only he could have been the father of the fetus she aborted. [Id., 93, 132] She's so naive about sex, that she misuses the term "oral sex" to refer primarily to her hand rubbing his penis, and/or to everything other than penile/vaginal intercourse. [Id., 86, 94, 280-81] Anything she wrote or said about having sex with anyone else was pure "fantasy," which was for herself alone -- she never sent any letters discussing or describing sexual experiences to anyone. [Id., 200-08, 310-11] Amazingly, she didn't even know how or where she learned enough about romantic "making love" to enable her to fantasize about it. [Id., 279, 309-10]

This image was further promoted by the inclusion in K.E.'s testimony of a number of purportedly self-verifying claims. Such phrases can be heard by jurors as containing the ring of truth, since they seem to require an actual experiential basis on the part of the declarant --

> * being frequently subjected to cunnilingus;
>
> * complaining that intercourse hurt, resulting in the use of vaseline, and advice to put her knees up during coitus;
>
> * articulating the difference between "rape-sex" and romantic "making love;" and
>
> * reporting that fellatio made her sick.

[TR-Tr. 86-87, 87, 279, 309-10, 231-33]

Next to this picture, K.E. and the prosecution placed a snapshot of a mother, applicant's wife, who was a cold-hearted, uncaring "bitch," with no desire to protect her child. [TR-Tr. 168, 297-98]

By contrast, the defense contended that applicant never engaged in sexual conduct with K.E. Her false accusations were designed to get her out of the socially limited, strict, and rule-bound environment of applicant's home. K.E. never wanted to move to Alaska in the first place, and urgently wanted to find a way to return to California, so that she could be with her friends there, her former boyfriend, Jared, and enjoy the free social and sexual life applicant and her mother denied her. The defense contended that her pregnancy in the fall of 1991 resulted from her sexual relations with an older boy in Alaska.

There was abundant, powerful evidence readily available to the defense to support its claims, but which the jury never heard. Some of this evidence was known to the defense at the time of trial, and simply not used. Some was known to the very witnesses called by the defense at trial, but neither discovered in, nor elicited from, them. Remarkably, the <u>facts</u> imbedded in some of this evidence were vaguely raised or insinuated during K.E.'s cross-examination. These suggestions were met with denials by K.E., and the defense never confronted her with, nor attempted to introduce, the readily available contrary evidence.

### <u>Known to the Defense, but Not Used:</u>

(1) Jay would drive K.E. to her friends' houses in Alaska, including her boyfriends' houses, and, at her request, Jay would not tell their parents. This created the opportunity for K.E. to engage in sexual activity with boys outside the home. [James Esquivel, Aff., 1994][6]

(2) K.E. told her California cousin, Summer Fabrizio, that she had sex with "Chris," and was concerned about being pregnant. This was around the time that K.E. did, in fact, become pregnant. [DEP-MK,178-82 & Dep-X 7][7]

(3) K.E. pointed out the 17 year old boy who got her pregnant in 1991 to her brother, Jay. [DEP-McG, 37; DEP-MK, 133-34; James Esquivel Aff., 1994][8]

(4) K.E. "dumped" Errol Bressler as her boyfriend, because he refused to meet her at her friend Mindy's house and spend the night with her there. [DEP-McG, 30][9]

---

[6] Trial counsel's focus in questioning K.E. about her brother Jay was on her failure ever to report to him her claims that applicant was abusing her. [TR-Tr. 176-79]

[7] Trial references to, and the testimony of, Summer Fabrizio were limited to K.E.'s failure to report the alleged abuse to her. [TR-Tr. 164-65, 202-03] Worse, K.E. was permitted to testify, without confrontation, that she never told Summer who got her pregnant. [TR-tr. 236]

[8] On cross, K.E. denied ever identifying to Jay the 17 year old who got her pregnant. [TR-Tr. 237] Instead, she testified she pointed out a boy, who was saying bad things about her at school, to Jay. [<u>Id.</u>, 238]

[9] By contrast, on cross trial counsel elicited only that K.E. lost an unnamed boyfriend because her house rules were so strict. [TR-Tr. 208-11]

