Abigail E. Sheldon
Attorney at Law
P.O. Box 873133
Wasilla, Alaska 99687
(907) 376-9562

Attorney for Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| PATRICK ROBERT HARVEY | ) | |
| | ) | |
| Petitioner, | ) | Case No. 3:05-cv-0083 |
| | ) | |
| vs. | ) | |
| | ) | BRIEF OF PETITIONER |
| MARC ANTRIM, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |

COMES NOW Patrick Harvey, by and through counsel, Abigail E. Sheldon, Attorney at Law, and argues his grounds for Habeas Relief. This court has found that Petitioner in this case, Patrick Harvey, exhausted all state remedies as to two claims: The failure of trial counsel to understand and exclude, or effectively to confront DNA evidence and the failure of trial counsel to adequately investigate and to incorporate investigation in the preparation and presentation of the defense.

**SUMMARY OF FACTS AND ARGUMENT[1]**

---

[1] Summary of facts and argument taken from Harvey Appellant Brief, pages 1-37, in case Court of Appeals No. A-07963. References in this brief to Appellant's brief will use the designation "A.B." Appellant's brief will be filed separately from this brief as it is too lengthy for electronic filing.

Petitioner's Opening Brief

Patrick Harvey was accused of sexually molesting his fifteen year old stepdaughter, K.E. At trial he was represented by Michael Karnavas, attorney for the Public Defender Agency and was convicted, (A.B. 1).

K.E. testified at trial that she was eight when Patrick Harvey married her mother and that the family moved from California to Alaska when she was in seventh grade, (A.B. 6). Patrick Harvey began working in Kodiak and K.E. testified that it was during a return visit home in the summer of 1991 that she began having sexual relations with Mr. Harvey, (A.B. 6). K.E. claimed that the sexual activity continued through December of 1992 or January of 1993. (A.B. 6). In September, 1991, at the age of thirteen, K.E. discovered she was pregnant, (A.B.6). At the time, she reported that the father was an unnamed seventeen year-old and she had an abortion, (A.B. 6). At fifteen, she reported that the father of the aborted fetus was actually Patrick Harvey and that she had not had intercourse with any other individual, (A.B. 7). DNA evidence was produced at trial that had been preserved from the aborted fetus since 1992, (A.B. 7).

### FAILURE TO ADEQUTAELY INVESTIGATE AND INCORPORATE INESTIGATION IN THE PREPARATION AND PRESENTATION OF THE DEFENSE

Trial counsel Michael Karnavas brought out during cross-examination of K.E. that she once described having sex with a boyfriend in California named Jared and at least one other boy in both letters and her journal, however when questioned, K.E. described those writings as fantasies, (A.B. 7). The defense theory of the case was that K.E. was sexually active with other males and invented the molestation story as a means to get to California where her boyfriend lived and Mr. Karnavas suggested as much through cross-examination of K.E, (A.B. 7). Trial counsel also got K.E. to admit that she told "normal teenage lies." (A.B. 7).

Petitioner's Opening Brief

However, K.E. persisted throughout her testimony that she had sexual relations with the defendant, Patrick Harvey, and only Patrick Harvey, (A.B. 7).

Although Mr. Karnavas was able to elicit several points for the defense theory of the case during his examination of K.E., there was substantial and material evidence known to defense counsel that was not used. There were at least three witnesses questioned by defense counsel who could testify about admissions made by K.E. regarding sex with other males but were never asked for this information. Those witnesses were Jerry Shivers, K.E.'s best friend; James Esquivel, K.E.'s brother, and Summer Smith, K.E.'s cousin. Any of these witnesses could have backed the defense argument that K.E. was having sex with someone other than Mr. Harvey. Such evidence would not only impeach K.E.'s credibility, because she testified that she never had sex with anyone other than Patrick Harvey, but would also obviously suggest to the jury that there were other males who had the opportunity to father K.E.'s fetus.

K.E.'s best friend, Jerry Shivers, told trial counsel during a pre-trial interview that K.E. revealed having sex with someone named "Jared" in California, and although Mr. Karnavas called Jerry Shivers to testify at trial, he never asked her about K.E.'s sexual experience. (A.B. 14).

James Esquivel, K.E.'s brother, informed Mr. Karnavas that K.E. once told him a boy at school made her pregnant, and she gave him the number of the school bus he rode on. (A.B. 14). James Esquivel told Mr. Karnavas that he once drove K.E. to her boyfriend's house and once drove a boy to meet her. Mr. Karnavas never asked Mr. Esquivel about the boy K.E. named as having made her pregnant and failed to ask about her other dates, (A.B. 14).

