# In the Court of Appeals of the State of Alaska

| | | |
|---|---|---|
| **PATRICK HARVEY,** | ) | |
| | ) | |
| Appellant, | ) | |
| v. | ) | |
| | ) | |
| **STATE OF ALASKA,** | ) | |
| | ) | Court of Appeals No. **A-07963** |
| Appellee. | ) | |
| | ) | Trial Court Case No. **3AN-00-02745CI** |

APPEAL FROM THE SUPERIOR COURT
THIRD JUDICIAL DISTRICT AT ANCHORAGE,
THE HONORABLE ERIC SANDERS, PRESIDING

### APPELLANT'S BRIEF

NANCY SHAW (7510091)
Attorney at Law
2600 Karluk Street
Anchorage, Alaska 99508
(907) 276-7776

Attorney for Appellant
Patrick Harvey

Filed in the Court of Appeals
of the State of Alaska, this 12th
day of August, 2002.

Marilyn May, Clerk

By: _C. Peterson_
Deputy Clerk

**VRA CERTIFICATION:**
I certify that this document and its attachments do not contain (1) the name of a victim of a sexual offense listed in AS 12.61.140 or (2) a residence or business address or telephone number of a victim or a witness to any crime unless it is an address used to identify the place of the crime or it is an address or telephone number in a transcript of a court proceeding and disclosure of the information was ordered by the court.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . iv

TEXT OF STATUTES AND RULES RELIED UPON
    . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

TABLE OF AUTHORITIES CITED . . . . . . . . . . . . . . . . xii

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . 1

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . 4

STATEMENT OF POINTS ON APPEAL . . . . . . . . . . . . . . . 5

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . 6
    EVIDENCE AT TRIAL . . . . . . . . . . . . . . . . . . 6
        The Complainant's Testimony . . . . . . . . . . . 6
        The "Probability of Paternity" Evidence . . . . . 7
        Final Argument . . . . . . . . . . . . . . . . . 11
    EVIDENCE RECEIVED AT HEARINGS ON
            PETITION FOR POST-CONVICTION RELIEF . . . . . 13
        Defense Objective to Show that
            K.E. Had Sex with Other Males . . . . . . . . 13
        Evidence Known to Defense Counsel
            That was Not Used . . . . . . . . . . . . . . 14
        Evidence that Was Readily Available
            If an Adequate Investigation Had Been Done . . 15
        Trial Counsel's Reflections
            on the Preparation and Presentation
            of the Defense Case
            . . . . . . . . . . . . . . . . . . . . . . . 17
        Trial Counsel's Did Not Research or Understand
            the Legal and Statistical Problems with
            the State's Expert Testimony on the
            Probability of Paternity . . . . . . . . . . 20
        Expert Testimony About the Probability
            of Paternity Evidence and Defense Counsel's
            Treatment of the DNA Evidence . . . . . . . . 24
        Expert Opinion on the
            Adequacy of the Defense Effort
            . . . . . . . . . . . . . . . . . . . . . . . 30
            Investigation and Fact Evidence . . . . . . . 30
            Expert Opinion: DNA Evidence . . . . . . . . 34

DECISION BELOW . . . . . . . . . . . . . . . . . . . . . . 38
        Court Disregards Self-Assessment of Trial Counsel

. . . . . . . . . . . . . . . . . 38
Court Dismisses Claims that
      Trial Counsel Was Not Asked About . . . . . . 38
Sexual Activity with Jared Possibly Inadmissible . 39
Sexual Activity with Chris Could Have Been
      Excluded Based Upon a Sound Tactical Choice
      . . . . . . . . . . . . . . . . . . . . . . . 40
Not Ineffective for Attorney and Investigator
      to Fail to Obtain and Use Written Statements
      of the Complaining Witness . . . . . . . . . . 40
Failure to Exclude or Expose Weaknesses
      in the DNA Evidence
      . . . . . . . . . . . . . . . . . . . . . . . 41

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . 42

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
Legal Standards for Demonstrating
      Ineffective Assistance of Counsel . . . . . . 42
The Court Erred in Disregarding Harvey's
      Claim that Counsel Should Have Examined James Esquivel
      About Taking K.E. to Meet Boys and Her
      Identifying the Boy Who Made Her Pregnant
      . . . . . . . . . . . . . . . . . . . . . . . 45
Witness Testimony: An Attorney of Minimal Competence
      Would Have Elicited Testimony from the Witnesses
      Who Were Called to Testify at Trial that the
      Complainant Said She was Sexually Active with Males
      Other than The Defendant
      . . . . . . . . . . . . . . . . . . . . . . . 47
Failures to Offer Evidence in Response
      to the Complainant's Claim That She'd
      Not had Sex with Anyone Other than
      Defendant were Not Harmless
      . . . . . . . . . . . . . . . . . . . . . . . 52
No Tactical Reson for Neglecting
      Evidence of Sexual Relationships
      and Sexual Opportunities
      . . . . . . . . . . . . . . . . . . . . . . . 53
Investigation: An Attorney of Minimal Competence
      Would Have Contacted the Girlfriends
      of the Complainant Who Would have Reported
      Complainant's Activities with Males . . . . . 53
Failure to Interview and Call Witnesses
      that Confirmed K.E.'s Sexual Activity
      Meets the *Risher* and *Strickland* Standards
      for Ineffective Assistance of Counsel . . . . 56
Failure to Investigate is Prejudicial . . . . . . . 57

No Sound Tactical Reason for
        Failing to Investigate . . . . . . . . . . . .   57
DNA Evidence: An Attorney of Minimal Competence Would
        Have   Researched   the   Admissibility   of   the
        Probability of
        Paternity and Would Have Filed a Motion to Suppress
        the   Statistical   Evidence   and/or   Would   have
        Effectively Cross-
        Examined the State's DNA Expert
        . . . . . . . . . . . . . . . . . . . . . . . .   58
Failure to Object to the Introduction of
        the Statistical Evidence or, if Unsuccessful,
        Failure to Cross-Examine About The Use of the
        Prior Probability Assumption of .5, Meets
        the *Risher* and *Strickland* Standards for
        Ineffective Assistance of Counsel   . . . . . .   63
 Introduction of the Probability Statistics and
        Failure to Cross-Examine about the Prior Probability
        of .5 and the "Prosecutor's Fallacy" was Not Harmless
        . . . . . . . . . . . . . . . . . . . . . . . .   64
No Sound Tactical Reason
        for Failing to Research,
        Understand, and Take Measures
        to Address the DNA Evidence   . . . . . . . . .   65

iii

# TABLE OF AUTHORITIES

CONSTITUTIONAL PROVISIONS

Alaska Constitution, Article I, Section 11 . . . . . . . . .  42

United States Constitution, Sixth Amendment . . . . . . . .  42


ALASKA STATUTES

A.S. 12.45.045 . . . . . . . . . . . . . . . . . . . .  50, 51


ALASKA RULES OF COURT

A.R.E. 404(a) . . . . . . . . . . . . . . . . . . . .  50, 51


CASES

*Arnold v. State,* 685 P.2d 1261 (Alaska App., 1984) . 32, 44, 54

*Baden v. State*, 667 P.2d 1275 (Alaska App., 1983) . . . . . .  50

*Baylor v. Estelle*, 94 F.3d 1321 (9ᵗʰ Cir., 1996) . . . . . .  52

*Bibbs v. State*, 814 P.2d 738 (Alaska App., 1991) . . . . . .  50

*Bridgman v. Commonwealth,* 351 S.E. 2d 598, 255 Va. App. 523 (Va.,
1986) . . . . . . . . . . . . . . . . . . . . . . . . . . .  60

*Brodine v. State,* 936 P. 2d 545 (Alaska App., 1997) . . . . .  64

*Byrd v. U.S.*, 614 A.2d 25 (D.C. Ct.App., 1992) . . . . . . .  52

*Callan v. State,* 904 P.2d 856 (Alaska App., 1995).
            . . . . . . . . . . . . . . . . . . . . . . . . .  42

*Cole v. Cole,* 328 S.E. 2d 446, 74 N.C. App. 247, affirmed 335 S.E.
2d 897, 314 N.C. 660 (1985) . . . . . . . . . . . . . . . .  60

*Commonwealth v. Beausoleil,* 490 N.E. 2d 788, 397 Mass. 206 (1986)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  60

*Commonwealth v. Perry,* 644 A. 2d 705 (Pa., 1994)

. . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*County of Sonoma v. Grant W.,* 184 Cal. App., 868, 220 Cal Rptr.
297, judgment vacated, 187 Cal. App. 3d, 232 Cal. Rptr. 471 (1986)
. . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Daniels v. State,* 767 P.2d 1163 (Alaska App., 1989) . . . . . 50

*Donnelly v. State,* 516 P.2d 396 (Alaska, 1973) . . . . . . 42

*Everett v. Everett,* 150 Cal App. 3d 1053, 201 Cal. Rptr. 351 (1984)
. . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Harmon v. State,* 908 P.2d 434 (Ak. App., 1995) . . . . . . 61

*Harris v. Reed,* 894 F.2d 871 (7th Cir., 1990) . . . . . . . 52

*In re Paternity of M.J.B.,* 425 N.W. 2d 404, 144 Wis. 2d 638 (1988)
. . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Jackson v. State,* 750 P.2d 821 (Alaska App., 1988) . 44, 48, 54

*Jager v. State,* 748 P.2d 1172 (Alaska App., 1988) . . . . . 50

*Kofford v. Flora,* 744 P.2d 1343 (Utah, 1987) . . . . . . . 60

*Mattox v. State Department of Revenue, Child Support Enforcement
Div., ex. rel. Neeson,* 875 P.2d 763 (Ak., 1994) . . . . . . 61

*Merrill v. State,* 457 P.2d 231 (Alaska, 1969) . . . . . . . 42

*Napoka v. State,* 996 P.2d 106 (Alaska App., 2000) . . . . . 50

*People v. Armstrong,* 530 N.E.2d 567 (Ill. Appl 1988), *app. den.* 535
N.E.2d 916. . . . . . . . . . . . . . . . . . . . . . 44

*People v. Barney,* 8 Cal. App. 4th 1998, 10 Cal. Rptr 2d 731 (1992)
. . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*People v. Pasko,* 540 N.E. 2d 462, 132 Ill. Dec. 722 (1989) . 59

*Peters v. State,* 18 P. 3d 1224 (Alaska App., 2001)
. . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Plemel v. Walter,* 735 P.2d 1209, 303 Ore. 262 (Ore., 1987) . 59

*Powell v. Alabama,* 287 U.S. 45 (1932) . . . . . . . . . . . 54

*Risher v. State*, 523 P.2d 421 (Alaska, 1974) . . . . . . 31, 43

*Sara H. v. Bart D.,* 467 N.Y.S. 2d 1001, 121 Misc 2d 425 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*State v. Bible*, 858 P.2d 1152 (Ariz., 1993) (In Banc) . . 35, 58-60

*State v. Boyd,* 331 N.W. 2d 480, (Minn., 1983) . . . . . . . 60

*State v. Carlson,* 267 N.W. 2d 170 (Minn., 1978). . . . . . 60

*State v. Hartman*, 426 N.W. 2d 320 (Wis., 1988) . . . 35, 59, 60

*State v. Jones*, 759 P.2d 558 (Alaska App., 1988) . . 32, 43, 44

*State v. Kim,* 398 N.W. 2d 544 (Minn., 1987) . . . . . . . . 59

*State v. Laraby,* 842 P.2d 1275 (Alaska App., 1992) . . . . . 42

*State v. Simpson*, 946 P.2d 890 (Alaska App., 1997) . . . 48, 52

*State v. Skipper*, 637 A.2d 1101 (Conn., 1994) . . . . 35, 59, 60

*State v. Spann*, 617 A.2d 247 (N.J., 1993) . . . . . . . 35, 58-60

*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 80 L.Ed. 2d 674 (1984) . . . . . . . . . . . . . . . . . . . 31, 43-45, 47, 48, 56

*Tall v. State,* 25 P.3d 704 (Alaska App., 2001) . . . . . . . 42

*Thompson v. Calderon*, 120 F.2d 1045 (9th Cir.) (en banc), *cert. den.* 118 S. Ct. 14 (1997) . . . . . . . . . . . . . . . . . . . 52

*U.S. v. Blaylock,* 20 F.3d 1458 (9th Cir, 1994) . . . . . . . 44

*U.S. v. Gray,* 878 F.2d 702 (3d Cir., 1989) . . . . . . . . 56

*United States v. Span,* 75 F. 3d 1382 (9th Cir., 1996) . . . . 32

*Williams v. Washington*, 50 F.3d 673 (7th Cir., 1995) . . . . 57

## TREATISES AND OTHER REFERENCES

*ABA Standards for Criminal Justice: Prosecution and Defense Function* (3d ed. 1993) . . . . . . . . . . . . . . . . . 54

*Modern status of rules and standards in state courts as to adequacy of defense counsel's representation of criminal client,* 2 A.L.R. 4th 27 §4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## TEXT OF STATUTES AND RULES RELIED UPON

Constitutional Provisions

United States Constitution
Amendment VI

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

United States Constitution
Amendment XIV
Section 1

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Alaska State Constitution
Article I
SECTION 7

**DUE PROCESS.** No person shall be deprived of life, liberty, or property, without due process of law. The right of all persons to fair and just treatment in the course of legislative and executive investigations shall not be infringed.

