Nancy R. Simel
Assistant Attorney General
Office of Special Prosecutions
and Appeals
310 K Street, Suite 308
Anchorage, Alaska 99501
Telephone: (907) 269-6250
Facsimile: (907) 269-6270
Email: nancy.simel@alaska.gov

Attorney for Respondent Antrim

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| PATRICK ROBERT HARVEY, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | Case No. 3:05-cv-0083 |
| ) | |
| MARC ANTRIM, ) | RESPONSE TO BRIEF OF |
| COMMMISSIONER, DEPARTMENT ) | PETITIONER |
| OF CORRECTIONS, ) | |
| ) | |
| Respondent. ) | |
| ) | |

A.   Introduction

Harvey has filed a petition for writ of habeas corpus in which he claims that his Alaska conviction for sexual abuse of a minor violates his rights to due process under the United States Constitution because he received ineffective assistance of counsel in connection with his trial. [Dkt. 1] This court concluded that Harvey had exhausted his state remedies with respect to two of his broad claims of ineffective assistance of counsel – his claim that trial counsel

did not understand, seek to exclude, or effectively refute the DNA evidence introduced by the prosecution at trial, and his claim that trial counsel did not adequately investigate and present evidence that allegedly showed that the victim was having sexual intercourse with others. Harvey has now filed a brief in support of these claims.

Defendants are filing this response on the merits in opposition to Harvey's brief on the merits of his remaining claims.

B.   Factual And Procedural Background

In January 1993, fourteen-year-old K.E. reported to a school nurse that her stepfather had sexually abused her. *See Harvey v. State*, Mem. Op. No. 3489 at 2 (Alaska App., November 13, 1996) (*Harvey I*)[1]. K.E. later told the police that the sexual abuse had started when she was a fifth-grader in California, and had continued on and off until K.E. reported the abuse. *Harvey I* at 2. K.E. was largely unable to recall either the dates or details of specific incidents of abuse. *Id.*

In late 1991, K.E. had suspected that she might be pregnant and told Harvey. After a pregnancy test confirmed her suspicion, they decided to abort the pregnancy and have K.E. claim that a 17-year-old boy was responsible. *Harvey I* at 2. K.E. had the abortion in December 1991, when she had been

---

[1]   A copy of this decision is being lodged with the court.

2

pregnant for approximately six weeks. *Id.* at 3. Harvey resumed his sexual abuse of K.E. after the abortion; the sexual abuse continued until 1993, when K.E. reported it to the authorities (as mentioned above). *Id.*

Polymerase chain reaction DNA testing on tissue from the aborted fetus showed that Harvey's genotype was consistent with, but not conclusive of, paternity. *Harvey I* at 4. The paternity index for Harvey was calculated to be 6.9, and the probability of paternity was calculated to be 87.34 percent. [Trial Tr. 439-42][2]

Harvey was charged with six counts of first-degree sexual abuse of a minor and four counts of second-degree sexual abuse of a minor.[3] At trial, the prosecution's case against Harvey consisted mainly of K.E.'s testimony, a romantic letter that Harvey had written to K.E. during the summer of 1991, and the DNA evidence. [Trial Tr. 77-154, 269-88, 419-75; PCR Tr. 421][4]

The defense theory was that K.E. was not truthful. [Trial Tr. 40-41, 69-76, 723-74] On cross-examination, K.E. admitted that she had previously recanted an allegation of sexual abuse against Harvey, was herself a liar, could cry on cue, fantasized about sex in letters and in a diary, wanted to return to

---

[2] A copy of the trial transcript is being lodged with the court.

[3] A copy of the indictment is being lodged with the court.

[4] A copy of the post-conviction hearing transcript is being lodged with the court.