<u>Harvey</u> - 17

(5) K.E. repeatedly admitted to Jerry Shivers that she had sex with, and lost her virginity to, Jared in California, when she was 12 years old. [PCR-Tr. 16-17, 29-30; DEP-McG, 15-18; DEP-MK, 139, 177-78; DEP-X __; Jerry Shivers Aff.,   8/30/94]  Significantly, this is the precise timeframe in which K.E. testified that applicant first had intercourse with her.[10]

(6) K.E. <u>was</u> sexually abused by her first stepfather, Gary Shaw, in California, when she was 7 years old.   In contrast to the undifferentiated, generic allegations in the Harvey case, 7 year old K.E. was able to identify, distinguish, and report at least three specific incidents of abuse by Shaw.   These incidents included cunnilingus, attempted fellatio, vaginal fondling, and attempted intercourse -- the same conduct K.E. later attributed to applicant. Shaw also showed her pornographic magazines. As with the present allegations, the abuse occurred at home, when her mother was at work and Jay was asleep or at a friend's house. K.E.'s mother was cited for failure to protect her, and the children were placed with their maternal grandmother.   [K.E./Shaw discovery; DEP-McG, 39-42] All K.E. had to do to fabricate sex abuse claims against applicant was to use her experience with Shaw as a template, and change the name of the "abuser."[11]

Although the defense called Jay Esquivel, Summer Smith, and Jerry Shivers as witnesses at trial, <u>**none**</u> of this evidence was introduced by the defense at trial.

### <u>Known to Defense Witnesses, but Never Discovered and Used:</u>

(1) Letter from K.E. to Jerry Shivers, 5/4/92 -- concerning K.E. talking to Jared on phone yesterday.  [DEP-MK, 147-52; DEP-X 3][12]

---

[10] On cross, K.E. insisted, successfully, that her writing to herself about sex and Jared was pure "fantasy." [TR-Tr. 205-06]

[11] Trial counsel's only mention of the prior abuse was in his opening statement. Since he had not made prior application under AS 12.45.045, he was immediately cut-off. [TR-Tr. 41] The lengthy debate which then ensued, out of the presence of the jury, and much later resumption of his opening sapped it of much of its effectiveness.

[12] The full extent of trial counsel's cross of K.E. regarding what papers of hers he did have was to elicit the absence of any claims of sexual abuse in the documents, and the presence of her "fantasies" about romantic "making love."

(2) Letter from K.E. to Jerry Shivers, 4/20/92 -- K.E. complaining about strict house rules. [DEP-MK, 155-56; DEP-X 18]

(3) Letter from K.E. to Jerry Shivers, 4/6/92 -- K.E. coaches Jerry on how to lie to her parents concerning having had sex. [DEP-MK, 157-59; DEP-X 19]

(4) Letter from K.E. to Jerry Shivers, 5/4/92 -- K.E. unhappy; it's been one year since she arrived in Alaska. [DEP-MK, 160; DEP-X 4]

(5) Letter from Jessica Obermeyer to K.E., 12/22/92, <u>shortly before K.E. makes the report</u> resulting in this case -- Jessica thinks Jared still likes K.E. Jessica wishes K.E. would move back to California. [DEP-MK, 162-63; DEP-X 5]

(6) Letter from K.E. to Jerry Shivers, 7/5/93, <u>after K.E.'s report and return to California</u> -- K.E. had sex with Keith three times yesterday, and she failed to "protect" herself. [DEP-MK, 168-70; DEP-X 9] This is the conclusive piece of motive evidence. For K.E., it is now "mission accomplished."

Although the defense called Jerry Shivers as a witness at trial, the defense learned about **none** of this information prior to verdict. **None** of this evidence was presented by the defense at trial.

### INEFFECTIVE:

The American Bar Association has long recognized a criminal defense attorney's duty to investigate the case.

> Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.

ABA Standards for Criminal Justice: Prosecution and Defense Function, Standard 4-4.1(a) (3d ed. 1993). Investigation is crucial, because "[f]acts form the basis of effective representation. Effective representation consists of much

more than the advocate's courtroom function per se." Commentary to Standard 4-4.1, 181.

There is, of course, an intimate connection between the thoroughness of an attorney's pretrial investigation and the effectiveness of his advocacy at trial.