Summer Smith was K.E.'s cousin and could have testified that K.E. described having sex with boys, even naming K.E.'s boyfriends in California and Alaska. Mr. Karnavas failed to elicit any of this information during her testimony. The District Attorney provided notes

Petitioner's Opening Brief

before trial of an interview with K.E.'s cousin, Summer Smith, (A.B. 14). K.E. told Ms. Smith about having sex with a boy named "Chris" in California before moving to Alaska, (A.B. 14). K.E. wrote to Ms. Smith and in her letter described having sex with someone, (A.B. 15). Investigator for the Public Defender Agency, Kim McGee, interviewed Summer by phone and confirmed that K.E. described sex with a boy named Chris to Ms. Smith and expressed concern about being pregnant, (A.B. 15). Ms. Smith listed boyfriends of K.E. named Earl, Chad and Lester, (A.B. 15). Michael Karnavas did not question Ms. Smith about any of this information, (A.B. 15).

While there existed critical information known by defense counsel before trial that was not used, there was equally critical information available to defense counsel, had a proper investigation been done.

James Esquivel, Monica Shelton, Michael Thorp, Jerry Shivers and Patrick Harvey himself all had exculpatory information. James Esquivel named three friends of K.E.'s for the defense investigator, but they were never contacted, (A.B. 16). Patrick Harvey and his wife informed defense counsel about Monica Shelton, a young woman who went to nightclubs with K.E. and her friend Sabrina, and had witnessed K.E. leave with men she didn't know, (A.B. 16). K.E. once asked Monica to provide an alibi for her if her father, Patrick Harvey were to call, (A.B. 16). Finally, Monica Shelton could have testified that K.E. used to make fun of her and Sabrina for being virgins and described sex as though it were fun, (A.B. 16). Although her name and information was provided to defense by Patrick Harvey, Monica Shelton was never contacted.

Michael Thorp was a friend of James Esquivel and could have confirmed that he and James would take K.E. to friends' houses while telling her parents that they were together, (A.B. 16). Mr. Thorp specifically recalled taking a boy to meet K.E. and once finding K.E.

Petitioner's Opening Brief

home with three boys, (A.B. 16).  Finally, Mr. Thorp could have testified that when the Harveys began to monitor K.E. more closely, she became angry, (A.B. 17).  All of this information would have been useful to bolster the defense theory that K.E. was sexually active with other boys and accused Mr. Harvey of molesting her because she did not want to live with the Harveys in Alaska.

      Finally Patrick Harvey provided defense counsel with many significant leads that were never utilized.  He provided K.E.'s journal which contained a list of her boyfriends and the dates she was seeing them, (A.B. 15).  He provided a letter with a picture of K.E. and a boy dated January 11, 1993, and the license plate number of the boy who had been taking K.E. out of school without permission, (A.B. 15).  K.E. told her mother that she had gotten pregnant at her friend "Sabrina's" house and Mr. Harvey offered to take defense counsel to Sabrina's house, (A.B. 16).  Patrick Harvey offered the investigator a list of K.E.'s friends, (A.B. 16).  None of these leads were pursued by Michael Karnavas.

      When questioned about the failure to elicit exculpatory evidence through lack of investigation and failure to ask questions at trial, his explanation was simple exhaustion, (A.B. 17, 18).  Mr. Karnavas explained that he was trying cases back-to-back, had insomnia, sleeping only three hours per night, was drinking as many as twenty cups of coffee per day, and had no social life, (A.B. 18).  He described tension between himself and his coworkers, investigators and clients, stating that the investigators were ready to kill him by the end of this case, (A.B. 18).  The Public Defender even suggested he take a leave of absence, (A.B. 18).  He did not do significant pre-trial preparation because he believed, incorrectly, that there was an offer on the table for a reduced charge and that he could persuade Mr. Harvey to take it, (A.B. 18).  No such offer existed, (A.B. 19).

      Clearly, any evidence that discredited K.E. was essential.  Evidence of prior statements

Petitioner's Opening Brief

about sex with other individuals would have contradicted her testimony that she had only had sex with Patrick Harvey. Her credibility and believability was essential to the state's case and defense counsel could have severely undermined it, but trial counsel not only failed to use information he had, he failed to unearth information that was readily at hand. There is no tactical reason given for this. Michael Karnavas was simply and understandably, exhausted.

### FAILURE TO UNDERSTAND AND EXCLUDE, OR EFFECTIVELY TO CONFRONT DNA EVIDENCE

K.E.'s credibility was not the state's entire case. The state also produced DNA evidence recovered from the fetus from K.E.'s abortion in 1991.