Alaska State Constitution

Article I

Section 11

**RIGHTS OF ACCUSED.** In all criminal prosecutions, the accused shall have the right to a speedy and public trial, by an impartial jury of twelve, except that the legislature may provide for a jury of not more than twelve nor less than six in courts not of record. The accused is entitled to be informed of the nature and cause of the accusation; to be released on bail, except for capital offenses

viii

when the proof is evident or the presumption great; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.


Statutory Provisions


A.S. 22.07.020

**Jurisdiction.** The Court of Appeals has appellate jurisdiction in actions and proceedings commenced in the superior court involving

...

(2) post-conviction relief;

...


Sec. 12.45.045

**Evidence of past sexual conduct in trials of certain sexual offenses.**

(a) In prosecutions for the crimes of sexual assault in any degree, sexual abuse of a minor in any degree, or unlawful exploitation of a minor, or an attempt to commit any of these crimes, evidence of the complaining witness' previous sexual conduct may not be admitted nor may reference be made to it in the presence of the jury except as provided in this section. When the defendant seeks to admit the evidence for any purpose, the defendant shall apply for an order of the court at any time before or during the trial or preliminary hearing. After the application is made, the court shall conduct a hearing in camera to determine the admissibility of the evidence. If the court finds that evidence offered by the defendant regarding the sexual conduct of the complaining witness is relevant, and that the probative value of the evidence offered is not outweighed by the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the complaining witness, the court shall make an order stating what evidence may be introduced and the nature of the questions that may be permitted. The defendant may then offer evidence under the order of the court.
(b) In the absence of a persuasive showing to the contrary, evidence of the complaining witness' sexual conduct occurring more than one year before the date of the offense charged is presumed to be inadmissible under this section.
(c) In this section "complaining witness" means the alleged victim of the crime charged, the prosecution of which is subject to this section.

ix

A.S. 12.72.010

**Scope of post-conviction relief.** A person who has been convicted of, or sentenced for, a crime may institute a proceeding for post-conviction relief if the person claims

(1) that the conviction or the sentence was in violation of the Constitution of the United States or the constitution or laws of this state;

...

Rules of Court

Alaska Appellate Rules
      Rule 202
      **Judgments from Which Appeal May be Taken.**
      ...
      (b) An appeal may be taken to the court of appeals from a final judgment entered by the superior court or the district court, in the circumstances specified in AS 22.07.020.

Alaska Rules of Criminal Procedure
      Rule 35.1
      **Post-Conviction Procedure.**

(a) **Scope.** A person who has been convicted of or sentenced for a crime may institute a proceeding for post- conviction relief under AS 12.72.010 - 12.72.040 if the person claims:

(1) that the conviction or the sentence was in violation of the constitution of the United States or the constitution or laws of Alaska;

...

Alaska Rules of Evidence

      Rule 404
      **Character Evidence Not Admissible to Prove Conduct--Exceptions--Other Crimes**

x

a) **Character Evidence Generally.** Evidence of a person's character or a trait of character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion, except:

(2) *Character of Victim.* Evidence of a relevant trait of character of a victim of crime offered by an accused, or by the prosecution to rebut the same, or evidence of a relevant character trait of an accused or of a character trait for peacefulness of the victim offered by the prosecution in a case to rebut evidence that the victim was the first aggressor, subject to the following procedure:

(i) When a party seeks to admit the evidence for any purpose, the party must apply for an order of the court at any time before or during the trial or preliminary hearing.

(ii) The court shall conduct a hearing outside the presence of the jury in order to determine whether the probative value of the evidence is outweighed by the danger of unfair prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim. The hearing may be conducted *in camera* where there is a danger of unwarranted invasion of the privacy of the victim.

(iii) The court shall order what evidence may be introduced and the nature of the questions which shall be permitted.

(iv) In prosecutions for the crime of sexual assault in any degree and attempt to commit sexual assault in any degree, evidence of the victim's conduct occurring more than one year before the date of the offense charged is presumed to be inadmissible under this rule, in the absence of a persuasive showing to the contrary.

Rule 613.

**Prior Inconsistent Statements-- Bias and Interest of Witnesses.**

(a) **General Rule.** Prior statements of a witness inconsistent with his testimony at a trial, hearing or deposition, and evidence of bias or interest on the part of a witness are admissible for the purpose of impeaching the credibility of a witness.

(b) **Foundation Requirement.** Before extrinsic evidence of a prior contradictory statement or of bias or interest may be admitted, the examiner shall lay a foundation for impeachment by affording the witness the opportunity, while testifying, to explain or deny any prior statement, or to admit, deny, or explain any bias or interest, except as provided in subdivision (b)(1) of this rule.

xi

## ARTICLE VIII. HEARSAY

Rule 801

### Definitions

The following definitions apply under this article:

(a) **Statement.** A statement is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.

(b) **Declarant.** A declarant is a person who makes a statement.

(c) **Hearsay.** Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

(d) **Statements Which Are Not Hearsay.** A statement is not hearsay if

(1) *Prior Statement by Witness.* The declarant testifies at the trial or hearing and the statement is

(A) inconsistent with the declarant's testimony. Unless the interests of justice otherwise require, the prior statement shall be excluded unless

(i) the witness was so examined while testifying as to give the witness an opportunity to explain or to deny the statement or
(ii) the witness has not been excused from giving further testimony in the action; or

...

Rule 802

### Hearsay Rule

Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Alaska Supreme Court, or by enactment of the Alaska Legislature.

## SUMMARY OF ARGUMENT

K.E.[1], a fifteen year-old high school student, accused her step-father of sexually molesting her. Patrick Harvey, the step-father, was represented at trial by the Alaska Public Defender Agency, and he was convicted. He filed a petition for post-conviction relief on grounds that he was not provided effective assistance of counsel.

The girl had become pregnant when she was thirteen, and, at that time, she reported to Mr. and Mr. Harvey that the father of the fetus was an unnamed seventeen year-old. She had an abortion. When she reported in her fifteenth year that she had been molested, she said that Patrick Harvey was the father of the aborted fetus and that she had no sexual experience with any other person. A laboratory examination of the preserved fetal tissue was reported by an expert for the State to show that the "probability of paternity" for Mr. Harvey was 87.34%.

A minimally competent defense strategy would have (1) utilized any evidence that was available to show that the girl became pregnant by having sexual intercourse with a person other than Patrick Harvey, (2) would have conducted an investigation to

---

[1]The complainant is referred to as "K.E." throughout this brief and fairly consistently in the proceedings on the application in the post-conviction relief. Exhibits received by the court in support of the application for post-conviction relief in some cases include the actual name of the person, and these are made part of the excerpt in a confidential envelope.

1

determine whether there existed evidence that refuted the complainant's claims or could be offered to impeach her credibility, and (3) would have included research into the meaning of the DNA analysis and the law on the admission of testimony about the probability of paternity.

Trial counsel failed to use information known to him that would have served the defense. He called the complainant's brother and her best friend to testify at the trial, but he failed to elicit testimony that the girl had been sexually active with her peers and enlisted her brother to drive her to meetings with boys. The complainant's cousin testified at trial for the defense, but counsel forgot to question her about the complainant's admission that she was having sex with a boy at approximately the time she became pregnant. The complainant's best friend, Jerry Shivers, was called to testify but was not asked about K.E's report that she'd had sex with "Jared." Mr. Harvey did not ask the brother to tell the jury that K.E. had pointed out to him the boy that made her pregnant.

Counsel failed to investigate leads that were given him by Mr. and Mrs. Harvey that would have documented occasions when K.E. said she had had sex with boys or was probably having sex with boys. K.E. told Mrs. Harvey that she had gotten pregnant when she went to the home of her friend, Sabrina, and Mr. Harvey offered to take defense counsel or the investigator to Sabrina's house, but this lead was not followed. Sabrina Dowd's neighbor, Monica Shelton,

2

would have confirmed that K.E. was meeting boys and talking about having sex.

Before the Harvey trial, a number of state Supreme Courts had ruled that the "probability of paternity" derived through genetic testing and statistical calculations was inadmissible; some courts declined to preclude use of the evidence but placed limits on what could be heard by the jury.  An expert consulted by the defense told defense counsel the probability of paternity evidence was inadmissible.  But counsel did no legal or scientific research and failed to send the right report to the expert that he consulted. He failed to notice that the fetal tissue sample was contaminated. Consequently, powerful and arguably inadmissible evidence was introduced, and the cross-examination failed to expose outright errors and insupportable assumptions in the state's expert testimony.

When confronted with these errors, counsel agreed that grave mistakes had been made; he explained that he was exhausted, was working long hours on twenty cups of coffee a day, and he had been asked to take leave from his position.  He agreed that he did not use evidence that he had, failed to develop exculpatory evidence through investigation, and learned about the legal and scientific defects in the DNA testimony for the first time at his deposition.

The record establishes that the state and federal criteria for ineffective assistance of counsel have been met.

3

## JURISDICTIONAL STATEMENT

This appeal is taken from an Order Denying Application for Post-Conviction Relief entered February 2, 2001 at Anchorage, Alaska. The appeal is brought under the authority of A.S. 22.07.020(a)(2) and Appellate Rule 202(b).

4

## STATEMENT OF POINTS ON APPEAL

The trial court erred in denying Patrick Harvey's application for post-conviction relief. The quality of Patrick Harvey's representation at trial did not meet state and federal constitutional standards for the effective assistance of counsel. Counsel was remiss in at least the following ways:

- Failure to Use Information Known to Defense Counsel When Examining Witnesses at Trial.

- Failure to Conduct an Adequate Investigation.

- Failure to Research and Understand DNA Evidence, Take Steps to Preclude the Admission of the Evidence, and Cross-Examine Effectively.

5

## STATEMENT OF THE CASE

### EVIDENCE AT TRIAL

The Complainant's Testimony

K.E. was born December 19, 1977. [Tr. 78][2] She testified that Patrick Harvey married her mother when she was about eight years of age. [Tr. 79] The family moved to Alaska at the end of K.E.'s seventh grade year. Mr. Harvey went to Kodiak to work. [Tr. 85] K.E. testified that Mr. Harvey came home to visit at a time when her mother had gone to California, and he insisted on having sexual relations before he returned to Kodiak. [Tr. 85-86][3] She testified about sexual contact that occurred after Mr. Harvey's Kodiak assignment.

In September 1991, K.E. realized that she was pregnant. She told her parents that the father of the fetus was "some guy I just met" [Tr. 93] and had an abortion in November or December 1991. [Tr. 93] She testified that, after the abortion, she continued to have sexual relations with Mr. Harvey through December 1992 or January 1993. [Tr. 98]

_____

[2]References in this brief to the trial transcript use the designation "Tr." References to the transcript of the May-June 2000 evidentiary hearing conducted on the application for post-conviction relief are designated "PCR Tr." References to an earlier hearing on the petition for post-conviction relief are designated "Tr. April 26, 1996".

[3]Patrick Harvey was acquitted of the charges dated "summer 1991" which, the prosecutor explained to the jury, related to the visit from Kodiak. [Tr. 685; 811-812]

On cross-examination, K. E. said that she did not have sex with anyone in Alaska other than the defendant. [Tr. 132]

Counsel for Mr. Harvey, Michael Karnavas, asked K. E. whether she'd had sex with her boyfriend, Jared, in California before she moved to Alaska in 1991, and K.E. denied having sex. She also denied telling anyone that she had had sex with Jared. [Tr. 131] Karnavas confronted K.E. with letters that she had written when she lived in Alaska [Tr. 128; 205] in which she talked about having a relationship with and having sex with Jared [Tr. 205] and with "Lester". [Tr. 205] K.E. also agreed that she kept a journal with entries of a sexual nature, but she described all of these writings as "fantasies." [Tr. 205-06]

Mr. Karnavas also pursued the line that K.E. had been unhappy in Alaska and that she wanted to return to California; the theory was that she had made a false report that she had been molested in order to get back to California. [Tr. 159-160, 218, 221, 588, 608]

Finally, Karnavas was able to engage the witness on the subject of lying, and K.E. agreed that she told "normal teenage lies." [Tr. 268]

The "Probability of Paternity" Evidence

The state's DNA expert testified that the sample of fetal tissue preserved from K.E.'s abortion was insufficient to yield results from the kind of analysis that is typically done for paternity testing purposes. [Tr. 428] "PCR Typing" was done instead upon a region of chromosome number 6 known as "HLADQ Alpha". [Tr.