California to get away from Harvey's strict household rules, and she said that the social worker to whom she had spoken had taken Harvey's side. [Trial Tr. 155-249, 251-68, 288-340; Karnavas Dep. 244][5]  Defense counsel Michael Karnavas also tried to defuse the impact of the romantic letter Harvey had written by showing that it referred to family games. [Trial Tr. 183-92, 215, 307-09, 519-29; Karnavas Dep. 68] Karnavas also elicited evidence through both his cross-examination of the prosecution's expert and the testimony of the defense expert that the DNA evidence did not establish that Harvey was the father of the fetus and that the DNA evidence was so weak it could not be relied upon in a civil case. [Trial Tr. 443-69, 474-75, 485-504]

        The jury convicted Harvey of four counts of first-degree sexual abuse and four counts of second-degree sexual abuse. *Harvey I* at 1, 8. On direct appeal, the court of appeals affirmed Harvey's convictions, but merged his convictions for second-degree sexual abuse with his convictions for first-degree sexual abuse because the sexual contact might have been incidental or preparatory to the sexual penetration for which he was convicted in the counts charging first-degree sexual abuse. *Id.* at 2, 8-31.

---

[5]    A copy of the transcript of the deposition of Michael Karnavas, Harvey's trial attorney, is being lodged with the court.

Harvey next filed an application for post-conviction relief in the Alaska Superior Court claiming ineffective assistance of counsel.[6] Harvey later filed an affidavit from Michael Karnavas.[7] In this affidavit, Karnavas stated that he was "fully confident" that

> the case was fully prepared, all major witnesses were interviewed by one of the investigators with the Alaska Public Defender Agency, the necessary pretrial motions had been filed, and every tactical decision that was made before trial or anticipated during the trial had been thoroughly analyzed.

[Affidavit ¶ 2]   Karnavas also stated in his affidavit that in his opinion investigator Kim McGee had done "an outstanding job" in investigating the case. [Affidavit ¶ 4]

Harvey filed an amended application for post-conviction relief, claiming, among other things, ineffective assistance of counsel based on the allegedly incompetent investigation of K.E.'s supposed prior sexual experiences and the allegedly incompetent handling of the DNA evidence.[8]

At the same time, Harvey also filed Karnavas's deposition. Karnavas testified in his deposition that at the time of Harvey's trial he was exhausted from his heavy trial schedule. [Karnavas Depo. 17, 22, 26, 41, 46]

---

[6]   A copy of Harvey's application for post-conviction relief is being lodged with the court.

[7]   A copy of Karnavas's affidavit is being lodged with the court.

Karnavas explained that he did not request a continuance to conduct additional investigation because Harvey did not want a continuance, and because as an assistant public defender he would just get more cases assigned to him. [Karnavas Depo. 247-48]

Karnavas suspected that K.E. had been having sex with boys her own age because she seemed mature for her age, especially in her diary, and knew about the specifics of sexual activity. [Karnavas Depo. 129-30] Karnavas had also gained the impression from speaking with K.E.'s friends that K.E. liked to flirt, tease boys, and probably had experimented with sex with teenage boys. [*Id.* at 130-31] Karnavas was aware, however, that K.E. had denied having sex with anyone but Harvey, and he lacked proof that K.E. actually had engaged in sex with any teenagers. [*Id.* at 131, 173-74]

Karnavas had spoken with defense witness Jerry Shivers, a teenage friend of K.E., and her mother, as well as with J.E. (K.E.'s stepbrother). Karnavas never saw any letters K.E. had written to Shivers because Shivers did not give the letters to either Karnavas or McGee, nor did Shivers alert them to the letters' existence. Karnavas explained that he did not bring up at trial K.E.'s supposed prior sexual experiences with a boy in California named "Jared"

---

⁸ A copy of Harvey's amended application for post-conviction relief is being lodged with the court.

because he could not verify the information. [Karnavas Depo. 134-39, 143,150, 173-74, 178, 212-13]

Karnavas had no recollection of whether J.E. had told him about giving K.E. rides to friends' houses where she would secretly meet boys. [*Id.* at 133] Karnavas was not asked, and did not testify at his deposition, about why he did not cross-examine J.E. on these matters.