> **Effective investigation by the lawyer has an important bearing on competent representation at trial,** for without adequate investigation the lawyer is not in a position to make the best use of such mechanisms as cross-examination or impeachment of adverse witnesses at trial. The lawyer needs to know as much as possible about the character and background of witnesses to take advantage of impeachment. The effectiveness of advocacy is not to be measured solely by what the lawyer does at the trial; **without careful preparation, the lawyer cannot fulfill the advocate's role. Failure to make adequate pretrial investigation and preparation may also be grounds for finding ineffective assistance of counsel.**

Commentary to Standard 4-4.1, 183 (emphasis added).

Alaska law is in accord. "Ideally, a thorough pretrial investigation should be conducted by the defense in all criminal cases." State v. Jones, 759 P.2d 558, 569 (Alaska App. 1988). Defense counsel's failure promptly to investigate and thoroughly to prepare will often deny the accused his constitutional right to the effective assistance of counsel. See Powell v. Alabama, 287 U.S. 45 (1932) (reversed); Arnold v. State, 685 P.2d 1261, 1265-67 (Alaska App. 1984) (reversed); Jackson v. State, 750 P.2d 821,825-27 (Alaska App. 1988) ("clearly inadequate" investigation held harmless).

Of course, one of the reasons to conduct a pretrial investigation is to learn the facts of the case. These facts are the building blocks of defense theory and trial strategy. Alaska appellate courts have held that trial counsel's failure sufficiently to familiarize himself with the facts of felony cases constitutes ineffective assistance. Arnold, 685 P.2d, 1266-67 ("minimal knowledge of the facts"); Jackson, 750 P.2d, 824-26.

Even under the more forgiving federal standard, the "adversarial testing process" "generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies. '[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" Kimmelman v. Morrison, 477 U.S. 365, 384 (1986) (holding counsel ineffective), quoting Strickland v. Washington, 466 U.S., 691. Accord Thompson v. Calderon, 120 F.3d 1045, 1053-56 (9th Cir. 1997) (en banc), rev'd on other, procedural grounds, 523 U.S. 538 (1998); Johnson v. Baldwin, 114 F.3d 835, 838-40 (9th Cir. 1997); Baylor v. Estelle, 94 F.3d 1321, 1323-25 (9th Cir. 1996); Harris v. Reed, 894 F.2d 871, 877-78 (7th Cir. 1990).

Here, the investigation did not begin in earnest until the eve of trial. [DEP-MK, 153]  In the rush, readily available exculpatory evidence was overlooked by trial counsel and/or his investigator.  A lack of adequate communication and preparation resulted in trial counsel's ignoring and/or forgetting substantial, available exculpatory evidence.  Important facts uncovered by his investigator, and disclosed by the state, just never made it into his comprehension of the case.  In turn, that information never made it into his evidentiary presentation at trial.

Given the positions of the parties, and the rulings by the judge on similar issues, there is little doubt that, if proffered, the evidence summarized in the FACTS section above would have been admitted.  None of it would have been offered to imply that K.E. consented to the sex acts alleged -- a proposition which, if true, would result in conviction on all counts, because consent is no defense to SAM.  Accordingly, the principal policy behind, and provisions of, Alaska's rape-shield statute would not bar admission.  See AS 12.45.045; Kvasnikoff v. State, 674 P.2d 302, 306 (Alaska App. 1983).

Alaska appellate courts have consistently construed the statute to permit admission of a sex complainant's prior sexual conduct when such conduct is **relevant** to some real issue in the case.  See, e.g., Napoka v. State, ___ P.2d ___, 2000 WL 193541 (Alaska App.); Bibbs v. State, 814 P.2d 738 (Alaska App. 1991); Daniels v. State, 767 P.2d 1163 (Alaska App. 1989); Jager v. State, 748 P.2d 1172, 1175-76 (Alaska App. 1988); Baden v. State, 667 P.2d 1275 (Alaska App. 1983).

Here, if proffered, the evidence would have been admitted, because it was relevant to a number of issues in the case, including the following:

**(1)    K.E.'s bias and motives to fabricate charges against applicant.**

Daniels, 767 P.2d, 1165-67 & n.2; People v. Hackett, 365 N.W.2d 120, 124-25 (Mich. 1984), cited with approval in Jager, 748 P.2d, 1177 n.3.