Expert testimony presented by the state showed that the probability of paternity for Mr. Harvey was 87.34%, based on an examination of preserved fetal tissue, (A.B. 1). According to the state's expert, Patrick Harvey was seven times more likely to be the father of the fetus, (A.B. 9). The tissue sample preserved from the abortion was insufficient to yield results from the kind of analysis that is typically done for paternity testing, (A.B. 7). A method called "PCR Typing" was used instead, (A.B. 7). Analysis of Chromosome six revealed that Patrick Harvey could not be eliminated as the father and that the allele in common between Patrick and the fetus could also be present in 13.7% of the population, (A.B. 8). PCR Typing was also done on chromosome one. This test did not exclude Patrick Harvey. The state's expert arrived at the number 87.34% based on the confined paternity index and he converted the index to a percentage by using Bayes' Theorem, (A.B. 8, 9). The "non-genetic odds" for this purpose was a neutral position of 50%, (A.B. 9).

During cross-examination, the state's expert agreed that full DNA testing would have been more precise and that the National Research Council of the National Academy of Sciences suggests that prosecutors and defense attorneys should not over-sell the reliability of

Petitioner's Opening Brief

DNA evidence, (A.B. 9).

Prior to trial, defense investigator Kim McGee contacted a DNA expert, Moses Schanfield, at the Analytical Genetic Testing Center in Colorado and attached one of two expert witness reports previously provided by the state, (A.B. 22). The second expert report was lost or mislaid and never discussed with Mr. Harvey or Mr. Schanfield before trial, (A.B. 22). In the months before trial, Dr. Schanfield twice tried to communicate with defense counsel that "Probability of guilt is non-admissible" and Kim McGee was confident she relayed that information to Mr. Karnavas, (A.B. 22, 23). Dr. Schanfield was aware that other states had precluded this type of evidence and courts in other states ruled that the use of Bayes' Theorem in calculating this probability rendered the evidence inadmissible because of the assumption that there is a 50% probability of guilt, (A.B. 23). Although defense counsel had access to Dr. Schanfield's opinion for months, it wasn't until the day after the state's expert testified, Michael Karnavas called him to ask questions about the evidence already presented and arranged for him to testify telephonically in Mr. Harvey's trial, (A.B. 10). During direct examination of his own witness, Mr. Karnavas elicited unhelpful and potentially harmful information, (A.B. 10, 11). Dr. Schanfield described the state's numbers as statistically accurate and their extrapolation is prejudicial, (A.B. 11).

Long after Mr. Harvey was convicted, his attorney in post-conviction relief proceedings contacted an expert on forensic use of genetic testing, Professor D.H. Kaye, who reviewed the testimony presented at trial, (A.B. 24). It was Professor Kaye's opinion that

(1) this presentation was inaccurate and misleading;
(2) that a defense attorney who was familiar with the legal literature and case law on parentage testing in civil and criminal cases should have objected to Dr. Baird's testimony that (a) the paternity index gives "the genetic odds in favor of paternity" and that (b) the "probability of paternity' of Patrick Harvey was 87.34%; and
(3) that, even if these objections were overruled, such an attorney might have been able

Petitioner's Opening Brief

>to show that the scientific tests did not provide "the genetic odds in favor or paternity." And that the 87% figure was arbitrary and should not have been accepted at face value.

A.B. 24

Professor Kaye explained that the State's expert erred with respect to the paternity index and that error has come to be called the "fallacy of the transposed conditional," the "inverse fallacy," or the "prosecutor's fallacy," (A.B. 25).

Mr. Harvey elicited the expert opinion of James McComas to evaluate his trial representation. Mr. McComas's opinion has been previously provided in the instant case. Mr. McComas has been found by the court to be an expert in the field of criminal law that enables him to give opinion testimony at the post-conviction proceedings, (A.B. 30). Among other things, Mr. McComas gave a brief summation of Professor Kaye's findings and the implications of the paternity index (PI):

>What the PI actually means is that all of the 78,000 Alaskan men, or of the millions of American men, having applicant's genotypes are 6.9 times more likely to father a child with the specified genotypes than a randomly selected man would be. Conversely, the PI is the relative probability of the genetic evidence occurring, given that the tested man is the biological father; it is not the "odds" that the tested man is the father, given the biological evidence.

A.B. 36

Mr. McComas also noticed that Mr. Karnavas failed to exploit the issue of possible contamination of the DNA evidence, (A.B. 36). The state's expert noted that the fetal tissue sample contained three alleles and assumed some maternal tissue must have been collected with the products of conception, (A.B. 8). Mr. McComas argued that the presence of extra alleles could have been the result of defects in the chain of custody and could have been grounds for suppression of the evidence or fruit for cross-examination, (A.B. 36).