7

429] At the HLADQ Alpha locus, two alleles were identified from blood samples taken from Patrick Harvey and K.E., and two from the fetal tissue sample and, when compared, Patrick Harvey was not eliminated as the father of the fetal tissue. [Tr. 434] The allele found in Patrick Harvey's blood and in the fetus was reported by the expert to also be found in 13.7% of the Caucasian population. [Tr. 435]

PCR Typing was also done at a site known as "D1S80" on chromosome number one. [Tr. 436] This testing measures the "number of repeat units that are present in the sample". [Tr. 437] The laboratory identified the pairs of repeat units for the blood drawn from Patrick Harvey and from K.E.   The fetal tissue "had a result that indicated that there were three repeat units present that were amplified by the PCR reaction."   The expert explained that "the reason for this is that the fetal material that was amplified was actually a mixture of DNA from both the mother and from the fetus." [Tr. 438]

The state's expert offered the conclusion that the "probability of paternity for the results with the two systems, DQ Alpha and D1S80, were calculated at 87.34%" based upon the "confined paternity index, which is the genetic odds in favor of paternity, was 6.90." [Tr. 439] The expert explained the paternity index to mean, in laymen's terms, "how likely is this particular individual to be the biological father versus a random person" [Tr. 440]; in this case, the paternity index indicated that "the genetic

8

odds in favor of paternity are 6.9 times more likely that Patrick is the biological father than a random Caucasian person of the population." [Tr. 441] Put a different way, Patrick Harvey, according to the expert, was 7 times more likely than a random Caucasian male to be the father of the fetus. [Tr. 441] A third phrasing for the odds, elicited by the prosecutor was that "if [K.E.] had sex with seven guys, ... we could expect one of those to produce those same results." [Tr. 471-72]

The expert testified that he converted the paternity index to a percentage number by combining the paternity index with "non-genetic odds", using Bayes' Theorem [Tr. 441] The "non-genetic odds" for this purpose was "a neutral position of 50%" [Tr. 441] yielding a "probability of paternity of 87.34%".

Mr. Harvey's lawyer was able to get the expert to agree that full DNA testing using the RLFP methodology would have provided more precise results. [Tr. 446] He also invited the expert to agree with a recommendation of the National Research Council of the National Academy of Sciences that prosecutors and defense attorneys ought not to over-sell the reliability of DNA evidence, and the expert agreed. [Tr. 453] And, finally, the expert admitted on cross-examination that DNA testing thorough and complete and adequate enough to make a positive match could not be done in this case. [Tr. 454, 474] Mr. Karnavas also recited for the witness the civil standard in paternity cases under Alaska law, which allows for a presumption of paternity in cases in which the percentage is

9

95% or more. [Tr. 456]]

Karnavas was able to demonstrate that the expert had made an assumption, in calculating the probability of paternity, that the father of the fetus was Caucasian [Tr. 463], but the witness testified that the outcome would be the same regardless of race. [Tr. 470] The State's expert testified on Thursday, March 10, 1994.

Counsel for Mr. Harvey telephoned a genetics expert on *Friday March 11* to discuss the expert testimony that had been offered in the state's case. He arranged for the expert to testify for the defense in the Harvey trial by telephone on the next trial day, which was March 15. Karnavas made an effort to establish that the expert testimony about the paternity index, possibly useful in a civil paternity case, might be less appropriate in a criminal case. This line of questioning elicited the following unhelpful testimony:

> A.  Well, it's prejudicial in the sense that there's an implication that this person is seven times as guilty as somebody else in the population when, in fact, if one is looking at this in a civil context, it would basically be considered non-informative.  So, to take a situation where in the civil context is not informative and imply that this person is seven times as guilty as somebody else, makes it a very prejudicial statistic without really any probative or useful value.
>
> Karnavas.  Okay.  And, is this an acceptable way of approaching the paternity index or probability of one being the father of a particular child or fetus?
>
> A.  It is in the civil arena.  Now, I don't know what – nobody has ever challenged any of these.  These statistics, the likelihood ratio and the probability of paternity come from Europe.  They've been accepted in the

10

United States for many years and most states require them
to be used in civil cases.  In forensic cases we normally
don't use them.

[Tr. 494-495]

In the course of making this weak and arguably *damaging* point for

the defense, Karnavas also got his expert to say that the numbers

offered by the prosecution were statistically sound.

Karnavas.  ...[W]hat is your opinion regarding that
paternity index?

A.  Well, I – the – the number appears to be accurate.

[Tr. 493]

Karnavas.  Dr. Baird from Life Codes has also indicated
that given the numbers that we have, the 87.34%, based on
that, he's concluded that Mr. Harvey is within a 13% of
the White population pool as being the potential father
in this particular case.

A.  That – if that's what their data says, that's certainly
not out of line with what I have.

[Tr. 495]

Final Argument

The theme that counsel struck in final argument was that K.E.

was made a false report that she been sexually abused by Patrick,

and testified falsely at the trial, in order to move back to

California.  [Tr. 738] As evidence that K.E.'s testimony was

unworthy of belief, counsel cited (1) the lack of proof that the

sexual abuse occurred [Tr. 731]; (2) K.E.'s admission that she is

a liar [Tr. 731]; (3) K.E.'s having stated that she stayed with her

aunt for two weeks to a month after a first – later recanted --

11

report of sexual abuse despite the aunt's contrary testimony [Tr. 732]; (4) the illogic of K.E. stating that she wanted to protect her mother while also saying that her mother was a "bitch" [Tr. 735-737]; (5) the contradiction between K.E.'s report that she particularly remembered Patrick Harvey coming home to Anchorage from Kodiak and a sexual encounter taking place at that time and Connie Harvey's testimony that Harvey never came back from Kodiak during this period [Tr. 738-739]; (6) an apparent contradiction between K.E.'s complaint about Patrick Harvey and her having written down explicit sexual fantasies [Tr. 740-741].

Challenging the DNA evidence, counsel argued that the statistics showed that, of one hundred people, thirteen would be in the pool of possible fathers, or 1300 would be in a pool of 10,000 white males in Anchorage. [Tr. 743-746] He also argued, inexplicably, that, when K.E. reported that she was sexually abused, she could not possibly have known that fetal tissue from the abortion would be preserved and susceptible of DNA testing. [Tr. 746] The DNA arguments were drawn together to this conclusion:

> So, what proof do they have that this, you know, aborted fetus is Patrick's? They have none because two years later she makes this accusation...

[Tr. 747]

> Two years later it's a lot − it's pretty easy to make that accusation and how is someone to prove against it if they're within this 13% of the pool?

[Tr. 748]

> Well, on cross-examination, Dr. Baird, isn't it a

12

fact that you can line up seven people and three out of
the seven or four out of the seven will not even be
within the pool? Yes. Just like you could have all
three people who may be? Yes. In other words Dr. Baird
added nothing to their case as the scales will show here
because there's nothing to back up, you see, [K.E.'s]
story.

[Tr. 755]

Reaching the conclusion of his summation, counsel reminded the
jury that "the rules were the rules"; K.E. "was not allowed to go
car dating, she wasn't allowed to use the phone over a period of
time." [Tr 770]

### EVIDENCE RECEIVED AT HEARINGS ON
### PETITION FOR POST-CONVICTION RELIEF

Defense Objective to Show that
K.E. Had Sex with Other Males

Trial counsel knew, before trial, that K.E. would claim that
she had never had sex with anyone but Patrick Harvey. [Exc. 146,
206] Trial counsel acknowledged, during a colloquy with the trial
judge, that showing that K.E. was sexually active, if it could be
done, was necessary to rebut the state's portrayal of the girl as
someone who'd not had sex with anyone but the defendant and who
must therefore have gotten pregnant by the defendant. [Tr. 117] The
public defender investigator agreed, during questioning by the
court at the hearing on the Petition for Post-Conviction Relief,
that the objective for the defense was to establish that someone
other than Harvey had had sex with K.E., particularly during the
period of time prior to the abortion. [PCR Tr. 194, 214]

13

Evidence Known to Defense Counsel
That was Not Used

K.E.'s best friend, Jerry Shivers, was interviewed by Michael Karnavas on the day she testified in the Harvey trial or the day before she testified [Exc. 49] She told Mr. Karnavas that K.E. said that she'd had sex with someone named "Jared" in California. [Transcript of Proceedings April 26, 1996, 30] Mr. Karnavas agreed that she told him this. [Exc. 173] Although Karnavas called Jerry Shivers to testify at the trial, he did not ask her about K.E.'s sexual experience. [Tr. 620-638]

James Esquivel, K.E.'s brother, advised Karnavas that K.E. had told him that a boy at her school had made her pregnant, and she gave him the number of the school bus that he rode on. [Exc. 53] James Esquivel told Karnavas that he would drive K.E. to places where she would meet boys, drove her once to her boyfriend's house [Exc 53], and once drove a boy to meet her. [Exc. 122] Karnavas confirmed that James Esquivel gave him this information. [Exc. 207] Although J. E. testified at trial, Karnavas forgot or neglected to ask him about the boy that K.E. named as the father and failed to ask about her other dates. [Tr. 596-619]

Before trial, the District Attorney forwarded notes of an interview with Summer Smith to Michael Karnavas. [Exc. 170] According this account, K.E. told Summer Smith, her cousin, that she had had sex with a boy named Chris in California before she moved to Alaska. K.E. had also written to Summer from Alaska that

14

she had sex with someone.  The Public Defender investigator, Kim McGee, then interviewed Summer by telephone; Summer told Kim McGee that she remembered talking to K.E. by telephone when K.E. lived in Alaska, and K.E. had reported to her that she was having sex with Chris and was concerned about pregnancy.  She guessed this was one and one-half to two years previous (before the trial in March 1994) Summer also provided the investigator with the names of other boyfriends that K.E. had had in Alaska, naming Earl, Chad and Lester.   The investigator took notes by hand during the conversation and typed a memo to Mr. Karnavas. [Exc.   171-173] Summer was called as a defense witness, but counsel neglected to ask her about K.E.'s admissions of sexual activity before and during her stay in Alaska. [Tr. 584-595]

Evidence that Was Readily Available
If an Adequate Investigation Had Been Done

Mr. Harvey, for his part, collected materials to assist Karnavas in preparing his defense and delivered them to the public defender office.   Among them, he provided K.E.'s "Victorian journal" on a back page of which K.E. had written a list of her boyfriends, with the date that she started going out with each and the date that she stopped. [PCR Tr. 157, Exc.   168] There was a picture of K.E. and a fellow in a letter dated January 11, 1993, and the license plate number of a boy that had been taking K.E. out of school without permission. [PCR. Tr. 158] K.E. had told her mother that she had gotten pregnant when she went to her friend

15

Sabrina's house, so he offered to show the public defender investigator where Sabrina lived. [PCR Tr. 258] Mr. Harvey also gave the investigator the names of K.E.'s friends. [PCR Tr. 258] The State stipulated that Mr. Harvey took an active part in attempting to assist in his own defense. [PCR Tr. 164] None of the leads provided by Mr. Harvey were utilized during the investigation [PCR Tr. 185-186] or at trial.

James Esquivel had given the public defender investigator the names of three of K.E.'s girlfriends, but the investigator file does not reflect that any were contacted. [PCR Tr. 186]

Monica Shelton's was a name that was given to the defense by the Harveys. She testified by affidavit that she, Sabrina and K.E. on several occasions went to a teen night club near her house, and that K.E. left with a guy that she didn't know. [Exc. 131-132] K.E. had once asked K.E. to provide an alibi for her if her father, Patrick Harvey, were to call Monica. [Exc. 132] Monica Shelton said that K.E. made fun of her and Sabrina for being virgins, and "talked about having sex as if it were really fun." [Exc. 132] Monica Shelton was never contacted. [PCR Tr. 186]

James Esquivel's friend, Michael Thorp, confirmed that he and James Esquivel would take K.E. to her friends' when they had told the Harveys that they (K.E. and James Esquivel) were spending time together. He remembered taking a boy to meet K.E. on one occasion, and finding K.E. home with three boys on another. [Exc. 127-128]

16

When the parents began to figure out what was happening and to monitor K.E.'s activities more closely, she became angry. [Exc. 128] Michael Thorp was not interviewed or called as a witness.

Jerry Shivers would also have produced, if asked, a number of letters that K.E. had written to her, primarily about boys. In April 1992, K.E. offered some advice to her friend about how to deflect her mother's questions about Jerry having sex. [Exc. 169] Among the letters was a July 5, 1993 letter Jerry received from K.E. shortly after she filed her complaint of sexual abuse. In this letter she said that "we did the same thing you and Reven, you and Nate did 3 times. I didn't protect myself." [Exc. 211-212] But Karnavas was uninterested in what Jerry Shivers had to say, badgered her and reduced her to tears during the 15-minute interview. [Tr. April 26, 1996: 14, 38-39] And the trial had already started.