Karnavas did not recall much about defense witness Summer Oberg, another teenage friend of K.E. [*Id.* at 183] He could not recall why he did not ask her about "Chris," a boy with whom K.E. had allegedly said she had sex. [*Id.* at 182, 184-85, 191, 193] Karnavas speculated he might not have asked about Chris due to oversight or he might have refrained from this line of inquiry because he did not think the court would allow him to pursue it. [*Id.* at 185]

In Karnavas's opinion, K.E.'s credibility was the main issue in the case. [Karnavas Depo. 66-67, 76, 104] After K.E. testified, Karnavas felt "fairly confident" about the prospect of obtaining an acquittal. Karnavas also opined that his closing argument went "fairly well" or "very well." [*Id.* at 74, 77-79, 250]

Harvey submitted a report by D.H. Kaye, a law professor at Arizona State University. According to Kaye, a competent attorney would have objected to the testimony of the state's DNA expert, would have been able to impeach the

7

state's expert, and would have been able to cast doubt on the genetic testing in its entirety by showing that the fetal sample could have been contaminated.[9]

At the evidentiary hearing in state court,[10] Shivers admitted that when she met with Karnavas, she had forgotten about the letters from K.E. and did not realize she could have given them to him. [PCR Tr. 119-20] Shivers also admitted that K.E. did not tell her the specifics of what she did with certain boys. [*Id.* at 135]

Investigator McGee testified at the evidentiary hearing that she followed up on every lead she thought was reasonable, but all of the leads were dead-ends, and all the boys with whom she had spoken denied having sex with K.E. [PCR Tr. 194-96, 237-239] McGee was unable to locate "Jared." [*Id.* at 198, 237-39] McGee had learned from Oberg that K.E. said she (K.E.) had sex in California with "Chris" and in Alaska with an unnamed boy. [*Id.* at 200-02]

---

[9] A copy of this report is being lodged with the court.

[10] Before the evidentiary hearing, Harvey conceded that he could not find "Jared," and that Karnavas had treated K.E.'s relationship with Jared as fantasy for tactical reasons. [PCR Tr. 75-77, 247-48, 319] Harvey also conceded that McGee, the defense investigator, had spoken to a number of boys to determine if K.E. had sex with any boy in Anchorage and also had spoken to Shivers about K.E.'s lifestyle. [PCR Tr. 91, 139] Harvey additionally conceded that McGee also had spoken with Harvey, his wife, and J.E. [PCR Tr. 139, 156-58] Harvey further conceded that Harvey had provided either McGee or Karnavas with notes written by K.E., K.E.'s diary, and a list of potential witnesses. [*Id.*] The parties agreed that McGee did not recall whether she had asked Shivers for any letters or notes from K.E. [*Id.* at 186]

McGee also had notes reflecting that J.E. had driven his sister places. [*Id.* at 224]

At the evidentiary hearing, criminal defense attorney James McComas faulted Karnavas for, among many other things, not communicating adequately with his investigator and not understanding and using the available investigative material. [PCR Tr. 307-09] According to McComas, five days – the time during which most investigative efforts were made – was inadequate. [*Id.* at 326] McComas acknowledged that, if Karnavas did not have a witness who would testify that K.E. was sexually active, it would have been reasonable to argue that K.E. had told sexual fantasies to other people, claiming they had occurred. [*Id.* at 358-61] McComas also acknowledged that his opinion on whether to introduce K.E.'s prior statements about having sex with "Jared" and "Chris" would be different if he thought the defense would be "torpedoed" by evidence that none of K.E.'s boyfriends had sex with her. [*Id.*]

Alaska Superior Court Judge Eric Sanders found Karnavas's overall trial performance was "quite sound." [PCR Tr. 432] Judge Sanders did not take Karnavas's criticisms of his own performance at face value because it is common for an attorney later to take the position that he made errors at trial and because Karnavas had previously given an affidavit stating otherwise. [*Id.* at 428-32] *See Dolchok v. State*, 639 P.2d 277, 295 (Alaska 1982) (Alaska law recognizes that defense counsel's evaluation of his own performance may be

9

more "a reflection of his dedication to his representation of clients, and remorse at the disappointing result obtained in this case, than it is an objective assessment of his work").