**(2)    K.E.'s detailed knowledge of sexual acts, and her feelings about participating in such sexual acts with a step-parent, did not necessarily arise from abuse committed by applicant.**

Bibbs, 814 P.2d, 738-41; LaJoie v. Thompson, 201 F.3d 1166, 1174 (9th Cir. 2000).[13]

**(3)    K.E. fabricated her accusations about applicant, and learned how to play and articulate the "victim" role, from her abusive experience with Gary Shaw.**

Baden, 667 P.2d, 1280; Brown v. Com., 510 S.E.2d 751 (Va.App. 1999).

**(4)  K.E. fabricated her first claim of intercourse with applicant in California from her own sexual intercourse with, and loss of virginity to, her boyfriend Jared.**

Baden, 667 P.2d, 1280; Brown v. Com., supra.

**(5)  K.E. was not the naive, cowering molestation victim, whose only sexual interest was to fantasize about "making romantic love" with imaginary boys, while languishing in her room, awaiting the next criminal assault.**

Napoka, 2000 WL 193541, at 6.

**(6)  K.E.'s own conduct and written/spoken statements were inconsistent with her claim of being subjected to constant, full-scale sex abuse.  Compare her non-specific current allegations with the event-specific report she made, at age 7, against Shaw.**

Napoka, supra; Clinebell v. Com., 368 S.E.2d 263, 264 (Va. 1988); Brown v. Com., supra; State v. LaClair, 433 A.2d 1326, 1328-29 (N.H. 1981).

---

[13] Accord State v. Budis, 593 A.2d 784, 791-92 (N.J. 1991); State v. Pulizanno, 456 N.W.2d 325, 335 (Wis. 1990); State v. Carver, 678 P.2d 842, 843-44 (Wash. App. 1984).

**(7)  Other possible sexual partners could have impregnated K.E. in the fall of 1991.**
LaJoie v. Thompson, 201 F.3d 1166, 1174 (9th Cir. 2000) (admitted to provide alternative explanation for medical evidence); Heflin v. State, 643 So.2d 512, 515-16 (Miss. 1994); Com. v. Majorana, 470 A.2d 80 (1983); People v. Martinez, 634 P.2d 26 Colo. 1981) (En Banc).

**(8)  To show that K.E. not only knew of, but had personally used, the social services system to make report of sexual abuse, resulting in a significant change in her living situation.**
State v. Lampley, 859 S.W.2d 909, 910-12 (Mo.App. 1993).

**(9)  To correct K.e.'s false testimony that she dod not have sex with Jared, and did not know where she had learned about romantic "making love."**
See State v. LaClair, 433 A.2d 1326, 1328-29 (N.H. 1981); Clinebell v. Com., supra; Brown v. Com., supra.

**(10)  To corroborate Connie Harvey's testimony that her immediate removal of K.E. from her home and placement with her aunt, after K.E.'s first report of touching by applicant in 1989, was intended as a responsible act to protect K.E.**

Here, applicant's constitutional rights to confrontation, compulsory process, and due process were all abridged by his own attorney's failures. Where, as here, trial counsel fails to present exculpatory, complainant-impeaching, and/or defense-corroborating testimony from available witnesses, ineffectiveness is frequently found, even under the more stringent federal standard.  See, e.g., State v. Simpson, 946 P.2d 890 (Alaska App. 1997); Thompson v. Calderon, 120 F.3d 1045 (9th Cir.) (en banc), cert. denied, 118 S.Ct. 14 (1997); Baylor v. Estelle, 94 F.3d 1321 (9th Cir. 1996); Byrd v. U.S., 614 A.2d 25 (D.C.Ct.App. 1992); Harris v. Reed, 894 F.2d 871 (7th Cir. 1990).

**NO TACTIC:**  The deposition testimony of trial counsel and of his investigator reveals a fundamental breakdown at the investigation/preparation stages of this case.  Trial counsel admits as much.  Doubting there could possibly be any "tactical" excuse for not at least proffering this evidence, he attributed his failure to remember or find, and to use, this information to oversights and/or exhaustion.  [DEP-MK, 185-87]

Trial counsel was already to preparing to leave the PDA when applicant's case came in. [DEP-MK, 188] He didn't like applicant, and believed he was guilty, until he heard the complainant's testimony in trial. [Id., 74-76 Although applicant was adamant about his innocence, and there is no documentary evidence of any plea offer even as low as a B-felony, trial counsel believed the case would plead out at the C-felony level. [Id., 61-65, 70-71] Trial counsel was simply too worn out to handle this case responsibly.