Petitioner's Opening Brief

Mr. Karnavas failed to research the case law alluded to by Dr. Schanfield, failed to adequately examine the expert reports provided by the state in advance of trial and failed to adequately cross-examine the state's expert DNA evidence, either because he didn't understand it, or made the poor tactical choice to allow it in, hoping his cross-examination would reveal the flaws and somehow prejudice the state's case (A.B. 36, 37). Mr. McComas stated that "[I]t is objectively unreasonable to stand idle while the prosecution introduces contestable "scientific" evidence that one's client is 87% likely to be guilty of Count VI, even in the absence of any other evidence against him" (A.B. 37).

An effective defense strategy would have utilized evidence that was available to show that K.E. became pregnant by having sexual intercourse with a person other than Patrick Harvey and would have conducted an investigation to determine whether there existed evidence that refuted K.E.'s testimony or could be offered to impeach her credibility, and would have included research into the meaning of the DNA analysis and the law on the admission of testimony about the probability of paternity.

## INEFFECTIVENESS STANDARD: U.S. CONSTITUTION

The Sixth Amendment to the U.S. Constitution guarantees that the accused in a criminal case shall receive the effective assistance of counsel. Powell v. Alabama, 308 U.S. 444 (1940). This guarantee applies to state court prosecutions through the 14th Amendment. Gideon v. Wainwright, 372 U.S. 335 (1963). An attorney is ineffective, for 6th Amendment purposes, when he performs "below an objective standard of reasonableness;" if that deficiency creates a "reasonable probability" that, but for these errors, the outcome of the trial would have been different, a new trial is required. Strickland v. Washington, 466 U.S. 668,

Petitioner's Opening Brief

687-88, 694 (1984).2

In his expert opinion, James McComas stated that:

[C]ounsel's unjustified ineffectiveness resulted in prejudice that meets both federal and state standards…Under the federal standard, areas 1, (failure to understand and exclude, or effectively confront, DNA evidence) 3, (failure to adequately investigate and to incorporate investigation in the preparation and presentation of the defense) and 4, (failure to litigate non-specific counts prior to and at trial) are independently sufficient to create a "reasonable probability" that, but for those errors, the outcome of the trial would have been different.

A.B. 31.

Clearly evidence of prior sexual conduct by K.E. would have impeached her testimony, not only because it would suggest another father for the aborted fetus, but also because it would demonstrate her dishonesty while testifying that Mr. Harvey was the only person with whom she had ever had sex. Her credibility was obviously of paramount importance to the state's case. DNA evidence suggesting that Mr. Harvey was 87% likely to have fathered her child was devastating and poorly and inadequately met by defense counsel. Impeaching that evidence or precluding it would have crippled the state's case. Mr. Karnavas was ineffective and it is more than reasonably probable that, but for his ineffectiveness, the outcome of trial would have been different. As previously stated, Mr. Harvey has sought appeal in State Court and been unsuccessful. Therefore, Mr. Harvey appeals to Federal District Court and seeks a finding that he received ineffective assistance of counsel.

---

[2] Accord Thompson v. Calderon, 120 F.3d 1045 (9th Cir.)(en banc), cert. denied, 118 S.Ct. 14 (1997); Johnson v. Baldwin, 114 F.3d 835 (9th Cir. 1997) ; Baylor v. Estelle, 94 F.3d 1321 (9th Cir. 1996); Sager v. Maass, 907 F.Supp. 1412 (D.Or.), aff'd, 84 F.3d 1212 (9th Cir. 1996); Griffin v. McVicar, 84 F.3d 880 (7th Cir. 1996); U.S. v. Span, 75 F.3d 1383 (9th Cir. 1996); Byrd v. U.S., 614 A.2d 25 (D.C.Ct.App. 1992);Nichols v. Butler, 953 F.2d 1550 (11th Cir. 1992) (en banc); Harris v. Reed, 894 F.2d 871 (7th Cir. 1990); U.S. v. Swanson, 943 F.2d 1070 (9th Cir. 1991).

Petitioner's Opening Brief

DATED this 18th day of April, 2008, at Wasilla, Alaska.

                                  s/Abigail E. Sheldon
                                  P.O. Box 873133
                                  Wasilla, AK, 99687
                                  Phone: (907) 376-9562
                                  Fax: (907) 376-9563
                                  E-mail:abigailbeacham@hotmail.com
                                  AK Bar # 9711058

Petitioner's Opening Brief

Certification:

I certify that on April 21, 2008, a copy of this document was mailed to:

Nancy R. Simel, Esq.
Assistant Attorney General
Office of Special Prosecutions & Appeals
310 K Street, Suite 308
Anchorage, AK 99501

s/Abigail E. Sheldon

Petitioner's Opening Brief