Trial Counsel's Reflections
on the Preparation and Presentation
of the Defense Case

When Karnavas was shown how he had neglected the exculpatory evidence that he had, failed to investigate obvious available sources of proof that the girl was having sex with someone other than Harvey, and misunderstood the genetic evidence utterly, Karnavas admitted that he had made glaring errors in the preparation of the case for trial and in the conduct of trial. [Exc. 194] Karnavas testified that was trying cases back-to-back,

17

worked long hours, was suffering from insomnia, slept three hours a night, and had no social life as the Harvey trial date approached. [Exc. 179-182, 224, 226] He was drinking as much as twenty cups of coffee a day to carry on. [Exc. 224] Karnavas was not getting along with the Agency's investigators who were "ready to kill me" by the end of a case [Exc. 205], was not getting along with coworkers and was not polite to the clients. [Exc. 195] He said that he had developed a reputation for making people cry. [Exc. 227] The Public Defender had recently "suggested" that he take a "leave of absence." [Exc. 193]

Karnavas recollected that the prosecutor had made an acceptable offer to settle the case, and nothing was done on the case pre-trial because he was confident that he could convince Patrick Harvey to take the deal. [Exc. 187-188] Karnavas tried to convince Mr. Harvey to plead guilty and warranted that, if Mr. Harvey entered a plea, he would serve just one and one-half to two years. [PCR Tr. 160] Preparation for trial was put on the "back burner." [PCR Tr. 260] In fact, no B or C felony plea agreement had *ever* been offered. [PCR Tr. 68][4] The trial file includes a response from Susan Wibker, the prosecutor, to an *offer that Karnavas had*

---

[4]Karnavas agreed that Harvey had communicated to him that he was not interested in any "deal" and always said he was innocent. [Exc. 189, 204] But Karnavas thought that Harvey was guilty. Only when he cross-examined K.E. at trial, and only after engaging with her during her cross-examination did he become "positive that he [was] innocent." [Exc. 189, 191]

_made_ just before trial dated February 28, 1994: "There is no B on the table.  Offer rejected." [Exc.  48]

The investigation began, then, with "frantic activity a few days before trial."[Exc. 225; PCR Tr. 222] The investigator's notes show that she was attempting interviews on March 2, 4, 6, 7 and 8, with the trial starting on March 7. [PCR Tr. 203-207] Jerry Shivers was interviewed by the investigator by telephone on March 4 and March 7 and seen by Karnavas on the day she testified or the day before she testified. [Exc. 49] Karnavas interviewed James Esquivel, the brother, twice, once the week before trial and once closer in time to the day he testified. [Exc.  52]

K.E. testified at trial that she'd not had sex with anyone but the defendant, as Karnavas expected she would. But Karnavas didn't present a case at trial that K.E. had had sex with others. Certainly, he testified, he would have introduced K.E.'s letters to Jerry Shivers, if he had had them [Exc.  209-210], and, on examining them, he offered the opinion that they would been admissible [Exc. 214] and that they would have been "potent as far as discrediting K.E." [Exc.  216]  Mr. Karnavas said that he had not seen the letter about sex with Keith, but that it would have been powerful evidence that K.E. was not sexually inexperienced as she claimed. [Exc. 211-213]

Mr. Karnavas was examined about information that he had received from his investigator prior to trial to the effect that

19

K.E. had a telephone conversation with her cousin, Summer, during the time that K.E. lived in Alaska and K.E. had reported that she was having sex with "Chris" and had concerns about pregnancy. [Exc. 221]. Karnavas agreed that the cousin, Summer, had testified at the trial, but that he had not asked her about K.E.'s statement that she was having sex in Alaska. [Exc. 223-224] Karnavas' only explanation for the failure to introduce this crucial evidence was that he was exhausted. [Exc. 224]

Counsel was also asked about the evidence that James Esquivel had provided, that K.E. was meeting boys with his assistance and that she had identified for him the boy that made her pregnant. [Exc. 207-208] He offered no tactical or other reason for neglecting to examine James about this when he testified.

Trial Counsel's Did Not Research or Understand
the Legal and Statistical Problems with
the State's Expert Testimony on the
Probability of Paternity

The State provided in discovery two reports prepared by Lifecodes Corporation which contained the results of Lifecodes' analysis of the DNA material in Patrick Harvey's blood, a sample of K.E.'s blood, and preserved tissue from K.E.'s 1991 abortion. The June 21, 1993 report is in two parts. The "Hae III Report" indicates that "no conclusions could be drawn using RFLP analysis due to the *degraded nature of the tissue sample*." [Exc. 240] Another section dated June 21, 1993 but separately titled "PCR Report" shows a paternity index of 3.65 and a probability of

20

paternity of 78.5%. The results include the disclosure that the persons preparing the report had assumed a "prior probability" of 0.5. [Exc. 242-244] A second report dated September 3, 1993 was forwarded to the public defender office on September 16, 1993. This report, titled "Additional PCR Report" reflected a "combined paternity index" of 6.90 and a probability of paternity of 87.34%. [Exc. 248] This report disclosed, once again, the use of a prior probability of 0.5 [Exc. 250], and also the peculiarity that the fetal tissue sample had 3 alleles at the D1S80 locus. [Exc. 249]

When questioned about the state's use of evidence of the "probability of paternity" statistics, Michael Karnavas said that he did not know before or during trial, and did not know until he was deposed, that the "probability of paternity" figure was calculated using an assumed "non-statistical" 50% probability of guilt. [Exc. 203, 263] Karnavas testified that he had never heard of Bayes' Theorem. [Exc. 196] He was not aware that the Supreme Courts of Massachusetts, Connecticut and Oregon, before the Patrick trial, had criticized the use of "probability of paternity" statistics in criminal cases because of the 50 per cent prior probability figure utilized in the Harvey calculations. [Exc. 203]

Mr. Karnavas did not research how courts hearing criminal cases had treated the use of probability evidence. [Exc. 196-197] He never thought about the admissibility of such evidence. [Exc. 198] He testified that he thought that the DNA probability figure allowed an opening for the defense "big enough to drive a Mack

21

truck through". The notion that the probability of paternity evidence might be harmful to the defense case "never occurred to [him]." [Exc. 199] On reflection, he agreed that he should have moved to suppress the evidence. [Exc. 200] He said:

> I didn't do it. I didn't see it. It was wrong...
> I just – obviously it was a – stupid decision on my
> part not to – to look at it from that point of
> view.

[Exc. 201]

Karnavas had received the two expert reports from the prosecutor, but the second report was mislaid and forgotten, and the defense expert contacted in December 1993 was sent only the first report. [PCR Tr. 236-237] The defense investigator testified that she didn't know that the second report existed. [PCR Tr. 237] Michael Karnavas and Patrick Harvey discussed only the first report. [PCR Tr. 277] It was Patrick Harvey's observation that Karnavas did a double-take when the second report was produced by the prosecutor at trial; Harvey had never seen it before. [PCR Tr. 277-278]

Karnavas had been alerted that there were grounds for excluding the state's "probability of paternity" testimony. In December 1993 his investigator had written a letter to a DNA expert, Moses Schanfield, at the Analytical Genetic Testing Center in Colorado, attaching the June 21, 1993 report from the state's expert. [Exc. 56, 236] Dr. Schanfield hand-wrote a short note that he faxed to Karnavas on December 15, 1993. He advised that

22

*"probability of guilt is non-admissible."* [Exc. 60] On January 18, 1994, two months before trial, Dr. Schanfield told the defense investigator by telephone that the probability of paternity was non-admissible. [Exc. 57, 236, 251] The investigator felt confident that she passed Dr. Schanfield's observations along to Karnavas. [Exc. 237]

Dr. Schanfield, of course, knew that other states had precluded this type of evidence, and courts in other states had ruled that the use of Bayes' Theorem in calculating this probability rendered the evidence inadmissible "because the calculations start with an assumption that there is a 50% probability of guilt." [Exc. 56] Dr Schanfield was aware that attorneys had filed motions to preclude the use of such evidence. On January 18, 1994 Dr. Schanfield spoke to Karnavas on the telephone, and, on this occasion also, he advised Karnavas that the "probability of guilt" was not admissible. [Exc. 57] But no application was made to the trial court to preclude the use of the "probability of paternity" evidence and no arrangements were made to have Dr. Schanfield or another expert testify.

Mr. Karnavas recalled being "a little panicky" after the state's expert testified. [Exc. 185] Five days into the trial he asked his investigator to locate Dr. Schanfield, and Karnavas spoke to Dr. Schanfield by telephone on the afternoon on March 11. [Exc. 183] The investigator then faxed, for the first time, a copy of

23

the September 3, 1993 report from Lifecodes with some questions about the testimony of the State's expert. She asked Dr. Schanfield if there was a "constitutional problem" with evidence that Patrick Harvey was seven times more likely to be the father of the aborted fetus than the average white man. [Exc. 57, 238]

Expert Testimony About the Probability
of Paternity Evidence and Defense Counsel's
Treatment of the DNA Evidence

In the post-conviction relief proceedings, counsel for Mr. Harvey requested one of the country's pre-eminent experts on the forensic use of genetic testing to review the testimony that was received by the court at Patrick Harvey's trial. It was the opinion of Professor D.H. Kaye that

(1) that this presentation was inaccurate and misleading;

(2) that a defense attorney who was familiar with the legal literature and caselaw on parentage testing in civil and criminal cases should have objected to Dr. Baird's testimony that (a) the paternity index gives "the genetic odds in favor of paternity" and that (b) the "probability of paternity" for Patrick Harvey was 87.34%; and

(3) that, even if these objections were overruled, such an attorney might have been able to show that the scientific tests did not provide "the genetic odds in favor of paternity," and that the 87% figure was arbitrary and should not have been accepted at face value.

[Exc. 62]

Professor Kaye explained, in his opinion letter, that the State's expert made an error in his testimony about the paternity index; this particular error is notorious in the legal and

24

statistical literature, and it has come to be called the "fallacy of the transposed conditional," the "inverse fallacy," or the "prosecutor's fallacy." Professor Kaye offered a simple example of the prosecutor's fallacy: Because the probability of a person being a lawyer given that he is a Supreme Court Justice is 100%, it can't be said that the probability that a person is a Supreme Court Justice given that he is a lawyer is 100%. [Exc. 64].

The paternity index demonstrates mathematically how many times more likely a person with Mr. Harvey's genotypes would be to contribute the 1.1 and 18 alleles [the alleles found in the fetal tissue sample] than would a man drawn at random (from the men represented in the databases that Lifecodes used to estimate the frequencies). [Exc. 67] This number was calculated by Lifecodes to be 6.886.

The "probability of paternity" is obtained "by combining the paternity index with the odds (*apart from the genetic evidence*) that the accused man is the biological father. This formula allows the statistician to solve the Supreme Court Justice problem, that is, to convert the probability of A *given B*, to B *given A* by using *Bayes Theorem*. "In paternity cases, the theorem offers a way to combine the genetic evidence with the nongenetic evidence to arrive at a final probability that the tested man is the biological father." [Exc. 68]

The formula for calculating the probability of paternity,

25

using the paternity index calculated for this case is:

6.9 x nongenetic odds

1 + 6.9 x nongenetic odds

[Exc. 68] The probability of paternity, of course, will vary as different values for the nongenetic odds are plugged into the formula. A juror might assign the nongenetic evidence a low value, consequently depressing the probability of paternity, and another juror might find the nongenetic evidence more compelling, placing a high numerical value on the nongenetic odds, thereby increasing the probability of paternity. Dr. Kaye's report includes a chart that demonstrates how the probability of paternity will increase or decrease with changes in the "starting probability" or prior probability. [Exc. 69]

The problem that occurs when *Bayes Theorem* is invoked without disclosure and explanation is that the statistician's assumption about the value of the nongenetic odds is unknown and unexplained to those using the statistic as a source of information. The State's expert in the Harvey case assumed, for purposes of his calculation, that the probability that the tested man, Patrick Harvey, was the father was 50%. As Professor Kaye explained, "In effect, he assumed that there were only two men who could have been the father, and that the defendant and the unknown man were equally likely to be culpable." [Exc. 64] Professor Kaye took issue with state's expert's explanation to the jury that the .5 value for the

26

non-genetic odds that he used in his calculation "was a neutral position ... for the non-genetic odds." [Exc. 70]

Dr. Baird, the state's expert at trial, presented the probability of paternity as a single number, 87.34%, even though that number varies with the fact finder's assessment of the other evidence in the case. [Exc. 69] It is only 87.34% if the prior probability is 50%. And, Dr. Baird described the paternity index as "the genetic odds in favor of paternity." Professor Kaye's assessment is that these statements were just wrong.

> But the paternity index is a ratio of two conditional probabilities – it does not give the odds of anything, let along the odds that Mr. Harvey is the father...[I]t relates to the chances of seeing the genetic evidence under the competing hypotheses of paternity and nonpaternity.
> ...
> The Dqα testing did not show that Mr. Harvey was "3.65 times more likely to be the biological father than a random person." A PI of 6.9 does not mean that the odds of Mr. Harvey's paternity were 6.9 to 1.

[Exc. 70]

Professor Kaye particularly condemned Dr. Baird's testimony that Patrick Harvey was seven times more likely than the random white male in Cincinnati to be the father of the fetus.