Judge Sanders viewed Harvey's trial as "not particularly complicated." [PCR Tr. 432] Judge Sanders found that Harvey's trial would not have been especially difficult to prepare or handle for a busy trial attorney like Karnavas because it involved only one major issue – K.E.'s credibility – and two minor issues – the DNA evidence and Harvey's letter. [*Id.* 432-33]

Judge Sanders found that, because Karnavas did not address the subject either in his affidavit or deposition, Harvey had failed to rebut the presumption of competency with respect to his claim that Karnavas should have further attacked K.E.'s credibility by eliciting from her stepbrother J.E. that he drove K.E. to friends' houses where she had the opportunity to have sex. [PCR Tr. 434-35] Judge Sanders also found that, because Karnavas did not address the subject either in his affidavit or deposition, Harvey had failed to rebut the presumption of competency with respect to his claim that Karnavas should have further attacked K.E.'s credibility by eliciting from J.E. that she had pointed out to him a 17-year-old boy who had purportedly gotten her pregnant. [*Id.*]

Judge Sanders found both that Karnavas had sound tactical reasons for not asking Oberg about K.E.'s relationship with "Chris" and for not asking Shivers about K.E.'s relationship with "Jared." [PCR Tr. 437-45] This testimony

would not have been admissible under Alaska's rape-shield statute, AS 12.45.045. [*Id.* at 437] In addition, Karnavas could not corroborate K.E.'s purported statements that she had sex with these boys. [*Id.* at 438, 440-44]

Judge Sanders alternatively found that, even if the defense was not competent for not finding either "Chris" or "Jared" during its pretrial investigation, Harvey was not prejudiced. Judge Sanders reasoned that because Harvey's new post-conviction attorney was unable to locate either boy, or to find anyone who either had sex with K.E. or had witnessed K.E. having sex with a boy, Harvey had not shown that he would have benefited from the additional investigation. [PCR Tr. 445-47]

Judge Sanders also found that Karnavas was not incompetent for not asking Shivers about written correspondence from K.E. during the investigation. [PCR Tr. 447-51] Judge Sanders noted that Harvey was not incarcerated and played an active role in the investigation, and that Shivers developed a close relationship to both Harvey and his wife after K.E. left Alaska. [*Id.* at 447-48] The judge also noted the absence of any reason for counsel to suspect that Shivers had letters from K.E. [*Id.* at 448-50]

Judge Sanders found that Karnavas made a reasonable tactical decision, after consulting with well-known expert Barry Scheck, not to challenge the DNA evidence because this evidence could be used to help the defense. Judge Sanders called Karnavas's critical self-assessment of his cross-

11

examination of the state's expert "unduly harsh." [PCR Tr. 451-61] Judge Sanders also explained that had Karnavas taken the approach advocated by attorney McComas, he now could be criticized for focusing on the weakest evidence and shifting the focus away from K.E.'s credibility. [*Id.* at 460-61]

The court of appeals affirmed the dismissal of Harvey's post-conviction relief application, finding that Harvey failed to rebut the presumption that his trial counsel had performed competently with respect to some claims because he did not provide an affidavit or testimony from Karnavas explaining his actions, and that with respect to other claims the record showed that counsel made objectively reasonable tactical decisions. *Harvey v. State*, Mem. Op. No. 4812 (Alaska App., January 14, 2004) (*Harvey II*).[11]

The Alaska Supreme Court denied Harvey's petition for hearing on May 14, 2004.[12]

    C.    Federal Habeas Review: The Burden Of Proof And The Presumption Of Correctness

Harvey, as the applicant for habeas relief, must demonstrate either that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or that the state court's decision was based on

---

[11]    A copy of this decision is being lodged with the court.

factual determinations that were "unreasonable" in light of the evidence presented during the state court proceedings. 28 U.S.C. § 2254(d). Furthermore, under 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct." In addition, "the applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*

Thus, in reviewing Harvey's claims of ineffective assistance of counsel, this court must accord the presumption of correctness to any factual findings made by either a state trial court or state appellate court. An issue does not lose its factual character because its resolution is dispositive of the ultimate constitutional question. When an issue involves the credibility of witnesses and therefore turns largely on an evaluation of demeanor, there are compelling and familiar justifications for according the presumption of correctness to the state court's determinations. Even when an issue such as the effectiveness of counsel's assistance involves a mixed question of fact and law, the subsidiary factual findings made by the state court are entitled to the presumption.

---

[12] A copy of Harvey's petition and the Alaska Supreme Court's order denying his petition are being lodged with the court.