> Unfortunately, by that time [when applicant's case came into the office] I was... burned out.... I was [running] on fumes at this point. I'm just trying to like make it to the stretch.... I remember being exhausted [by the time of trial]. And I remember frantic activity.... I take full responsibility for being in trial with a less than complete case.

[DEP-MK, 189-90]

**PREJUDICE:** As trial counsel succinctly, and accurately, put it, "[Y]ou win a case on investigation." [DEP-MK, 19] Here, the case was lost because trial counsel never internalized the results of the defense investigation, and because other readily available exculpatory evidence was not uncovered from the very witnesses the defense presented at trial. Competently used, this evidence would have shattered the image of K.E. that she and the prosecutor portrayed. K.E.'s bias and motives to fabricate would have been proven by her own words and writings to others. At least a reasonable doubt would arise as to who got her pregnant. K.E.'s accurate and sympathetic description of how a young girl feels when subjected to sexual abuse by an adult would no longer confirm only the single hypothesis of applicant's guilt.

At his deposition, trial counsel acknowledged the utility of this evidence, and testified he would have, and should have, found it and offered it. [DEP-MK, 146, 156, 159, 163, 169-70, 174-75] In my opinion, there is much more than a reasonable doubt that his failure to do so contributed to applicant's conviction.

Where, as here, failure to conduct an adequate investigation actually harms the defense at trial, the convictions must be vacated. Arnold v. State, 685 P.2d 1261, 1265-67 (Alaska App. 1984) (reversed). Accord Thompson v. Calderon, 120 F.3d 1045, 1053-56 (9th Cir.) (en banc), cert. denied, 118 S.Ct. 14 (1997); Johnson v. Baldwin, 114 F.3d 835, 838-40 (9th Cir. 1997); Baylor v. Estelle, 94 F.3d 1321, 1324-25 (9th Cir. 1996); Harris v. Reed, 894 F.2d 871, 879 (7th Cir. 1990).

### 4. Failure to Litigate Non-Specific Counts Prior to & At Trial.

**FACTS:** Applicant was indicted on 10 Counts of Sexual Abuse of A Minor in the 1st and 2d Degrees. The indictment alleges these 10 crimes in bald statutory language. The only difference in the six penetration counts pertains to timeframes.[14] The four SAM-2 counts (VII-X) are even worse. They are literally identical, the only distinction between each being the Roman numeral assigned to it in sequence. There is no specification even of the specific sexual acts alleged in any of the counts in the charging document.

The evidence at trial showed that only two of the charges -- Counts I & II -- were alleged to arise from an identifiable, specific incident.[15] In the grand jury, and again at trial, the prosecution's _theory_ was that Count VI involved a non-specific instance of penile-vaginal intercourse, which led to K.E.'s pregnancy and an abortion in the fall-winter of 1991. In the grand jury, and again at trial, the prosecution's _theory_ was that the other counts pertained to _categories_ of sexual conduct -- _e.g._, fellatio, cunnilingus, touching breast with lips, etc. Thus, Counts III-X were supported by K.E's generalized testimony that the full range of sexual conduct occurred constantly during a 19-month period, when she was 13-14 years old. [TR Tr. 86-88, 92]

Like the indictment, the final jury instructions on the 10 Counts consisted of undifferentiated repetitions of statutory language concerning "sexual penetration" and "sexual contact," and did not even incorporate the prosecutor's category of act approach.

Significantly, applicant was acquitted on Counts I & II, the only two counts for which the state and complainant presented evidence of a specific claimed incident.

---

[14] Counts I & II allege penetration in the "summer, 1991," Counts III-V cover "May 1991 [-] December 1992," and Count VI alleges penetration between "September 1991 and December 1991."

[15] The Court of Appeals assertion that Count VI was incident-bound is obviously wrong. MO&J, at 10-12. The "incident" cited by the Court is the discovery of K.E.'s pregnancy. That was the _result_ of a sexual incident, but K.E. never purported to be able to distinguish and describe one or more specific incidents of alleged intercourse during the relevant timeframe.

## INEFFECTIVENESS:

**Prior to trial**, competent counsel would have taken appropriate steps to obtain dismissal, election or specification of the generic, identical charges lodged in Counts III-X. By failing to do so, trial counsel necessarily limited his client's defense on those charges to a general denial, and forfeited potentially good legal and constitutional defenses.