[Exc. 70]

Dr. Kaye's report includes a list of seventeen state Supreme Court cases and articles in the legal literature, seven of which were available to Mr. Karnavas at the time of the Harvey trial, that warn of the use of the transposition fallacy by prosecutors

27

and their experts. Dr. Kaye also provided fourteen cases and articles that criticize, or reverse, convictions based on the use of an undisclosed prior probability. [Exc. 71-74]

Dr. Kaye offered the opinion that the presentation of the genetic evidence in the Harvey case corrupted the fact-finding process:

> Based on my review of the transcript ... I do not believe that the jury had a realistic opportunity to give the genetic test results the weight that they deserved. Given the repeated and unchallenged statistical misinterpretations of the DNA tests, it is hard to imagine how even the most intelligent juror could have recognized that Lifecodes did not know the "genetic odds in favor of paternity" and the "probability of paternity" was not necessarily 87.34%, but some figure that depended on the juror's assessment of all the other evidence in the case.
> Furthermore, by asserting that the final probability of paternity of 87.34% was based on a "neutral position," the testimony invited the jurors to presume that in the absence of any other evidence, they should act as if the state already had established that it was 50% probable that Mr. Harvey was guilty. This presumption conflicts with the constitutionally mandated presumption of innocence. Jurors should not be asked to regard a person accused of a crime as unusually likely to be guilty as charged. Arguably, they should approach the evidence from the starting point that a defendant is neither more nor less likely than a randomly selected person to be guilty of an offense. Using a starting point of 50% for assessing guilt cannot be reconciled with this principle.

[Exc. 74]

Consequently, in Professor Kaye's view, it fell to defense counsel to move to exclude the evidence that was improperly before the jury and, if unsuccessful, to cross-examine intelligently.

> For these reasons, I believe that a defense attorney who had reviewed the pertinent literature and

28

investigated the genetic evidence in this case with reasonable thoroughness would have questioned the scientific testimony on evidentiary and constitutional grounds that apparently were never considered in this case. Despite the decisions of the supreme courts of other states excluding the "probability of paternity" in criminal cases, defense counsel did not seek to exclude the misleading "probability of paternity", did not dispute the "neutral position" of a 50% starting probability of guilt, did not inquire into the implications of the extra allele in the tissue sample, and did not notice the transposition fallacy. Instead, counsel allowed clearly fallacious testimony about the genetic tests to come in and engaged in cross-examination that revealed a profound lack of understanding of the prosecution's numerical evidence.

[Exc. 74]

Professor Kaye also offered his opinion that Dr. Schanfield

had, if anything, underscored the errors in the Baird testimony.

Yet, if anything, Dr. Schanfield actually reinforced Dr. Baird's erroneous portrayal of the paternity index and the probability of paternity. When defense counsel stated that Dr. Baird "testified that the probability or the paternity index is seven times as likely of it being Mr. Harvey," Dr. Schanfield accepted this transposed conditional, and replied that "Well, I – the – number appears to be accurate ... that number is accurate if it's used in civil cases." Transcript at 493. He maintained that the 7-to-1 ratio and the figure of 87% certainty were acceptable "in the civil arena." Id. At 494. He added that these statistics have "been accepted in the United States for many years." Id. At 495. His theory was that even though the odds in favor of guilt were 7 to 1, they should (for some mysterious reason) "basically be considered non-informative" because this case was not "in the civil context." Id at 494. This testimony defies common sense. If genetic tests are informative and tend to show paternity in one context, they tend to prove it in another. Jurors listening to Dr. Schanfield could have had no idea that the odds in favor of guilt were not 7 to 1 – both experts testified that they were – or that the 87% "probability of paternity" presupposed tha the remaining evidence in the case proved guilt to the level of 50%. Dr. Schanfield simply gave the jurors another reason to believe what Dr.

29

Baird had mistakenly said about these figures, and he gave them no comprehensible, let alone plausible, reason to discount the incorrectly portrayed numbers in this case.

[Exc.  69]

In response to the written testimony of Professor Kaye at the hearing on the petition for post-conviction relief, the state introduced the opinion letter of George Riley, assistant director of the Fairfax Identity Laboratories in Fairfax, Virginia.  Dr. Riley agreed with the Professor Kaye in every respect.  He added that the paternity index of 6.9 and the probability of paternity of 87.34% "are both significantly lower than typically encountered in routine paternity tests," a routine paternity index being higher than 100 "which is the industry standard for minimum PI."  And "a routine probability of paternity is greater than 99%, which is the industry standard for the minimum probability of paternity."  Dr. Riley differed from Professor Kaye only in his evaluation of the way that the weaknesses of the genetic evidence was presented, which, he thought, were "effectively addressed."  [Exc.  150-151]

Expert Opinion on the
Adequacy of the Defense Effort

*Investigation and Fact Evidence*

Mr. Harvey enlisted the services of James McComas to evaluate the adequacy of his representation.  Mr. McComas was found by the court to be "an expert in the field of criminal law that enables him to give opinion testimony in this proceeding. [PCR Tr. 303] The

30

court received both a written opinion [PCR Tr. 298] and Mr. McComas' live testimony.

McComas identified five areas in which, in his opinion, "trial counsel's representation failed to meet the standard of 'a lawyer with ordinary training and skill in the criminal law.'"

1.  Failure to Understand and Exclude, or Effectively to Confront, DNA Evidence.
2.  Failure to Request, Obtain & Argue the Cautionary Instruction on Admissions by the Accused.
3.  Failure Adequately to Investigate & to Incorporate Investigation in the Preparation and Presentation of the Defense.
4.  Failure to Litigate Non-Specific Counts Prior to & At Trial.
5.  Failure to Protect Accused from Improper Inferences of Guilt.

[Exc. 93] It was Mr. McComas' opinion that "each of the five areas of ineffectiveness independently raise at least a reasonable doubt that trial counsel's conduct contributed to applicant's convictions on Counts III-X," referencing the Alaska standard from *Risher v. State*, 523 P.2d 421, 424-25 (Alaska, 1974). McComas also addressed the federal standard for ineffective assistance of counsel, concluding that "under the federal standard, areas 1, 3 & 4 are independently sufficient to create a "reasonable probability" that, but for those errors, the outcome of the trial would have been different," citing *Strickland v. Washington,* 466 U.S. 668 (1984). [Exc. 94]

Mr. McComas rejected the notion that trial counsel's failures could be construed as tactical decisions. Acknowledging that the

31

case law[5] allows a reviewing court to presume that an attorney's actions were "motivated by sound tactical considerations," McComas concluded, citing *State v. Jones*, 759 P.2d 559, 569 (Alaska App., 1988), *Arnold v. State,* 685 P.2d 1261 (Alaska App., 1984), and *United States v. Span,* 75 F. 3d 1382, 1390 (9th Cir., 1996), that this attorney's presentation was not entitled to the presumption because the mistakes were made because of the failure to investigate and research the issues, or ignorance, rather than strategy. Reviewing Karnavas' deposition, McComas observed that "trial counsel admitted that almost none of his challenged acts/omissions arose from, or were supported by, tactical decision-making." [Exc. 93]  To the degree that Karnavas claimed tactical justifications, those tactical justifications, in Mr. McComas' opinion, were "objectively unreasonable, and cannot excuse his conduct." [Exc.  92]

Mr. McComas' assessment of the investigation, and Karnavas' use of the material that he had, was that counsel's failures abridged Mr. Harvey's constitutional rights to confrontation, compulsory process, and due process. [Exc.  92]

> There was abundant, powerful evidence readily available to the defense to support its claims, but which the jury never heard.  Some of this evidence was known to the defense at the time of trial, and was simply not used.  Some was known to the very witnesses called by the defense at trial, but neither discovered in, nor elicited

---

[5]*Strickland v. Washington,* 466 U.S. at 698); *State v. Jones,* 759 P.2d at 569.

from, them. Remarkably, the facts embedded in some of
this evidence were vaguely raised or insinuated during
K.E.'s cross-examination. These suggestions were met
with denials by K.E., and the defense never confronted
her with, nor attempted to introduce, the readily
available contrary evidence.

[Exc. 105]

Here, the investigation did not begin in earnest
until the eve of trial. [Deposition, 153] In the rush,
readily available exculpatory evidence was overlooked by
trial counsel and/or his investigator. A lack of
adequate communication and preparation resulted in trial
counsel's ignoring and/or forgetting substantial,
available exculpatory evidence. Important facts
uncovered by his investigator and disclosed by the state,
just never made it into his comprehension of the case.
In turn, that information never made it into his
evidentiary presentation at trial.

[Exc. 109] Mr. McComas's opinion letter includes a detailed list

of the items of evidence or factual propositions that were known to

the defense but not used and a second list of facts known to the

defense witnesses that were never discovered and never used. [Exc.

105-107] The opinion letter sets out the case law supporting the

admissibility of the evidence that counsel overlooked, forgot, or

failed to develop. [Exc. 110-111]

The expert's evaluation of the impact of these errors on the

outcome of the trial was that the failures to develop and present

factual evidence was sufficient independently to establish

ineffective assistance of counsel.

Here, the case was lost because trial counsel never
internalized the results of the defense investigation,
and because other readily available exculpatory evidence
was not uncovered from the very witnesses the defense
presented at trial. Competently used, this evidence

33

would have shattered the image of K.E. that she and the prosecutor portrayed.   K.E.'s bias and motives to fabricate would have ben proven by her own words and writings to others.   At least a reasonable doubt would arise as to who got her pregnant... In my opinion, there is much more than a reasonable doubt that his failure to do so contributed to the applicant's conviction.

[Exc.  112]

*Expert Opinion: DNA Evidence*

Mr. McComas' assessment of trial counsel's treatment of the

DNA evidence compelled the same conclusion, on separate grounds.

Although, prior to trial, he received written reports from Lifecodes, trial counsel never learned about or understood the state's DNA evidence.  He did no research, and failed to make any effort to exclude or limit the state's DNA evidence and related testimony.  He was oblivious to the existence and significance of physical evidence that the fetal tissue sample had been contaminated.  He never learned about or understood the potentially unconstitutional assumption underlying the 87% PoP [probability of paternity] figure.  He never learned about or understood what conclusion could validly be drawn from the PI [paternity index], and where the state's expert and argument exceeded that limit of validity.
                    . . .
Although this highly technical genetic and statistical evidence constituted half of the "corroboration" for K.E.'s accusations, trial counsel did not substantively consult with a qualified expert on DNA until he was already in trial. [Deposition Tr. 51-54] He characterized this belated effort as "sort of an afterthought." [Deposition Tr. 53] This was far too little, way too late.

[Exc.  96]

Trial counsel was on notice that DNA evidence of paternity of

exactly the type that the state proposed to introduce at trial

had been found inadmissible by other courts because the expert that

34

he had briefly consulted three months before trial, Dr. Schanfield, told him that the evidence was inadmissible. Mr. McComas' observation was that, had counsel acted on the suggestion of his own expert, he would have discovered, not only case law supporting a motion to exclude the evidence altogether, but also, in the text of the cases themselves[6], sufficient information about paternity statistics to conduct a competent cross-examination. [Exc. 97]

With a modest research effort, in Mr. McComas' view, even failing in the attempt to have the DNA test results excluded, counsel could have demonstrated that the 87% probability of paternity number depends wholly upon the unsupported presumption that the non-genetic odds of guilt were 50%. [Exc. 97]

Counsel should have understood and been able to elicit from the witness a correct description of the information accurately and actually conveyed by the paternity index. Dr. Baird's statement that the paternity index means that Mr. Harvey is 6.9 times more likely to be the father than a randomly selected man "is flat wrong." [Exc. 97] Mr. McComas' paraphrase of Professor Kaye's advice on the implications of the paternity index is neat,

---

[6]Mr. McComas offered, as examples from the legal literature: *State v. Bible*, 858 P.2d 1152, 1184-89 (Ariz., 1993)(In Banc); (DNA random match probability calculation and testimony inadmissible); *State v. Skipper*, 637 A.2d 1101, 1103-08 (Conn., 1994) (PoP based on Bayes' Theorem inadmissible; conviction reversed); *State v. Spann*, 617 A.2d 247 (N.J., 1993) (same; new trial ordered); *State v. Hartman*, 426 N.W. 2d 320, 326 (Wis., 1988)(same; reversed). [Exc. 97]

understandable and worth repeating.

> What the PI actually means is that **all** of the 78,000
> Alaskan men, or of the millions of American men, having
> applicant's genotypes are 6.9 times more likely to father
> a child with the specified genotypes than a randomly
> selected man would be. [D.H. Kaye opinion letter, 3, 6]
> Conversely, the PI is the relative probability of the
> genetic evidence occurring, given that the tested man is
> the biological father; it is not the "odds" that the
> tested man is the father, given the biological evidence.