D. <u>Harvey Has Not Sustained His Burden Of Proof With Respect To His Claim That Trial Counsel Did Not Adequately Investigate The Case And Prepare The Defense</u>

Harvey contends, as he did in the state courts, that Karnavas should have discovered that (1) Jerry Shivers supposedly could have testified that K.E. allegedly was having sex with "Jared" in California, (2) J.E. could have testified that K.E. had told him a boy at school had gotten her pregnant and that he had driven her to a boy's house once, and (3) Summer Oberg could have testified that K.E. had described having sex with boys and had told her the names of her boyfriends in Alaska and California. Harvey also seems to contend that Monica Shelton and Michael Thorp had information that K.E. was meeting with boys and that these potential witnesses should have been contacted by the defense and called to testify at trial. In addition, Harvey contends that Karnavas did not make adequate use of the leads that Harvey had provided. [Dkt. 62 4-5]

Harvey's contentions entirely overlook the fact that the Alaska courts addressed these contentions and made findings on them. These findings are presumed to be correct and control the outcome of this case. Harvey has not claimed that the state courts' findings were unreasonable. Nor has he attempted to provide clear and convincing evidence to rebut any of the findings made by the state courts. Nor has he argued that the decision of the state courts is contrary to, or an unreasonable application of, any decision by the United States Supreme Court. Such arguments would, in any event, fail.

The Alaska rule requiring the defendant to obtain an explanation for trial counsel's challenged conduct does not conflict with *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Arnett v. State*, 938 P.2d 1079, 1081 (Alaska App. 1997); *Steffensen v. State*, 837 P.2d 1123, 1126 (Alaska App. 1992); *Parker v. State*, 779 P.2d 1245, 1248 (Alaska App. 1989); *State v. Jones*, 759 P.2d 558, 569 (Alaska App. 1988). In *Strickland*, the Court allocated the burden of proof of incompetent representation onto the defendant. 104 S.Ct. at 2064 (defendant must show counsel's performance was deficient). Because the burden of proof lies on the defendant, it is proper to require the defendant to provide proof that counsel's actions were not taken for an objectively reasonable tactical reason.

A full pretrial investigation is not essential in all cases to afford a client constitutionally effective representation. A vast difference exists between

15

the level of trial preparation that is adequate to assure minimally competent representation and an ideal level of trial preparation. Counsel's decision not to pursue a particular line of inquiry is assessed for reasonableness, applying a heavy measure of deference to counsel's judgments. *See Strickland v. Washington*, 466 U.S. at 691, 104 S.Ct. at 2066. That counsel *could* have conducted a more thorough investigation that *might* have borne fruit does not establish ineffective assistance. *Burger v. Kemp*, 483 U.S. 776, 794, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987). The relevant inquiry is not what could have been pursued, but whether the choices made by counsel were reasonable. *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998). The question also is not what present counsel would have done. *Id.*

"Where the attorney has consciously decided not to conduct further investigation because of reasonable tactical evaluations, the attorney's performance is not constitutionally deficient." *Siripongs*, 133 F.3d at 734. In other words, trial counsel is entitled to make a judgment as to which avenues of inquiry are more likely to yield exculpatory evidence that can be used at trial. When a tactical choice has in fact been made, even if it was made by an attorney who was not fully informed as to available options, the choice will be subject to challenge only if the tactic itself is shown to be unreasonable. *Jones*, 759 P.2d at 569-70. When the defendant is adamantly opposed to further delay, and does not initially provide counsel with all of the information that would have revealed

the promise in certain avenues of investigation, counsel's decisions not to pursue or focus on certain areas of inquiry should be accorded great deference. *Jones*, 759 P.2d at 571-72 & n.6.

The fact that the state courts did not accept the conclusions of Harvey's expert in criminal defense, attorney McComas, that the investigation should have been more extensive does not mean that the state courts' findings have been rebutted. Judge Sanders, the trial court judge who listened to McComas testify, had broad discretion as to how much weight to place on an expert's opinion, especially where as here, the area of expertise – criminal law – is a subject on which the trial court is particularly well-suited to evaluate. In addition, the fact that Harvey's current counsel and McComas would have handled the investigation differently does not mean that Karnavas's approach was not within the range of competency.