In sexual abuse cases involving young complainants and prolonged, sometimes distant, periods of abuse, courts recognize that exactitude with respect to the dates of alleged offenses may not reasonably be expected. Accordingly, in the absence of a risk of prejudice to the defendant, flexibility is permitted in charging the timeframe within which offenses are alleged to have been committed. Covington v. State, 703 P.2d 436, 438-40 (Alaska App.), error held harmless on reh'g, 711 P.2d 1183 (Alaska App. 1985). Here, the complainant was 16 years old, and was testifying about events which, according to her, occurred when she was 13-15 years old, and which she reported when she was 15. There is no factual basis for applying a "forgiving" standard to this teenager's indefinite allegations.

Although the date of offense need not be precise, the law does require the witness to "have a specific incident in mind," and the "jury convict[ing] [a defendant] of each count [to have] a specific incident in mind." Covington v. State, 703 P.2d, 440. This specific incident requirement is directly derived from at least three constitutional sources.

First, due process prevents the conviction of a person without proof beyond a reasonable doubt that he committed a specific criminal act. Jackson v. Virginia, 443 U.S. 307, 318 (1979); In re Winship, 397 U.S. 358 (1970); Shafer v. State, 456 P.2d 466, 467 (Alaska 1969); Beck v. State, 408 P.2d 996, 997 (Alaska 1965); art. I, §7, Alaska Constitution; Amendment XIV, U. S. Constitution.

Second, the accused's right to an unanimous verdict by the jury includes the constitutional requirement that the jury agree on "just what the defendant did." State v. James, 698 P.2d 1161, 1167 (Alaska 1985). Accordingly, a jury must be unanimous as to the actus reus -- that is, the specific criminal incident in which the accused was involved -- before it may convict him. Castillo v. State, 821 P.2d 133, 137-37 (Alaska App. 1991) (reversing conviction; jury may not have been unanimous as to "just what the defendant did").

Third, lack of incident specificity violates the accused's right to be free from double jeopardy. He could be convicted and sentenced on multiple counts constituting but a single offense, or he could be subjected to consecutive prosecutions for the same offense, because of uncertainty as to just what he had previously been tried for. Covington, 703 P.2d, 439. Accord Russell v. United States, 369 U.S. 749, 763-64 (1962); Price v. State, 437 P.2d 330, 331 (Alaska 1968); Adkins v. State, 389 P.2d 915, 916 (Alaska 1964).[16]

Thus, competent counsel would have filed a pre-trial **motion to dismiss** the non-specific counts, **or to require the prosecution to elect** among them, dismissing those which were simply multiplicitous. "Multiplicity" is the charging of one offense in multiple counts of an indictment. Wright & Miller, 1 Federal Practice & Procedure, Ch. 4, sec. 142, 877 (Feb. 1998 disc).

Certainly, the risk of multiple convictions and sentences for the same offense can be obviated at sentencing or, as here, by merger on appeal, but the psychological impact on the jury of charging one offense in multiple counts must be addressed before trial. U.S. v. Reed, 639 F.2d 896, 904 n.6 (2d Cir. 1981), quoting Wright & Miller. Where, as here, multiplicitous charges subject the accused to the risk of unfair prejudice, failure to require election/dismissal is error. See, e.g., Maldonado-Rivera, 922 F.2d, 981-82 (2d Cir. 1990); U.S. v. Bradsby, 628 F.2d 901 (5th Cir. 1980); U.S. v. DiGeronimo, 598 F.2d 746, 750 (2d Cir.), cert. denied, 444 U.S. 886 (1979). See also Braverman v. U.S., 317 U.S. 49 (1942).

Competent counsel would also have moved, alternatively, for a **bill of particulars**. Alaska Crim. R. 7(f); Spight v. State, 450 P.2d 157, 160 (Alaska 1969) (robbery case); Christian v. State, 513 P.2d 664, 666 (Alaska 1973) (fraud case).[17] Appellate courts in Alaska have upheld the validity of some indictments

---

[16] Entry of multiple convictions or imposition of multiple punishments for the same offense violates state and federal double jeopardy provisions. See U.S. v. Maldonado-Rivera, 922 F.2d 934, 980-91 (2d Cir. 1990); Whitton v. State, 479 P.2d 302, 312 (Alaska 1970). In Alaska, a statutory presumptive sentencing jurisdiction, it is imperative that multiple felony convictions for the same offense be prevented, regardless of the sentence imposed. U.S. v. Ball, 470 U.S. 856, 864-65 (1985).