[Exc.  97]

Mr. McComas also cited Karnavas for failing to notice the
presence of an extra allele at one of the gene loci and exploiting
its implications.  Dr. Baird, the state's expert, had made the
assumption that the fetal tissue sample contained three alleles
because some maternal tissue must have been collected with the
products of conception, and this assumption was reflected in his
written report.  But, Mr. McComas points, out, there were other
possibilities, including defects in the chain of custody.  The
contamination of the sample provided a "promising basis for
objecting to admission of the PCR test results", and, if that
effort failed, a credible point for cross-examination. [Exc.  98]

Mr. McComas anticipated and rejected the suggestion that
counsel's "pathetically weak" cross-examination of the state's
DNA expert was the product of a rational strategy.  Even were there
something to be said for allowing the state's testimony to be
admitted, as the springboard for a devastating cross-examination,
"trial counsel did virtually nothing to pursue the belatedly

claimed strategy." [Exc.  100] And the strategy was objectively
unreasonable:

> [T]his quasi-sponsorship "tactic" is not objectively
> reasonable in a winnable case.   It is even more
> unreasonable where, as here, it is invoked as to one of
> only two categories of corroboration for the solitary
> accuser's   testimony.     Fourth,   it   is   objectively
> unreasonable   to   stand   idle   while   the   prosecution
> introduces contestable "scientific" evidence that one's
> client is 87% likely to be guilty of Count VI, even in
> the absence of any other evidence against him.

[Exc.  100] Mr. McComas' opinion was that calling Dr. Schanfield to

testify did not repair the damage done by counsel's allowing the

Baird testimony to stand.   Dr. Schanfield described Dr. Baird's

paternity index number as "accurate," and counsel, because he was

unprepared, failed to use his witness to identify and explain that

Dr. Baird's testimony was an example of "prosecutor's fallacy" or

that there was a 50% probability of guilt "built into" Dr. Baird's

probability of paternity calculation. [Exc. 101]

## DECISION BELOW

Court Disregards Self-Assessment of Trial Counsel

Judge Sanders stated his findings in open court. He first discussed trial counsel's own reflections on the quality of his representation of Patrick Harvey, which were presented to the court in a 1995 affidavit and a deposition taken in 1998. Judge Sanders was skeptical about the value of such evidence: "[N]o attorney can be expected to have a clear recollection of why things were done or not done years after the trial is concluded." [Tr. 431-432] Ultimately, Judge Sanders disregarded the statements made by trial counsel.

> But regardless of whether Karnavas or any other attorney subjectively believes that he or she did an excellent job or a completely incompetent job, this court must make an independent evaluation of the record in assessing all of the decisions. Consequently, this Court will not defer to Michael Karnavas in his appraisal of his performance, either in the 1995 affidavit or his 1998 deposition.

[Exc. 27]

Court Dismisses Claims that
Trial Counsel Was Not Asked About

Judge Sanders reviewed the evidence that was readily available to defense counsel that could have been utilized to undercut her credibility. [Exc. 28] The court's first conclusion was that there were four factual propositions raised by Harvey in the post-conviction relief proceedings that trial counsel had not been asked about. Because Karnavas did not address these four topics in

38

either his affidavit or his deposition testimony, Judge Sanders ruled that Harvey had "offered inadequate evidence to rebut the presumption that Karnavas acted competently based on sound tactical choice." [Exc. 28]

Two examples of ineffective assistance of counsel that are raised in this appeal were dismissed by Judge Sanders in this fashion.

> One, that James Esquivel, K's brother, would drive her to friends'  houses, including boyfriends' houses, and that neither J. nor K. would tell her parents about this.  According to the applicant, this created the opportunity for K. to engage in sexual activity with boys outside her home.

>                          . . .
> Third, that when she was with her brother, J., K. pointed out the 17 year-old boy who purportedly got her pregnant.

[Exc.   28]

Sexual Activity with Jared Possibly Inadmissible

Judge Sanders identified, as trial counsel had, a single main issue for the defense: the credibility of K.E. [Tr. 432] "Karnavas, correctly perceived that, if he could raise a reasonable doubt about the truthfulness of K, his client would be found not guilty." [Exc.   27]

Having said this, the court considered the evidence that K.E. had told her friend Jerry Shivers that she had had sex with a boy named Jared when she was 12 years old. He dismissed the claim that this evidence ought to have been introduced through the witness, Jerry Shivers, because it was "conceivable" that it would have been

inadmissible under the rape shield law or Evidence Rule 403. [Exc. 29]

Sexual Activity with Chris Could Have Been
Excluded Based Upon a Sound Tactical Choice

Judge Sanders expressed doubts about the admissibility of the evidence that K.E. admitted having sex with Chris and was concerned about pregnancy given the "rape shield law" or Evidence Rule 403. But, even if admitted, Judge Sanders thought the risk was great that Chris (or Jared) would be located by the prosecution, he {or they} would then be called to testify, and he (or they) would deny having sex with K.E. Following this line, Judge Sanders concluded that it would have been a sound defense strategy to avoid introducing evidence that K.E. was sexually active with her peers.

> In conclusion, the court finds that it would not be ineffective for Harvey's defense to elect not to present evidence that K. said she had had sex with Jared or Chris, unless those statements could be corroborated; or, in the alternative, that the defense could be satisfied that the state would not be able to rebut this testimony by calling Jared and Chris as witnesses.

[Tr. 30]

Not Ineffective for Attorney and Investigator
to Fail to Obtain and Use Written Statements
of the Complaining Witness

Judge Sanders considered the collection of letters written by K.E. to her best friend, Jerry Shivers, who was a defense witness at trial. Judge Sanders' ruling on this issue was that he could not conclude that no competent attorney would have failed to ask whether there was written correspondence helpful to the defense.

40

[Exc.  32]

Failure to Exclude or Expose Weaknesses
in the DNA Evidence

Judge Sanders discounted the position of Mr. Harvey that competent counsel would have 1) identified, researched and investigated before trial the grounds for excluding or limiting the evidence, 2) identified ways to undermine the testing process and statistical conclusions, and 3) retained a qualified DNA expert to consult and to use as an expert witness at trial.

> After reviewing the various submissions concerning DNA, and particularly Professor Kaye's letter and written report, I am convinced that, in every case involving DNA, the prosecutor and the defense attorney can spend many hours, if not many days, questioning expert witnesses about DNA evidence. This type of testimony is quite complicated, and in the context of the Harvey case, surely would have shifted the focus away from Harvey's best primary defense; that being that K. was not telling the truth.
> Having reviewed the entire record, I cannot conclude that no reasonably competent attorney would have adopted the strategy used by Karnavas in dealing with the DNA evidence. In other words, I do not find that his tactic was objectively unreasonable.

[Ex.  34]

Judge Sanders' assessment of the evidence that there was an 87% probability that Harvey was guilty was that it was "not very compelling." It was his view that "the jury could have ignored the DNA evidence and, based on K's testimony, reached the same verdicts that it did." [Exc.  40] He therefore found that the introduction of the "probability of guilt" did not offend due process. [Exc. 40]

41

## STANDARD OF REVIEW

The appellate court views the evidence in the light most favorable to upholding the lower court's findings of fact when it reviews the denial of an application for post-conviction relief. *State v. Laraby,* 842 P.2d 1275, 1280 (Alaska App., 1992) The appellate court accepts the superior court's findings of fact unless they are clearly erroneous. *Merrill v. State,* 457 P.2d 231, 233-34 (Alaska, 1969), modified on other grounds, *Donnelly v. State,* 516 P.2d 396, 399 n. 6 (Alaska, 1973) Questions of law are reviewed *de novo. Callan v. State,* 904 P.2d 856, 857 (Alaska App., 1995).

## ARGUMENT

Legal Standards for Demonstrating
Ineffective Assistance of Counsel

The decisions of the Alaska appellate courts require that an applicant for post-conviction relief relying upon a claim of ineffective assistance of counsel[7] demonstrate that the quality of his legal representation "fell below the 'range of competence displayed by one of ordinary training and skill in the criminal law'" and that "this incompetence had an adverse impact on the case that contributed to the defendant's conviction." *Tall v. State,* 25 P.3d 704, 708 (Alaska App., 2001) citing *Risher v. State,* 523 P.2d

---

[7]A claim of ineffective assistance of counsel invokes the protections of Article I, Section 11 of the Alaska Constitution and the Sixth Amendments to the United States Constitution.

421 (Alaska, 1974).    Once the *Risher* criteria are met, "the
defendant need only create a reasonable doubt that the attorney's
incompetence contributed to his conviction. *State v. Jones,* 759 P.
2d at 573.

The federal standard for incompetence of counsel requires also
that the contestant demonstrate, as *Risher* requires, that
performance was deficient and that the claimed errors had an impact
upon the outcome of the trial.  The federal standard of performance
is whether counsel's conduct "fell below an objective standard of
reasonableness." The federal and state standards depart measurably
from one another on the second prong: While a reasonable doubt is
sufficient under Alaska state decisions on ineffective assistance,
an applicant in federal court must show that there is a reasonable
probability that, "but for counsel's unprofessional errors, the
result of the proceeding would have been different." A "reasonable
probability" is "a probability sufficient to undermine confidence
in the outcome."    *State v. Jones,* 759 P. 2d at 568, citing
*Strickland v. Washington,* 466 U.S. at 687-688.

The convicted person claiming ineffective assistance of
carries the burden of rebutting a presumption that the trial
attorney's actions were the product of "sound tactical
considerations." *State v. Jones,* 759 P.2d at 569. But a tactical
decision will not insulate counsel's conduct from reversal if the
claimed tactic is one "that no reasonably competent attorney would

43

have adopted under the circumstances." And a defense strategy that is the product of a "mistake made out of ignorance rather than from strategy" is also invalid as a defensible tactic. *State v. Jones,* 759 P.2d at 569.

The Alaska Court of Appeals has repeatedly turned to professional standards of competence in order to determine whether or not an attorney's errors or omissions fell below the acceptable standard. *See e.g. Jackson v. State,* 750 P.2d 821, 825, (Alaska App., 1988) "This court has formerly cited with approval the American Bar Association's Standards relating to the defense functioning in the context of an ineffective assistance of counsel case."[8]

The "prevailing professional norm" defining reasonableness of representation is not derived by anecdotal sampling of the average performance of the defense bar in a given courtroom, but rather is defined by professional standards consonant with the requirements of the Sixth Amendment. Federal courts have also routinely turned to the *ABA Standards* in reviewing whether or not trial counsel's representation was inadequate.[9] In *Strickland v. Washington*, the Supreme Court stated:

---

[8]See also *Arnold v. State*, 685 P.3d at 1265.

[9]*See U.S. v. Blaylock,* 20 F.3d 1458, 1466 (9th Cir, 1994) (court can look to *ABA Standards* for guidance, and application of *Standards* and caselaw to case requires finding of inadequacy); *People v. Armstrong,* 530 N.E.2d 567 (Ill. Appl 1988), *app. den.* 535 N.E.2d 916.

> [The Sixth Amendment right to counsel] relies ... on the
> legal profession's maintenance of standards sufficient to
> justify the law's presumption that counsel will fulfill
> the role in the adversary process that the Amendment
> envisions.

*Strickland v. Washington,* 104 S.Ct. at 2064-65. In *Strickland*, the
court expressly recognized that

> Prevailing norms of practice as reflected in American Bar
> Association standards and the like ... are guides to
> determining what is reasonable.

The Court emphasized that such standards are only guides, and are
not independently conclusive. 104 S.Ct. 2065. Standards for
effective conduct are derived from the federal and state
constitutions, statutes, criminal rules, codes of ethics, ABA
standards and the standards of other professional organizations,
and case law. The *ABA Standards* have widely been used by courts in
every jurisdiction for guidance in determining professional
standards.[10]

The Court Erred in Disregarding Harvey's
Claim that Counsel Should Have Examined James Esquivel
About Taking K.E. to Meet Boys and Her
Identifying the Boy Who Made Her Pregnant

Judge Sanders struck two claims advanced by Patrick Harvey in
his application for post-conviction relief on grounds that Harvey
had failed to present the issues to trial counsel during the PCR
proceedings. Judge Sanders was incorrect. Mr. Karnavas was in a

---

[10]*See Modern status of rules and standards in state courts
as to adequacy of defense counsel's representation of criminal
client,* 2 A.L.R. 4th 27 §4 (collecting reported decisions from
more than 14states citing to the *ABA Standards.*

45

fact questioned about these two aspects of James Esquivel's knowledge of K.E.'s social/sexual activity during his deposition.

The two issues were described by the court in the following terms:

> One, that James Esquivel, K's brother, would drive her to friends' houses, including boyfriends' houses, and that neither J. nor K. would tell her parents about this. According to the applicant, this created the opportunity for K. to engage in sexual activity with boys outside her home.
>
> · · ·
>
> Third, that when she was with her brother, J., K. pointed out the 17 year-old boy who purportedly got her pregnant.