Even though most of the investigation was conducted in the week prior to trial, the investigation was more than minimally adequate. The investigation actually began much earlier, several months before trial. Karnavas initially characterized McGee's investigation of the case as "outstanding." At his deposition, Karnavas said that McGee had done a "very good" job in investigating Harvey's case. According to Karnavas, he decided not to seek a continuance so that he could conduct additional investigation for the tactical reason that Harvey did not want a continuance. This tactical reason was

17

not unsound. *See Valcarcel v. State*, 2003 WL 22351613 at *3 (Alaska App. 2003). Moreover, as Judge Sanders recognized, Harvey's case was not particularly difficult to prepare and Harvey gave substantial assistance to the investigation.

As Karnavas acknowledged in his deposition, all of the major witnesses, including several of K.E.'s friends and relatives, had been interviewed by himself or McGee. In addition, the defense had K.E.'s diary and information about both her prior recantation and the prior abuse by her first stepfather. McGee followed up on every lead she thought was reasonable and had spoken with a number of K.E.'s friends in her attempts to locate a boy with whom K.E. had sex. Given the abundant information about K.E. that the defense had available, in order to meet the standard of minimal competency it was not necessary to conduct extensive interviews with all of K.E.'s girlfriends. Moreover, because Harvey's post-conviction counsel was unable to locate a boy with whom K.E. had engaged in sexual relations or anyone who had observed K.E. having sex with a boy, Harvey was not prejudiced from the omission of the additional investigation. [PCR Tr. 445-47]

> E. <u>Harvey Did Not Sustain His Burden Of Proof With Respect To His Claim That Karnavas's Approach To The DNA Evidence Was Inadequate</u>

Harvey contends that Karnavas should have further researched the significance of the DNA analysis done by the state, challenged the evidence of

the probability of paternity, and challenged the admissibility of the state's DNA evidence. [Dkt. 62 6-9] Again, Harvey entirely overlooks the findings made by the Alaska state courts that, even though it may have been possible to attack the DNA evidence presented by the state's expert, Karnavas's tactical approach of discussing the issue with Dr. Shanfield and Barry Scheck of the Innocence Project was well within the range of competency. *Harvey II* at 19-23. As the Alaska Court of Appeals explained, both Karnavas's and Harvey's approaches to the DNA evidence had advantages and disadvantages. *Id.* at 22-23. If Karnavas had devoted more time and effort on what the prosecutor called the "weakest" evidence, Karnavas could have been criticized for shifting the focus away from the defense's best argument – that K.E. was fabricating her allegations against Harvey. [*See* PCR Tr. 460-61]

Moreover, the Alaska state courts were not unreasonable in finding that Karnavas's approach to the DNA evidence was competent, rather than ineffectual. Despite Karnavas's decision not to research Bayes's theorem, Karnavas was able to establish through his cross-examination of Dr. Baird and his examination of his own expert Dr. Schanfield that (1) the probability of paternity calculation includes a "prior probability" of paternity based on nongenetic evidence that is inappropriate in a criminal case; (2) the prior probability can be modified to any value; (3) a paternity index of 6.9 and a probability of paternity of 87.34 percent are values that are significantly lower

than those commonly encountered in civil paternity actions and are too low to allow a presumption of paternity; (4) the results did not preclude the possibility that someone else could have been the father; and (5) overemphasis on the DNA evidence could be prejudicial to Harvey. [Trial Tr. 441, 446, 453, 471, 494; PCR Tr. 454-56] Harvey therefore has not sustained his burden in refuting the findings of the Alaska courts that not all competent attorneys would have selected Harvey's approach as preferable to the one taken by Karnavas.

F.  Conclusion

This court should deny Harvey's habeas petition.

DATED June 23, 2008, at Anchorage, Alaska.

TALIS J. COLBERG
ATTORNEY GENERAL

s/ Nancy R. Simel
   Assistant Attorney General
   State of Alaska, Dept. of Law
   Office of Special Prosecutions
      and Appeals
310 K St., Suite 308
Anchorage, Alaska 99501
Telephone: (907) 269-6250
Facsimile: (907) 269-6270
e-mail: nancy.simel@alaska.gov
Alaska Bar. No. 8506080

**Certificate of Service**

I certify that on July 7, 2008, a copy of the foregoing
Response to Brief of Petitioner was served electronically
on **Abigail Sheldon.**
s/ **Nancy R. Simel**