[17] Accord U.S. v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988); U.S. v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987); U.S. v. Rosa, 891 F.2d 1063, 1066 (3d Cir. 1989); U.S. v. Staggs, 881 F.2d 1527, 1536 (10th Cir. 1989)(Logan, J., concurring), cert. denied 493 U.S. 1020 (1990); U.S. v. Tedesco, 441 F.Supp. 1336 (M.D. Pa. 1977).

charging offenses in broad statutory language.  Cheely v. State, 850 P.2d 653, 658-61 (Alaska App. 1993); Williams v. State, 648 P.2d 603, 605-06 (Alaska App. 1982).  At the same time, these court recognize that such broad charging impedes defense preparation, and point to Rule 7(f) as a means of remedying such prejudice in cases where the prosecution charges in statutory language.

> The accused is not without remedies in finding out more specifically the crime with which he is charged. He has access to the record of the grand jury proceeding.  **An accused can also ask for a bill of particulars.** Liberal discovery of the state's case is also permitted.  Given these liberal discovery rules, we conclude that an accused does have the ability to obtain adequate discovery of the state's case and to get adequate notice of the state's theory or theories of prosecution.

Cheely, 850 P.2d, 660, quoting Williams, 648 P.2d, 606 (emphasis added).

Trial counsel took no action prior to trial to find out just what his client was being accused of, so he could not prepare an effective defense.  He took no action to preclude the spectacle and prejudice of the jury having 10 nearly undifferentiated counts drummed into them in jury selection, in the state's opening statement, in the states closing argument, and in final instructions.

**At trial**, competent counsel would have at least protected his client's right to an unanimous jury verdict by requesting a Covington instruction, which would require unanimity as to a specific, and different, criminal incident for each conviction count.

Where, as here, the evidence concerns claims of multiple, undifferentiated acts of sex abuse, the risk of a non-unanimous verdict/double jeopardy violation is high.  "Sexual abuse is not a 'continuing offense.'"  Covington, 703 P.2d, 440.  Yet, as far as Counts III-X are concerned, K.E. "was unable to recall any specific events or dates which would distinguish the circumstances of one [sexual act] from another."  Id.  Where, as here, there is "substantial doubt" that the jury convicting appellant "had a specific incident in mind," the likelihood of constitutional error is unacceptably high. Id., at 440-41; Strehl v. State, 722 P.2d 226, 228-29 (Alaska App. 1986).

Trial counsel's failure to request and obtain instructions which could provide the legal basis for acquittal constitutes ineffective assistance of counsel. U.S. v. Span, 75 F.3d 1383, 1387-90 (9th Cir. 1996).

conclusively established by Strehl v. State, 722 P.2d 226, 228-29 (Alaska App. 1986). In Strehl, convictions on two counts of sexual abuse were vacated, because they "might have been based on any one of a number of different instances of sexual touching alluded to in Strehl's confession and in the testimony of [his] wife and of the victim." Id., 229. Precisely the same risk exists here. The indictment of, and convictions on, Counts III-X could be based on any one of a number of findings within the broad, undifferentiated statements of K.E.

Additionally, applicant was prejudiced by the sheer number and repetition of Counts brought, read, and submitted to the jury. "[T]he prolix pleading may have some psychological effect upon a jury by suggesting that defendant has committed not one but several crimes." Wright & Miller, 1 Federal Practice & Procedure, Ch. 4, sec. 142, 878 (Feb. 1998 disc), quoting U.S. v. Reed, 639 F.2d 896, 904 (2d Cir. 1981). And, in lay terms, the jury may infer that "where there's smoke, there's fire."

### 5. Failure to Protect Accused From Improper Inferences of Guilt.

**FACTS:** Det. Hollenbeck, the case agent, testified that she sought a court order to obtain a blood sample from the accused, and that the order "was granted," resulting in her getting the sample of his blood which was used for DNA analysis. [TR-Tr. 360] Her testimony raised two obvious inferences of guilt -- (1) that applicant refused to provide a sample voluntarily, because he knew he was the father, and (2) that the issuing judge must have thought there was a persuasive evidentiary basis for granting the order.