[Exc. 28]

The examination of Karnavas about these two issues is found at page 133 of his deposition:

> Q    Okay. Well, do you remember what he told you?
> A    No.
> Q    Do you remember that – whether or not he told you that Kim had had sex with some boy in California?
> A    Gee.
> Q    Named Jared, probably.
> A    He might have told that. It just doesn't – I just don't recall. I'm not saying that he didn't tell me, I just don't recall saying it.
> Q    Okay. Do you remember his telling you that Kim would get rides from him to go to see her girlfriends and meet boys at her girlfriends' houses? That he'd sort of – that he'd pick her up secretly and not tell his parents and take her over to girlfriends' houses to meet boys?
> A    Gee, that I don't recall. I mean, I don't recall re – that coming out in the trial either.
> Q    But it ...
> A    'Cause I mean if that – if he had told me that, I would have looked into it. So I don't – I – I have a – I have no recollection one way or the other.
> Q    Uhm-hm. And any – any recollection of him telling you that Kim pointed out the boy that she said got her pregnant to him?

46

```
A    Yeah, that I recall.  That I recall.  That was over here,
     yeah.
Q    Uhm-hm.  What do you remember that he said, if any more
     than that?  Do you remember him telling you that he had
     - she had pointed him out at a school bus or something,
     and that he had gone and kind of roughed up the kid or
     ...
A    Something like that.  I can't - yeah.  I mean, vaguely I
     have this recollection.
```

[Exc.  207-208]

Plainly, James Esquivel's evidence about K.E.'s meeting boys and her identification of the boy that made her pregnant were discussed with trial counsel.  It was only a sound tactical reason for forgetting the evidence that was lacking.

Witness Testimony: An Attorney of Minimal Competence
Would Have Elicited Testimony from the Witnesses Who Were Called to
Testify at Trial that the Complainant Said She was Sexually Active
with Males Other than The Defendant

Conduct on the part of trial counsel that has the effect of undermining the adversarial process is ineffective: "[T]he court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Strickland v. Washington,* 104 S.Ct. at 2066.

Sound tactical decisions are immune from challenge.  But tactical decisions made without a sound basis are subject to scrutiny.  A decision made without adequate information is only adequate if failure to get that information in the first instance was reasonable.

[S]trategic choices made after thorough investigation of

47

> law and facts relevant to plausible options are virtually unchallengeable; *and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation.* In other words, counsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary.*

*Strickland v. Washington,* 104 S.Ct. at 2066.  (Emphasis added.)

The seriousness of the charges faced by a defendant is considered in determining whether or not trial counsel's conduct was adequate. *See. e.g. Jackson v. State,* 750 P.2d at 825.

In this case, Patrick Harvey was facing conviction on ten serious felonies.  The central issue in the case was the complainant's credibility, and, in particular, the reliability of her statement that she was only having sex with the defendant. Michael Karnavas had available to him extensive factual information that might well have affected the jury's view of the complainant's credibility. He knew about her prior inconsistent statements about the pregnancy, and he knew about her contacts with boys.  But he put none of this before the jury.  There was no sound tactical reason for this failure.

A finding of ineffective assistance in these circumstances is required by *State v. Simpson*, 946 P.2d 890 (Alaska App., 1997).  In that case, a defense attorney had accerss to, but failed to appreciate and to put forward to the jury, evidence that would have undermined the credibility of juvenile complainants in a case involving a charge of sexual abuse of a minor.  The Alaska Court of

48

Appeals upheld the Superior Court's finding that "[n]o reasonably competent attorney would have overlooked the value of this evidence," that no strategic decision was made, and that the error was prejudicial to the defendant.

Most startling of counsel's oversights was the failure to inquire of Summer Fabrizio, when she testified for the defense, whether K.E. had admitted having sex with a boy in Alaska at approximately the time she conceived. K.E. had also admitted to Summer that she was worried about being pregnant. This testimony alone could have created the reasonable doubt needed for an acquittal.

Judge Sanders dodged the significance of the Summer Fabrizio information by finding that the period of time during which K.E. was having sex with this boy could not have covered the period during which she became pregnant. We dispute his conclusion. When confronted with the question about the timing of the relationship K.E. described to Summer, the public defender investigator agreed that it would have taken place about the time that K.E. became pregnant. [PCR Tr. 202] Summer's date was in any event approximate; she was recalling a long-ago telephone conversation. Separate from the question of timing, Summer's testimony would have been admissible under Evidence Rule 613 as a prior inconsistent statement, contradicting K.E.'s essential claim that she'd had no sexual partners but the defendant.

Given the rulings by the trial judge on similar issues, there

49

is little doubt that the judge would have admitted evidence of the sexual activity of the complaining witness, at least during the year and one-half that she lived in Anchorage and particularly close in time to the pregnancy. This evidence would not have been offered to show that K.E. consented, which is not at issue when the complaining witness is a minor, nor would the evidence be offered to show merely that she was unchaste. Rather, and most importantly, the evidence directly addressed the circumstances of the pregnancy and K.E.'s bold and untrue statement that she had no sexual experience but with the defendant that could have led to the pregnancy.

Evidence that K.E. was sexually involved with other males, in the setting of this case, would have been admissible despite the "rape shield" statute, found A.S. 12.45.045 and reiterated in part at A.R. E. 404(a). The Court of Appeals has construed the statute to permit admission of other sexual behavior of the complainant when that conduct is germane to issues in dispute at trial. *See, e.g. Napoka v. State,* 996 P.2d 106 (Alaska App., 2000); *Bibbs v. State*, 814 P.2d 738 (Alaska App., 1991); *Daniels v. State*, 767 P.2d 1163 (Alaska App., 1989); *Jager v. State*, 748 P.2d 1172, 1175-76 (Alaska App., 1988); *Baden v. State*, 667 P.2d 1275 (Alaska App., 1983). Harvey would not have sought to introduce evidence of K.E.'s sexual partners to show that she was *promiscuous* and therefore unworthy of protection; the objective would have been to

50

show that some male other than Patrick Harvey had made her pregnant and, of course, that she was testifying falsely when she said that Patrick Harvey was the only person she'd ever had sex with and when she said that Harvey had abused her.

Dominant among the allegations at issue at the Harvey trial was the identity of the person that made K.E. pregnant. If the jury were to believe that Harvey was the only male that could have impregnated her, then Harvey would be likely found guilty on all counts. This issue was focused when K.E. claimed she'd never had sex with anyone else.

It is worth noting that neither the rape shield statute, A.S. 12. 45.045, nor A.R.E. 404(a) *prohibits* the admission of evidence. It requires only that the proponent of such evidence make application for an order governing the admission of the evidence outside the presence of the jury. The customary balancing of the probative value versus the prejudicial impact of the evidence is conducted by the court, with some regard for the privacy interests of the victim.

51

Failures to Offer Evidence in Response
to the Complainant's Claim That She'd
Not had Sex with Anyone Other than
Defendant were Not Harmless

Counsel's failure to offer known evidence through witnesses that actually testified at trial, when that evidence directly addressed the crux of the prosecution's case, deprived Patrick Harvey of the essentials of due process and the right to counsel under both state and federal constitutions. *State v. Simpson,* 946 P.2d 890 (Alaska App., 1997); *Thompson v. Calderon*, 120 F.2d 1045 (9th Cir.) (en banc), *cert. den.* 118 S. Ct. 14 (1997); *Baylor v. Estelle*, 94 F.3d 1321 (9th Cir., 1996); *Byrd v. U.S.*, 614 A.2d 25 (D.C. Ct.App., 1992); *Harris v. Reed,* 894 F.2d 871 (7th Cir., 1990).

An attorney of ordinary capabilities, armed with the evidence that K.E. was having sex with someone other than Patrick Harvey, could have instilled a reasonable doubt that K.E.'s allegations were true. Michael Karnavas agreed, and the legal expert testifying at the hearing on the petition concluded that neglecting this evidence lost the case.

> Here, the case was lost because trial counsel never
> internalized the results of the defense investigation,
> and because other readily available exculpatory evidence
> was not uncovered from the very witnesses the defense
> presented at trial.   Competently used, this evidence
> would have shattered the image of K.E. that she and the
> prosecutor portrayed.

[Exc.  112]

No Tactical Reson for Neglecting
Evidence of Sexual Relationships
and Sexual Opportunities

Karnavas' trial objective was to show that K.E. was
fabricating her claim that she had been abused by her step-father.
Ideally, the defense would also be able to show the jury how K.E.
came to be pregnant.  The evidence that K.E. said she was having
sex with Chris, and her identification of the boy that made her
pregnant, served Karnavas' trial strategy precisely.  Evidence that
K.E. was sneaking out to see boys throughout her stay in Alaska
explained how and when K.E. would have been able to have the sexual
relationship she described to Summer Smith (Fabrizio) and how she
could have become pregnant.  Given defense counsel's stated
strategy, there could be no reasonable tactical reason for
neglecting the very evidence that would have given factual
structure to the defense.

Investigation: An Attorney of Minimal Competence
Would Have Contacted the Girlfriends
of the Complainant Who Would have Reported
Complainant's Activities with Males

The *ABA Standards* include the proposition that an element of
an effective defense is an investigation of the case.

Defense counsel should conduct a prompt ·investigation of
the circumstances of the case and explore all avenues
leading to facts relevant to the merits of the case and
the penalty in the event of conviction.

53

*ABA Standards for Criminal Justice: Prosecution and Defense Function,* Standard 4.4.1(a) (3d ed. 1993) "Effective representation consists of much more than the advocate's courtroom function per se." Commentary to Standard 4-4.1, 181. Failure to investigate implicates the constitutional guarantee of the right to effective assistance of counsel. *Powell v. Alabama,* 287 U.S. 45 (1932); *Arnold v. State,* 685 P.2d at 1265-67; *Jackson v. State,* 750 P.2d 825-27 (Alaska App., 1988).

The pretrial investigation provides the support structure for the attorney's courtroom performance and determines his effectiveness at trial.

> Effective investigation by the lawyer has an important bearing on competent representation at trial, for without adequate investigation the lawyer is not in a position to make the best use of such mechanisms as cross-examination or impeachment of adverse witnesses at trial. The lawyer needs to know as much as possible about the character and background of witnesses to take advantage of impeachment. The effectiveness of advocacy is not to be measured solely by what the lawyer does at the trial; without careful preparation, the lawyer cannot fulfill the advocate's role. Failure to make adequate pretrial investigation and preparation may also be grounds for finding ineffective assistance of counsel.

Commentary to Standard 4-4.1, 183.

Trial counsel did not undertake the investigation of Mr. Harvey's defense until a week before trial. Believing that Mr. Harvey was guilty, and thinking that Mr. Harvey ought to plead guilty (despite the evidence that he already had that K.E. reported having sex with her boyfriend or boyfriends), counsel did not seek

54

out evidence that would undercut the state's case and his own conviction, even when his last-minute offer to settle the case was refused.   Only during trial, after cross-examining K.E., did he realize that Patrick Harvey was innocent, and then it was too late to produce the evidence that would have convinced the jury.

A natural source of information was K.E.'s girlfriends.  Mr. Harvey, his wife, and his stepson provided names of these girls, and Harvey offered to show the investigator where two of them lived.  This was the apartment house where K.E. said she had been impregnated.  Monica Shelton's description of the lifestyle in her apartment, with a hot tub in the living room and unsupervised teenagers frequenting the place, supported James Esquivel's report that K.E. had an active social/sexual life that her parents knew nothing about.  Monica Shelton's recollection that K.E. laughed at her and Sabrina Dowd for being virgins and left alone with men she met at a nightclub would have cut against K.E.'s portrayal of herself as a girl that had no sexual experience outside her home and who was frightened and disgusted by sexual overtures.

A second fruitful line would have been the eyewitnesses to K.E.'s dating habits.   James Esquivel's friend, Michael Thorp, witnessed boys visiting with K.E. at her house and K.E. going to boys' homes and meeting boys.  His testimony would have put to rest any suggestion that James fabricated his testimony in an effort to help Patrick Harvey.

Counsel's failure to direct an investigation of K.E.'s friends

55

was not a sound tactical decision. Karnavas did not position himself to know whether or how the fruits of an investigation would be put to use in defending Mr. Harvey.  Karnavas does not claim that he neglected the investigation as part of any conscious decision about the defense, or about what would not be of benefit. He was exhausted.  He left the preparation of the case to the days immediately before *and during* the trial; there was no time for exculpatory evidence.

Failure to Interview and Call Witnesses
that Confirmed K.E.'s Sexual Activity
Meets the *Risher* and *Strickland* Standards
for Ineffective Assistance of Counsel

A failure to investigate on issues central to the charges against the accused generally establishes the first *Risher/Strickland* criterion, conduct below the acceptable range for attorneys with training in the criminal law.

> Ineffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he had not yet obtained the facts on which such a decision could be made.