Any doubt about the jury's appreciation of these natural, but improper, inferences ended when it sent the following note during deliberations -- "Was the blood test of Patrick Robert Harvey court ordered? Was the blood given voluntary?" [TR-Tr. 795] In response, the jury was simply told that "questions of fact must be determined by the jury from the evidence." [Id., 795-96, 798]

**INEFFECTIVE:** It is "entirely impermissible" for the jury to infer guilt from an accused's failure to consent to a search by state law enforcement officers. Bargas v. State, 489 P.2d 130, 132-34 (Alaska 1971). When the prosecution offers evidence or argument implying guilt from the accused's failure to consent, appellate courts often find plain error. Padget v. State, 590 P.2d 432, 434 (Alaska 1979); Bargas v. State, supra. The prohibition even

applies when the search is lawful, and the suspect has no legal right to refuse. Elson v. State, 659 P.2d 1195, 1197-99 (Alaska 1983).[20]

Competent counsel would seek and obtain a protective order precluding references to court orders and search or arrest warrants. Alternatively, he would request a cautionary instruction from the trial judge, directing the jury not to draw any inference of guilt against the accused because of the application for/issuance of an order or warrant.[21]

Here, trial counsel did neither. Even when the jury note made clear that deliberations had wandered into an impermissible and unfairly prejudicial area, trial counsel took no meaningful action. [TR-Tr. 795-98]

**NO TACTIC:** There is no objectively reasonable "tactic" which can justify trial counsel's failure to protect his client from this obvious and unfair prejudice. Jones, 759 P.2d, 569-70.

**PREJUDICE:** The toxic effect of such evidence/comment is obvious. Jurors naturally infer from an accused's failure to consent/assertion of rights that he has something to hide. They make the powerful, and natural, inference that the accused's actions demonstrate consciousness of guilt.

Alaska courts have recognized that such evidence and comment are "obviously prejudicial," Dorman v. State, 622 P.2d 448, 458 (Alaska 1981), and "entirely impermissible." Bargas, 489 P.2d, 132. So fundamental are the rights involved -- and so damaging, and natural, the improper inference of guilt -- that the Alaska Supreme Court has consistently held such violations to constitute **reversible plain error**. See Dorman, 622 P.2d, 456-59; Padget v. State, 590 P.2d 432, 434-35 (Alaska 1979); Bargas, 489 P.2d, 132-34; Silvernail v. State, 777 P.2d 1169, 1176-79 (Alaska App. 1989).

---

[20] The same principle appears in cases condemning evidence/argument that an accused asserted his rights to silence or counsel. Dorman v. State, 622 P.2d 448, 456-59 (Alaska 1981) (pre-warning silence; reversed); Reynolds v. State, 706 P.2d 708 (Alaska App. 1985) (post-warning silence; reversed). Gunnerud v. State, 611 P.2d 69, 75-76 (Alaska 1980) (pre-arrest silence; reversed); Silvernail v. State, 777 P.2d 1169, 1174-79 (Alaska App. 1989) (pre-arrest silence; reversed).

[21] Incomprehensibly, trial counsel himself also elicited the fact that the police obtained a search warrant authorizing them to electronically monitor and record conversations between K.E. and applicant after her report. [TR-Tr. 317]

## CONCLUSION

For the reasons already stated, trial counsel's representation of applicant fell below the objective standard of reasonableness. <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88, 694 (1984). In these areas, counsel failed to perform at least as well as a lawyer of ordinary training and skill in criminal law. <u>Risher v. State</u>, 523 P.2d 421, 424-25 (Alaska 1974).

For the reasons already stated, none of trial counsel's failures or erroneous decisions can be excused as tactically justifiable.

For the reasons already stated, each of the five areas of ineffectiveness independently raise at least a reasonable doubt that trial counsel's conduct contributed to applicant's convictions on Counts III-X. <u>Risher, supra</u>. Under the federal standard, areas 1, 3 & 4 are independently sufficient to create a "reasonable probability" that, but for those errors, the outcome of the trial would have been different. <u>Strickland, supra</u>.


Do not hesitate to contact me if I may be of further assistance.


Sincerely yours,

James H. McComas
Attorney at Law