*U.S. v. Gray,* 878 F.2d 702, 711 (3d Cir., 1989) Failure to prepare for the trial of an unclassified felony "is not an example of forgoing one possible avenue to pursue another approach; it is simply an abdication of the minimum performance required of defense counsel." *Commonwealth v. Perry,* 644 A. 2d 705, 709 (Pa., 1994)

56

Failure to Investigate is Prejudicial

Prejudice is established when the post-conviction proceeding demonstrates that trial counsel's failure "produced a trial significantly different than the one that [the defendant] should have received." *Williams v. Washington*, 50 F.3d 673, 684 (7th Cir., 1995) What we are able to understand now is that K.E. was a enthusiastically heterosexual teenager who spent a great deal of time in the company of boys.  We know from what she told her girlfriends that she'd had sex with a boy before she came to Alaska in 1991, was sexually involved with one and as many as three or more boys during her year and a half in Alaska, and continued to be sexually active after she left the state in 1993.  The decision that the jury was entitled to make was whether K.E. was fabricating her multiple sexual experiences with boys or fabricating a sexual relationship with her step-father.    Instead, because the investigation was lacking and the defense case was, consequently, factually impoverished, the defense invited the jury to decide only whether K.E.'s "demeanor" was such that she could not be believed.  This was a different trial from the trial that Patrick Harvey was entitled to, where a fair exposition of all the facts, including K.E.'s various boasts and behaviors, was laid before the jury.

No Sound Tactical Reason for
Failing to Investigate

Counsel did not deliberately decide to forego investigation of the Harvey case because he was pursuing a different defense

57

strategy.    The    investigation    done    in    connection    with    the
application for post-conviction relief, which we claim ought to
have been done before trial, supported his defense strategy
exactly.    The week before trial was simply too late in the day to
begin a basic investigation.

DNA Evidence: An Attorney of Minimal Competence Would
Have Researched the Admissibility of the Probability of
Paternity and Would Have Filed a Motion to Suppress the Statistical
Evidence and/or Would have Effectively Cross-
Examined the State's DNA Expert

The Harvey case went to trial March 8, 1994.    During the
preceding ten years state appellate courts throughout the country
had been hearing and deciding the admissibility of DNA evidence in
criminal and civil paternity cases.    In the early nineties
controversy had "erupted in the scientific community concerning the
reliability of DNA evidence".    *State v. Bible,* 858 P. 2d 1152, 584,
175 Ariz. 549, (Ariz., 1993), *cert denied* 511 U.S. 1046, 114 S.Ct.
1578, 128 L.Ed. 2d 221 (1994).    The Supreme Court of New Jersey
characterized    the    discussion    in    the    literature    as    "raging
controversy." *State v. Spann,* 617 A.2d at 255.

Many state courts had issued decisions condemning the use of
statistical evidence purporting to demonstrate the probability that
an individuals' DNA matched a known sample.    These decisions were
divided among courts that viewed the evidence as not generally
accepted in the scientific community and those that rejected the
statistical    probability    evidence    because    of    the    methodology,

58

derived from Bayes' theorem, that utilized a mathematical assumption that the accused was as likely as not to be a match, implicating the presumption of innocence.   These courts were concerned that the statistical probabilities of genetic matches would be construed by juries to represent the probability of guilt and expressed offense at the corruption or displacement of the jury function.   Other courts limited the admission of DNA testimony to descriptions of the exact genetic attributes of the accused and the sample but prohibited the use of population frequency statistics and statistical probabilities of genetic matches.   Some courts precluded admission of the probability of paternity if it fell below 90% or 95%.

Were counsel to have researched the use of DNA evidence before trial commenced in March 1994, he could have found the following cases, representing a sample of the appellate court decisions that precluded the use of DNA evidence or allowed that only some of the DNA evidence adduced at the Harvey trial was admissible: *State v. Skipper,* 637 A.2d 1101, 228 Conn. 610 (Conn., 1994); *State v. Spann,* 617 A.2d 247, 130 N.J. 484 (N.J., 1993); *People v. Barney,* 8 Cal. App. 4th 1998, 10 Cal. Rptr 2d 731 (1992); *State v. Bible,* cited above; *People v. Pasko,* 540 N.E. 2d 462, 132 Ill. Dec. 722 (1989); *State v. Hartman,* 426 N.W. 2d 320, 145 Wis. 2d 1 (Wisc., 1988), *In re Paternity of M.J.B.,* 425 N.W. 2d 404, 144 Wis. 2d 638 (1988); *State v. Kim,* 398 N.W. 2d 544 (Minn., 1987); *Plemel v.*

*Walter,* 735 P.2d 1209, 303 Ore. 262 (Ore., 1987); *Kofford v. Flora,* 744 P.2d 1343 (Utah, 1987); *Bridgman v. Commonwealth,* 351 S.E. 2d 598, 255 Va. App. 523 (Va., 1986); *Commonwealth v. Beausoleil,* 490 N.E. 2d 788, 397 Mass. 206 (1986); *County of Sonoma v. Grant W.,* 184 Cal. App., 868, 220 Cal Rptr. 297, judgment vacated, 187 Cal. App. 3d, 232 Cal. Rptr. 471 (1986); *Cole v. Cole,* 328 S.E. 2d 446, 74 N.C. App. 247, affirmed 335 S.E. 2d 897, 314 N.C. 660 (1985); *Everett v. Everett,* 150 Cal App. 3d 1053, 201 Cal. Rptr. 351 (1984); *Sara H. v. Bart D.,* 467 N.Y.S. 2d 1001, 121 Misc 2d 425 (1983); *State v. Boyd,* 331 N.W. 2d 480, (Minn., 1983); *State v. Carlson,* 267 N.W. 2d 170 (Minn., 1978).

This research in the legal literature would also have provided a sound detailed preparation for the scientific and statistical issues raised by a proposed use of genetic probability statistics. *See, for example, State v. Spann,* 617 A. 2d at 489-495; *State v. Bible,* 858 P.2d at 576-584; *State v. Skipper,* 637 A.2d 1103-at 1106; *State v. Hartman,* 426 N.W. 2d at 323-325. In particular, reading the cases would have alerted trial counsel to the use of Bayes' Theorem and the "customary" use of a prior probability of .5, or an assumption that the defendant was as likely as not to be a match, in calculating the probability of paternity. On this subject, *State v. Hartman,* 426 N.W. 2d at 326; *State v. Skipper,* 637 A. 2d at 618-622, *State v. Spann,* 617 A.2d at 251-256 are comprehensive.

60

Alaska's courts were not immune to the DNA questions    The controversies surrounding the admission of DNA evidence were known and litigated in Alaska at the time of the Harvey trial.

The trials from which appeals were taken in *Mattox v. State Department of Revenue, Child Support Enforcement Div., ex. rel. Neeson,* 875 P.2d 763 (Ak., 1994) and *Harmon v. State,* 908 P.2d 434 (Ak. App., 1995) occurred before or concurrently with the Harvey trial.  The attorneys for Mattox and Harmon had identified legal issues associated with the introduction of DNA evidence and had filed pretrial motions. "Extensive hearings" had been conducted in the trial court in the *Harmon case.*

We are unable to say with certainty that the Anchorage Superior Court would have suppressed the DNA evidence against Patrick Harvey.  Several grounds upon which such evidence had been precluded by other courts were available: (1) The probability of paternity evidence was too likely to be construed by the jury to be equivalent to the probability of guilt, or sufficient proof of guilt. (2) The probability of paternity below 90% was considered by other courts to be unhelpful and irrelevant. (3) The inclusion of the prior probability of .5 in the probability of paternity calculation, utilizing Bayes' Theorem, incorporated an unwarranted assumption that the defendant was as likely as not to be guilty. There are others.  And there was ample respectable legal authority from other jurisdictions that could have been enlisted in support

61

of a decision to preclude the evidence.

If the trial court were unwilling to deny the State the genetics evidence, it might well have ordered that only a portion of the evidence be admitted, as some other courts had done. It may have agreed with the many courts that have balked at admitting those elements of the statistical data that incorporate the Bayes' Theorem calculation, but allow the State's experts to describe the genetic findings from the samples and, in some cases, the frequency of the alleles in the relevant population.

The third possibility is that the legal research would have informed Karnavas about the use of Bayes' Theorem in reaching the probability of paternity figure and would have allowed him to intelligently cross-examine the state's expert about the calculation, at a minimum showing that different assumptions could yield a lower probability of paternity percentage figure. The research would also have alerted counsel to the "prosecutor's fallacy" so that he could have confronted the state's expert with his erroneous testimony and undercut the force of the probability statistics.

There are only three possibilities, all of them immensely more favorable to Patrick Harvey than the ineffectual treatment of the DNA evidence that Mr. Karnavas afforded. The research would have eliminated the cornerstone of the state's case against Patrick Harvey, the research would have led to a marked limitation on the

statistical evidence that was admissible, or Harvey's counsel could have effectively cross-examined the state's expert and prepared his own.

Failure to Object to the Introduction of
the Statistical Evidence or, if Unsuccessful,
Failure to Cross-Examine About The Use of the
Prior Probability Assumption of .5, Meets
the *Risher* and *Strickland* Standards for
Ineffective Assistance of Counsel

Counsel for Mr. Harvey was advised by the DNA expert that he consulted that damaging evidence against his client, the State's DNA evidence, was "inadmissible"; he was on notice from an outside source, then, that there might exist grounds to exclude the DNA evidence. We have shown that there in fact existed many state court decisions that confirmed the expert's advice that the evidence was inadmissible, but counsel failed to the access readily available case law that would have provided powerful support for an argument that the DNA evidence should be suppressed, in whole or in part. He did not inform himself of any relevant legal or scientific issues in order to decide whether motion practice was in order. He did not file any motions.

Counsel did not consult the legal or scientific literature to prepare a cross-examination of the state's witnesses, and, as we have seen, that literature was readily available and provided several different strategies for limiting the impact of the state's evidence.

63

Introduction of the Probability Statistics and
Failure to Cross-Examine about the Prior Probability
of .5 and the "Prosecutor's Fallacy" was Not Harmless

The Alaska Court of Appeals has specifically recognized the persuasive potential of scientific evidence. In *Brodine v. State,* 936 P. 2d 545 (Alaska App., 1997), the Court noted the "significant danger of prejudice from admitting evidence which appears scientific and is especially likely to be accepted and believed." *Brodine v. State,* 936 P.2d at 549. In 2001, the Court cautioned that juries can be easily misled about the usefulness and precision of DNA evidence.

> Admitting a DNA profile match without evidence that properly interprets the significance of the DNA match could be very misleading. It is generally well known that DNA testing often allows scientists to identify a particular individual from among millions. Because the potential precision of DNA testing is so well known, a jury might assume that any DNA profile match is extremely unlikely and therefore extremely probative. But as explained above, this is not always true. A jury might therefore give undue weight to a DNA profile match in a case where no evidence has been presented showing the significance of the match.
> Furthermore, admitting a DNA profile match with improper interpretive evidence may be misleading.

*Peters v. State,* 18 P. 3d 1224, 1227 (Alaska App., 2001).

Allowing the introduction of DNA evidence, when there is grounds to suppress it, then allows the jury to hear evidence that may cause it to assume that an "unlikely" DNA match has been made and that guilt is proved. If the evidence is permitted by the court, failure to cross-examine to the purpose of informing the jury of the use of a factually baseless prior probability number

64

invites the jury to believe that there is scientific proof of a high probability of guilt.

It follows that counsel's failure to competently address the "probability of paternity" testimony at trial allowed the evidence to go to the jury with undiminished potential for being understood as establishing, scientifically, an 87% probability of guilt. There is no doubt that the probability of paternity numbers contributed to the conviction; suppression or emasculation of the DNA evidence would have left the jury to decide the case on the uncorroborated testimony of K.E.

No Sound Tactical Reason
for Failing to Research,
Understand, and Take Measures
to Address the DNA Evidence

There could have been no legitimate strategy for failing altogether to research the DNA issues, particularly once counsel was alerted that the evidence was considered inadmissible. As we have seen above, there were three potential harvests if the research were done: suppression, limitation of the evidence, or effective cross-examination. It is inconceivable that there was a benefit to neglecting the research.

The Alaska standards for ineffective assistance require us to consider whether the choice not to file a motion to suppress the DNA evidence or to limit the admission of probability statistics was a sound tactical strategy. "Sound tactical considerations" require that counsel first position himself to understand the

65

relevant legal and strategic issues before making a choice.  A plan made in a climate of ignorance is not entitled to deference.  In this case, counsel did not do the necessary legal research necessary to a decision to decline to file motions.  He did not know what the issues were and declined the invitation of his expert to do the research.

Most certainly, counsel did not make a conscious decision to do a poor or limited cross-examination.  In fact, it appears that he desired to cross-examine the DNA expert thoroughly to diminish the impact of the DNA evidence.  The cases cited above contain a storehouse of scientific information, explained in terms understandable to the non-specialist audience.  Counsel was unaware of Bayes' Theorem and its implications, and did not cross-examine about the use of the prior probability because he did not research the meaning of the reference to the prior probability in the report that he had.   Counsel was unaware of the "prosecutor's fallacy" and allowed the testimony to stand unrebutted because he did not know that the state's expert had fallen victim to it.  Consequently, false and misleading testimony, that smacked of scientific truth, was allowed to reach the jury.

Dated this 12th day of August 2002.

Respectfully submitted,

Nancy Shaw